# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| OVERTIME ELITE LLC,<br><br>     Plaintiff,<br><br>v.<br><br>ANDREW GUMPER; AG LIGHT AND SOUND INC.; AG PRODUCTION SERVICES, INC.; and DOE CORPORATIONS 1-100.<br><br>     Defendants. | Civil Action No.:<br><br>**DEMAND FOR CIVIL JURY TRIAL** |

## COMPLAINT

Plaintiff Overtime Elite LLC ("Overtime Elite"), by and through undersigned counsel, hereby submits this Complaint against Andrew Gumper, AG Light and Sound Inc. ("AG Light"), AG Production Services, Inc. ("AG Production"), and Doe Corporations 1-100 (collectively "Defendants") and alleges in support thereof as follows:

## **INTRODUCTION**

This is a breach of contract action.  Plaintiff Overtime Elite is a basketball league for the nation's most exceptional young athletes.  Its vision is to offer unparalleled preparation for its players' success by focusing on three areas traditional basketball programs underserve – academics, economic empowerment, and player development.  Overtime Elite is also unique among basketball leagues for its innovative use of social media to market itself while helping its players establish their own brands.

To realize its vision and effectively implement its social media marketing plans, Overtime Elite contracted with Defendants[1] to construct the OTE Center of Excellence ("the Project") – a multipurpose facility with a basketball arena, show court, practice courts, classrooms, exercise space, and related amenities.  But mid-way through the Project, Defendants simply walked away, leaving Overtime Elite scrambling to fix numerous defects in Defendants' work, complete the Project, and pay Defendants' unpaid subcontractors.  Overtime Elite brings this action to recover

---

[1] The Contract was nominally between Overtime Elite and AG Light.  However, as set forth herein, the relationship between Defendants was such that the Court should disregard their individual corporate identities for purposes of this litigation – that is to say, the Court should "pierce the corporate veil" with respect to Defendants.

damages sustained as a direct and proximate result of Defendants' breaches of their contract with Overtime Elite (the "Contract").

## PARTIES

1. Plaintiff Overtime Elite is a Delaware limited liability company. Its sole member is Overtime Sports, Inc.

2. Overtime Sports, Inc. is a Delaware corporation with its principal place of business in the state of New York.

3. Upon information and belief, Defendant AG Light is a Nevada corporation with its principal place of business in the state of Nevada.

4. Upon information and belief, Defendant AG Production Services, Inc. is a Nevada corporation with its principal place of business in the state of Nevada.

5. Upon information and belief, Andrew Gumper is a citizen of the state of Nevada.

6. Doe Corporations 1-100 are corporate entities formed by Andrew Gumper, the precise names and identities of which are not yet known.

## JURISDICTION AND VENUE

7. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between

Overtime Elite and Defendants and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

8.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because Defendants' breaches of the Contract occurred in this judicial district.

## FACTUAL BACKGROUND

### A.     The Project and Contract.

9.     Andrew Gumper is the sole shareholder of Corporate Defendants.  Through his various corporate entities, he provides large-scale production services for events such as concerts and music festivals.  Among the services he provides are semi-permanent, truss-based structures and audio and light systems.

10.     Overtime Elite and Andrew Gumper began discussing the Project in March 2021.  The Project entailed the construction of a basketball arena at 230 17th Street NW, Atlanta, Georgia, with various amenities, including a show court, practice courts, offices, and exercise rooms.

11.     The Project differed from other projects Andrew Gumper had completed in that a permanent structure was required.  Andrew Gumper assured Overtime Elite that he could construct a permanent structure that satisfied all of the essential requirements for the Project.

12.     Based on Andrew Gumper's assurances and proposed design for the Project, Overtime Elite ultimately retained Defendants.

13.     The Contract was a design-build contract, meaning Defendants were responsible for not only the construction of the Project, but its design as well.  In exchange, Overtime Elite agreed to pay a fixed fee of $16 million.  Overtime Elite paid Defendants this amount – and more – between April 16, 2021, and October 22, 2021.   In exchange, Defendants agreed to complete the Project in accordance with the agreed-upon design and scope of work.

14.     The Contract was modified as the Project progressed from design through construction.  The final version of the Contract was executed on August 19, 2021, but Overtime Elite and Defendants had interim agreements that imposed obligations on Overtime Elite and Defendants.  A copy of the Contract is submitted as Exhibit A.

**B.     Defendants' Deficient Performance.**

15.     Andrew Gumper was heavily involved in all aspects of the Project from the outset.  The final design for the Project was almost entirely created by Andrew Gumper, despite the fact that Defendants retained an architect to consult on design.  As soon as construction commenced, Andrew Gumper was almost always on the Project site.

16.    Not long after construction began, Overtime Elite became aware of deficiencies in Defendants' work with respect to the HVAC, plumbing, and electrical systems.  Overtime Elite also discovered deficiencies in the basic structural requirements for the Project.  In order to ensure completion of the Project, Overtime Elite provided self-help in these and other areas of the Project.

17.    In October 2021, Defendants admitted to Overtime Elite that they would be unable to complete the work on the HVAC system and requested help from Overtime Elite.  Overtime Elite was forced to correct Defendants' defective work and self-perform the remaining HVAC work at its own expense.

18.    On November 10, 2021, Defendants admitted to Overtime Elite that they owed $4-5 million to their subcontractors but had no cash on hand to pay them.

19.    Overtime Elite requested a comprehensive summary and accounting of what Defendants owed to their subcontractors, as well as the costs required to finish the Project.  Defendants did not respond to this request.

20.    Instead, on November 19, 2021, Andrew Gumper left Atlanta without paying Defendants' subcontractors and prior to the completion of the Project.  Less than a week later, all of Defendants' remaining employees had abandoned the Project and Defendants' trailer was removed from the Project site.  Neither Andrew Gumper nor any of Defendants' other employees returned to the Project site.

21.    Defendants left a substantial amount of work on the Project undone. Defendants had not completed the pool area, camera stand, or smoke control system – all components of Defendants' *own* design for the Project.

22.    Overtime Elite was forced to self-perform the remaining work on the Project and correct numerous defects in the work Defendants had performed.  All of this work was done at significant expense to Overtime Elite.

**C.    Subcontractor Claims.**

23.    It was Defendants' obligation alone to pay their subcontractors.  But prior to Defendants' abandonment of the Project, numerous subcontractors had provided notice to Defendants based on Defendants' failure to meet their obligations. Overtime Elite was forced to intervene and pay a premium to allow the subcontractors to complete their work.

24.    Additionally, when Defendants abandoned the Project and left the state, Defendants' unpaid subcontractors began asserting claims against Overtime Elite for payment.  Overtime Elite was forced to resolve these claims by paying Defendants' unpaid subcontractors.

25.    Several of the unpaid subcontractors placed liens on the Project.  At least one lien has resulted in litigation that remains pending in Georgia state court.

26.    Resolving the claims of Defendants' unpaid subcontractors has forced Overtime Elite to pay significant amounts that should have been paid by Defendants. Additionally, Overtime Elite has incurred attorney's fees and expenses to resolve the unpaid subcontractors' claims.

**D.    Defendants' Conversion of Funds.**

27.    In late 2021, Overtime Elite inadvertently issued duplicate checks made out to "Vegas Electric Supply/AG Light & Sound."  The checks were issued for the same amount and were for AG Light & Sound to pay a supplier for the Project.

28.    Overtime Elite attempted to cancel the transaction, but both checks had already been deposited.  One check was endorsed by Vegas Electric Supply and Andrew Gumper and properly deposited by Vegas Electric Supply.

29.    The second check ("Converted Check") was endorsed only by Andrew Gumper.

30.    Upon information and belief, Andrew Gumper deposited the Converted Check into his personal bank account.   In the alternative, upon information and belief, Andrew Gumper deposited the Converted Check into the account of one of the Corporate Defendants.

31.    Overtime Elite demanded the return of the funds received from the Converted Check, but Andrew Gumper refused on behalf of himself, or in the alternative, on behalf of the Corporate Defendants.

32.    The total value of funds converted by Andrew Gumper or the Corporate Defendants is $44,842.18.

**E.    Termination of the Contract & Dispute Resolution Efforts.**

33.    On February 16, 2022, Overtime notified Defendants of its intent to terminate the Contract.  Overtime Elite cited Defendants' abandonment of the Project, failure to pay its subcontractors, and other breaches of the Contract as grounds for termination.

34.    Overtime Elite requested that Defendants participate in mediation in an effort to resolve their dispute, but the mediation was unsuccessful.

## COUNT I - BREACH OF CONTRACT

35.    Overtime Elite incorporates the foregoing allegations as if fully set forth herein.

36.    There existed between Overtime Elite and Defendants a valid and enforceable contract for the construction of the Project.

37.    Overtime Elite performed all of its obligations under the Contract.

38.    Defendants breached the Contract when they abandoned the Project prior to completion.

39.    Defendants also breached Article 9.6.2 of the Contract when they failed to pay architects, consultants, and subcontractors Defendants retained to perform work on the Project.

40.    Defendants also breached Article 3.1.3.3 of the Contract because they did not perform their work on the Project within the applicable standard of care.

41.    The Contract had specific requirements for the Project's HVAC system. These requirements were known to Andrew Gumper from the earliest stages of the Project, and he assured Overtime Elite that Defendants could satisfy these requirements.

42.    Andrew Gumper admitted to Overtime Elite in October 2021 that Defendants would not be able to meet the HVAC specifications set forth in the Contract.

43.    Overtime Elite was forced to retain a separate contractor to correct Defendants' defective HVAC system and to complete this part of the Project.

44.    Overtime Elite also discovered several, critical structural deficiencies in Defendants' work that breached the standard of care, including numerous unsupported struts.

45.    Defendants' work on the Project's electrical and plumbing systems did not comply with building code requirements or the requirements of the Project's design documents.

46.    As a direct and proximate result of Defendants' breaches, Overtime Elite has incurred more than $12.9 million in damages, including, but not limited to, the following:

- $2.3 million for work Overtime Elite was forced to self-perform to complete the Project;

- $5.2 million for amounts Overtime Elite paid to resolve claims of Defendants' unpaid subcontractors (an additional $400,000 in claims remain unresolved);

- $1.6 million for costs to correct and complete Defendants' deficient work;

- $1.8 million for additional costs incurred as a result of managing and completing Defendants' work;

- $1.4 million for materials and scope not provided by Defendants but required by the Contract.

47.    Overtime Elite has also incurred significant attorney's fees and expenses to defend against litigation brought by Defendants' unpaid subcontractors.

48.     Under Article 3.1.14.1 of the Contract, Defendants are liable for all expenses, including attorney's fees, incurred by Overtime Elite in defending against claims brought by third-parties arising out of Defendants' acts or omissions with respect to the Contract.

49.     Overtime Elite continues to suffer injuries, damages, and losses as a direct and proximate result of Defendants' breaches of the Contract.  Overtime Elite is entitled to recover these damages from Defendants in an amount to be determined at trial.

## COUNT II - BREACH OF EXPRESS WARRANTY

50.     Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

51.     There existed between Overtime Elite and Defendants a valid and enforceable contract for the construction of the Project.

52.     Defendants breached certain express warranties they made in the Contract.

53.     Defendants expressly warranted in Article 3.1.3.4 that they were financially solvent and possessed sufficient capital to complete the Project.

54.     In reality, Defendants were not solvent or otherwise lacked sufficient capital to complete the Project.  Andrew Gumper admitted as much in November 2021 when he told Overtime Elite that Defendants lacked sufficient cash to pay their subcontractors.

55.     As a result of Defendants' breach of this express warranty, Overtime Elite incurred damages including, but not limited to, amounts it was forced to pay to resolve claims by Defendants' unpaid subcontractors.

56.     Additionally, Defendants expressly warranted in Article 3.1.3.4 that they had sufficient experience and competence to complete the Project.

57.     But this was also untrue.  After the Project began, Andrew Gumper admitted to Overtime Elite that Defendants lacked the competency to complete the Project's HVAC system.

58.     As a result of Defendants' breach of this express warranty, Overtime Elite incurred damages including, but not limited to amounts it was forced to pay to self-perform work Defendants were unable to complete.

59.     Defendants expressly warranted in Article 3.1.12 that their work would "be free from defects."

60.     Defendants breached this express warranty because their work was defective in multiple respects, including the HVAC system and certain structural defects.

61.     As a result of Defendants' breach of this express warranty, Overtime Elite was forced to correct numerous defects in Defendants' work at significant expense.

62.     Overtime Elite continues to suffer injuries, damages, and losses as a direct and proximate result of Defendants' breaches of their express warranties.  Overtime Elite

is entitled to recover these damages from Defendants in an amount to be determined at trial.

## COUNT III - CONVERSION

63.     Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

64.     Defendants' conduct with respect to the Converted Check amounts to conversion.

65.     Upon information and belief, Andrew Gumper deposited the Converted Check into his personal bank account and improperly received funds from Overtime Elite as a result.

66.     In the alternative, upon information and belief, Andrew Gumper deposited the Converted Check into the account of one of the Corporate Defendants, who improperly received funds from Overtime Elite as a result.

67.     Overtime Elite is the sole, rightful owner of the funds converted by Andrew Gumper or the Corporate Defendants.  Neither Andrew Gumper nor any of the Corporate Defendants had any right to the funds.

68.     Overtime Elite demanded the return of the funds, but Andrew Gumper refused on behalf of himself, or in the alternative, on behalf of the Corporate Defendants.

69.     Overtime Elite is entitled to recover from Andrew Gumper, or in the alternative, Corporate Defendants, the $44,842.18 that they unlawfully converted.

## COUNT IV – MONEY HAD AND RECEIVED

70.     Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

71.     Defendants' conduct with respect to the Converted Check supports a claim for money had and received.

72.     Upon information and belief, Andrew Gumper deposited the Converted Check into his personal bank account and improperly received funds from Overtime Elite as a result.

73.     In the alternative, upon information and belief, Andrew Gumper deposited the Converted Check into the account of one of the Corporate Defendants, who improperly received funds from Overtime Elite as a result.

74.     Overtime Elite is the sole, rightful owner of the funds wrongly received and retained by Andrew Gumper or the Corporate Defendants.  Neither Andrew Gumper nor any of the Corporate Defendants had any right to receive or retain the funds.

75.     Overtime Elite demanded the return of the funds, but Andrew Gumper refused on behalf of himself, or in the alternative, on behalf of the Corporate Defendants.

76.    Overtime Elite is entitled to recover from Andrew Gumper, or in the alternative, Corporate Defendants, the $44,842.18 that they unlawfully received and retained.

## COUNT V – PUNITIVE DAMAGES

77.    Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

78.    Defendants' misconduct with respect to the Converted Check was willful, wanton, malicious, and demonstrated conscious indifference to the consequences.

79.    Andrew Gumper knew that neither he nor the Corporate Defendants had any right to receive the Converted Check or any of the funds improperly received from the deposit of the Converted Check.

80.    Andrew Gumper knew that Overtime Elite had the sole right to the funds he or Corporate Defendants received, yet he willfully refused to return the funds.

81.    Defendants' willful and wanton misconduct justifies an award of punitive damages pursuant to O.C.G.A. § 51-12-5.1.

## COUNT VI – PIERCING THE CORPORATE VEIL – UNDERCAPITALIZATION

82.    Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

83.     Corporations and shareholders may be regarded as a single entity when the corporate form is used to perpetuate fraud, including the avoidance of contractual obligations through undercapitalization.

84.     Andrew Gumper is the sole shareholder of each of the Corporate Defendants and has exclusive control over their activities.

85.     Upon information and belief, Andrew Gumper intentionally undercapitalized the Corporate Defendants to avoid meeting their contractual obligations.

86.     Defendants abandoned the Project due to insufficient capital (despite having received over $16 million from Overtime Elite), while simultaneously pursuing other significant, capital-intensive projects.

87.     Upon information and belief, around the time Andrew Gumper abandoned the Project, he and another of his corporate entities were preparing to undertake a separate, capital-intensive project to construct the mainstage for the Coachella Music Festival in April 2022.

88.     This is not the first instance of Andrew Gumper and Corporate Defendants failing to pay subcontractors.   Publicly available sources reveal numerous complaints from unpaid subcontractors suggesting a pattern of undercapitalization to avoid meeting contractual obligations and other liabilities.

89.    By undercapitalizing his entities, Andrew Gumper abused the corporate form to deter litigation, avoid liabilities, and perpetuate fraud.

90.    As a result of Andrew Gumper's use of his various corporate entities to avoid obligations, Defendants should be regarded as a single entity for purposes of their liability to Overtime Elite.

## COUNT VII - PIERCING THE CORPORATE VEIL – COMMINGLING OF ASSETS

91.    Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

92.    Corporations and shareholders may be regarded as a single entity when their assets have been commingled.

93.    Each of Andrew Gumper's entities is involved in the creation of semi-permanent truss-based structures and lighting displays for events like concerts and music festivals.  The equipment used in these structures is reusable and owned by Andrew Gumper through his network of corporate entities.

94.    Upon information and belief, Andrew Gumper commingles these assets such that Corporate Defendants perform their primary business functions using the same pool of assets without regard to ownership.

95.    Overtime Elite came to believe Andrew Gumper was commingling assets when an employee of one of Andrew Gumper's entities returned to the Project site

18

after Andrew Gumper abandoned it.  At the time, Andrew Gumper, through an entity other than Defendant AG Light and Sound, was completing another project in Atlanta.  Upon information and belief, the employee was looking for materials that had been left at the Project site (which would have nominally belonged to Defendant AG Light and Sound) to use in the other project.

96.    Andrew Gumper's corporate entities also share a single website, which Andrew Gumper uses to advertise his services, without distinguishing between his various corporate entities.

97.    As a result of Defendants' commingling of assets, Defendants should be regarded as a single entity for purposes of their liability to Overtime Elite.

## COUNT VIII - PIERCING THE CORPORATE VEIL – ALTER EGO

98.    Overtime Elite incorporates the allegations in Paragraphs 1-34 as if fully set forth herein.

99.    Corporations and shareholders may be regarded as a single entity when the shareholder uses the corporations as an instrumentality for conducting the shareholder's business.  In other words, when a corporation is the "alter ego" of a shareholder.

100.  Andrew Gumper uses the Corporate Defendants as instrumentalities for conducting his own business.

101.   Andrew Gumper treats the assets of the Corporate Defendants as though they are his own.

102.   Upon information and belief, Andrew Gumper deposited a check from Overtime Elite to AG Light into his personal bank account.

103.   Andrew Gumper also disregards corporate formalities with respect to his corporate entities.

104.   For example, Mega Structures, Inc., another of Andrew Gumper's entities, has not filed a biennial corporate statement – a required corporate filing under New York – in the past due by six years.  Nevertheless, Andrew Gumper continues to advertise "Mega Structures" on the single website shared by all Corporate Defendants.

105.   Andrew Gumper also appears to intentionally conflate his activities and those of his various corporate entities through their shared website by titling the website "AG Production Services" while providing contact information for "AG Light and Sound."

106.   Further blurring the distinction between Andrew Gumper and his corporate entities is the fact that the website refers only to "AG's" services.  For example, the homepage of the website states that "AG builds venues from the ground up . . ." without clarifying whether this refers to AG Light, AG Production, or Andrew Gumper himself.

107.   Elsewhere, Andrew Gumper refers to "AG" as a single company, despite using the website to advertise the services of his various corporate entities.

108.   As a result of Andrew Gumper's use of the Corporate Defendants as alter egos, Defendants should be regarded as a single entity for purposes of their liability to Overtime Elite.

## COUNT IX – ATTORNEY'S FEES & EXPENSES

109.   Overtime Elite incorporates the allegations in Paragraph 1-34 as if fully set forth herein.

110.   Andrew Gumper admitted to Overtime Elite that Defendants would be unable to complete critical parts of the Project.

111.   Andrew Gumper further admitted that Defendants lacked sufficient cash on hand to pay Defendants' subcontractors.

112.   Defendants abandoned the Project without excuse or justification.

113.   Despite Defendants' clear liability – confirmed by Andrew Gumper's admissions to Overtime Elite – Defendants have refused to compensate Overtime Elite for losses and damages caused by Defendants' misconduct.

114.   Defendants have acted in bad faith, been stubbornly litigious and caused unnecessary trouble and expense.

115.   As a result of Defendants' misconduct, Overtime Elite is entitled to recover its attorney's fees and expenses pursuant to O.C.G.A. § 13-6-11.

## JURY DEMAND

116.   Overtime Elite respectfully demands a trial by jury on all issues raised in this Complaint and will tender the appropriate fee.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Overtime Elite respectfully requests the following relief:

a.   That the Court enter judgment in favor of Plaintiff and against Defendants on the causes of action stated above and any other cause of action which may be added to this Complaint by amendment or otherwise;

b.   That the Court award the equitable relief requested herein in favor of Plaintiff;

c.   That the Court award damages in favor of Plaintiff as compensation for Defendants' breaches of the Contract, including pre and post-judgment interest, costs, and attorney's fees;

d.   That the Court award such other relief as the Court may deem just and proper.

Dated: October 17, 2022.        Respectfully submitted,

TROUTMAN PEPPER HAMILTON SANDERS
LLP

/s/ *Wheaton P. Webb*
Jason D. McLarry
Georgia Bar No. 141229
*Jason.McLarry@troutman.com*
Wheaton P. Webb
Georgia Bar No. 902682
*Wheaton.Webb@troutman.com*

Bank of America Plaza
600 Peachtree Street NE, Ste. #3000
Atlanta, GA 30308
T: 404.885.3000
F: 404.885.3900

*Counsel for Plaintiff Overtime Elite, LLC*