## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| OVERTIME ELITE, LLC, | CASE NO.: 1:22-CV-04143-TWT |
| Plaintiff, | |
| vs. | **COUNTERCLAIM** |
| ANDREW GUMPER; AG LIGHT AND SOUND, INC., AG PRODUCTION SERVICES, INC.; and DOE CORPORATIONS 1-100, | **JURY TRIAL DEMANDED** |
| Defendants. | |
| AG LIGHT AND SOUND, INC., | |
| Counterclaimant, | |
| vs. | |
| OVERTIME ELITE, LLC, | |
| Counterdefendant. | |

### AG LIGHT AND SOUND, INC.'S COUNTERCLAIM AGAINST OVERTIME ELITE, LLC

COMES NOW Defendant AG LIGHT AND SOUND INC., by and through its undersigned counsel, and files this its Counterclaim against OVERTIME ELITE, LLC, showing this Honorable Court has follows:

1

**PARTIES**

1.      AG Light & Sound, Inc. ("AG Light & Sound") is a Nevada corporation with its principal place of business in the state of Nevada.

2.      Upon information and belief, Overtime Elite, LLC ("OTE") is a Delaware limited liability company with its principal place of business in New York, New York.

**JURISDICTION AND VENUE**

3.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between AG Light & Sound and Counterdefendant and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Contract at issue in this litigation was performed in this judicial district.

**FACTUAL BACKGROUND**

A.      **The Arena Project**

5.      When OTE first contacted AG Light & Sound's principal, Andrew Gumper, in late March 2021, the land on which the Overtime Elite Arena (the "Arena") now sits was a piece of undeveloped, raw land.

6.      OTE told Mr. Gumper of its unique concept – to start a professional basketball league for high school underclassmen.  That concept was only announced

on March 4, 2021.  *See* OTE's March 4, 2021 press release, attached hereto as **Exhibit 1**.

7.     OTE announced the location of the Arena on May 19, 2021.  *See* OTE's May 19, 2021 press release, attached hereto as **Exhibit 2**.

8.     The plan was for OTE's league to begin in September 2021 – about five months in the future – in an arena that was still in the conceptual stages.

9.     To make matters more difficult, OTE's lease for the land was a relatively short lease (upon information and belief, 5 years), meaning that the Arena needed to be removable.  OTE needed a rapid construction to build a building in a few months, rather than the two years it would normally take.

10.    OTE engaged in specific discussions with Mr. Gumper about possibly removing the building when the lease is up, if the lease cannot be renewed.  While removal of the Arena is not covered in the contract, it underscores the uniqueness of the project.

11.    There are very few companies in the United States with the ability to complete this project anywhere close to this extremely short timeline – and probably no other companies willing to try.

12.    After initial meetings and discussions between AG Light & Sound and OTE, AG Light & Sound undertook the Herculean task of building the Arena.  From the very beginning, crews worked at break-neck speed to keep up with an extremely

3

ambitious and constantly changing construction schedule, making significant progress every single day.

13.     There were many weather delays beyond anyone's control, including at least two hurricane days (remnants of storms) and many rain delays.  But because OTE was trying to move so fast, their Arena plans were not fully developed, and rampant changes became the norm.

14.     Indeed, if OTE had been forthright about what it wanted (it was not) and provided the final plans in the beginning (it did not), AG Light & Sound would not have agreed to this aggressive schedule and would have charged significantly more.  OTE essentially engaged in a "bait and switch" operation to have its Arena built.

15.     The work on the Arena began immediately – even before a contract was negotiated or plans finalized.

16.     The parties worked together each day to keep things moving.  OTE was constantly moving the target – making changes to nearly every aspect of the project multiple times per week.  Those changes included moving walls, doors, windows, etc., and many other aspects of the project.

17.     Each week, Mr. Gumper walked the project with Sanford Berger, OTE's owner's representative, along with several OTE executives.

18.    Each week Mr. Berger and OTE's executives noted the status of the project and discussed the owner's changes to the plans.  Due to the break-neck speed at which things were moving, many of the changes were provided to AG Light & Sound through verbal communications rather than formally through change orders or written documents.  AG Light & Sound moved forward each day in good faith, working closely with Mr. Berger and OTE's executives to push the project toward completion.

19.    In July or August 2021, OTE brought in a construction management firm to assist, and all parties worked together on the project.

20.    The contract between the parties was not even signed until August 19, 2021 – after about 80% of the work had already been completed.  The course of performance of the contract had long been established through day-to-day operations on the project.

21.    Prior to the contract signing, OTE made several progress payments. The last payment was in or about September 2021.  OTE refused to make any further payments and, although AG Light & Sound's employees were on site until approximately November 24, 2021, AG Light & Sound's employees ultimately left because OTE failed and refused to meet its financial obligations to AG Light & Sound.

22.    In the end, although the substantial completion and final completion dates were extended by mutual agreement from what appears in the contract, AG Light & Sound met the deadlines and OTE had a successful inaugural season with many games played in the Arena.

23.    Further, the Arena is still a fully functioning arena that plays host to, among other things, OTE's league and Professional Fighters League events.  Several photos of the Arena, taken from OTE's website, are attached hereto as **Exhibit 3**.[1]

**B.    The Contract**

24.    This dispute involves the design-build contract and its related amendments for the Overtime Elite Arena (the "Contract").  The Contract relates to the design and build of the OTC Center of Excellence located at 264 17th Street NW, Atlanta, GA 30363.

25.    The building was completed on time, per the specific instructions of OTE's representative, and is currently in use.

26.    The following documents constitute the Contract:

- AIA Document A141-2014, Standard Form of Agreement Between Owner and Design-Builder, attached hereto as **Exhibit 4**;

---

[1] https://www.overtimeelite.com/

- AIA Document A141-2014 Exhibit A, Design-Build Amendment (with attachments), attached hereto as **Exhibit 5**; and

- AIA Document A141-2014 Exhibit B, Insurance and Bonds, attached hereto as **Exhibit 6**, as well as the referenced exhibits.

- OTE agreed to pay for each change.  Given the course of performance, including constant changes that came verbally on almost a daily basis – both before and after the Contract was signed in August 2021 – there are many additional Contract terms, changes to the plans, etc.  Some of those may be documented in text messages and emails; others may be documented in revised versions of plans.  Many of the changes were pursuant to verbal instructions from OTE or its representatives.

27.   AG Light & Sound has the final version of the Contract, but does not have the complete document including the referenced attachments.  OTE has never provided a complete copy of the Contract to AG Light & Sound, and has refused requests for the same.

28.   The Contract was entered into on August 19, 2021.  By the time the Contract was signed, the project was well underway.  In fact, the project reached substantial completion within about six (6) weeks of the signing of the Contract.

29.   Pursuant to § 1.1.6 of the Standard Form of Agreement, this project was for a stipulated sum not to exceed Sixteen Million Dollars ($16,000,000).  § 1.1.6

specifically references a Design-Builder's proposal dated March 23, 2021, and revisions dated June 23, 2021, as well as the Scope of Services dated July 29, 2021. This section references that these documents are collectively documented in Exhibit A to the Contract.

30.    Further, "[a]ny change(s) **after June 24, 2021** will be over and above the Stipulated Sum/Guaranteed Maximum of $16,000,000 and will be documented in a Change Order(s)."  (Emphasis added.)

31.    Under § 1.1.7, various deadlines are referenced as part of Exhibit A, and the Substantial Competition date was to be September 12, 2021.  Final Completion was scheduled for September 30, 2021, but with the following proviso:

> The Substantial Completion date and/or Final Completion date are subject to change due to problems beyond the reasonable control of the Design-Builder, including but not limited to extreme weather, unforeseen site issues not caused by Design-Builder, and/or widespread health issues, including mandated stoppages related to Covid-19.

32.    Section 1.2 identifies OTE's Project Team, which includes various entities including Overtime Sports, Inc., S.M. Berger Architecture P.C., Tack Advising, LLC, and RL Edward Partners, among others.   The owner's representative, identified in § 1.2.2, was Sanford M. Berger.

33.    Mediation was a mandatory pre-condition to litigation, per § 1.3 of the Contract.  The parties mediated the dispute in June 2022.  The mediation was unsuccessful.

34.     Article 2 addresses compensation and progress payments, including compensation for work performed prior to execution of the Contract.  § 2.1.1 lists some of the payments that OTE had already made to AG Light & Sound.

35.     Article 6 of the Contract deals with changes in the work.  Although the Contract sets forth the process for changes in the work, generally the owner did not follow this process.  Rather, the owner's representative, Mr. Berger, walked the property with AG Light & Sound's representative every day and gave directives on how the work would be changed.  Oftentimes, other OTE executive team members participated in these walk-throughs.

36.     The initial project and what was ultimately completed were significantly different. Even after the Contract was signed, the process for handling change orders was already in place and had been utilized for months prior to the signing of the Contract.  That process remained the same throughout the build.

**C.     Design-Build Amendment**

37.     Section A.1.1 provides that the Contract was a stipulated sum Contract. § A.1.2.1 provides that this is a "not-to-exceed amount" of $16,000,000, with specific reference to "Design Builder's proposal, dated March 23, 2021 and revised June 23, 2021, as well as the Scope of Services, dated July 29, 2021, collectively attached as Exhibit A1 to this Amendment."

38.    Although § A.1.5.2 addresses progress payments, the parties operated for months on a schedule they had agreed to that is not fully reflected in the Contract. Some of the payments, however, were set forth in the Standard Form of Agreement.

39.    Section A.2.2 set forth the substantial completion and final completion dates, September 12, 2021 and September 30, 2021, respectively, with the following proviso:

> The Substantial Completion date and/or Final Completion date are subject to change due to problems beyond the reasonable control of the Design-Builder, including but not limited to extreme weather, unforeseen site issues not caused by Design-Builder, and/or widespread health issues, including mandated stoppages related to Covid-19.

40.    Section A.3.1.3 references the drawings as follows:

> *See* Construction Documents, dated June 16, 2021, as well as the Scope of Services, dated July 29, 2021, collectively attached as Exhibit A3 to this Amendment. Any change(s) after June 24, 2021 will be over and above the Stipulated Sum/Guaranteed Maximum of $16,000,000 and will be documented in a Change Order(s).

41.    Thus, the parties agreed and understood that there would be additional costs and expenses. Every change after June 24, 2021 was to be added to the minimum Contract amount.

42.    The parties worked together on the design of the Arena. OTE decided the layout and general parameters of the Arena; AG Light & Sound designed the structure to support what OTE had laid out. OTE's architect, Mr. Berger, sent many

versions of drawings AG Light & Sound was to follow.  There were many iterations of the project.

## D.   **OTE's Bad Faith**

43.     Although the parties seemed to work well together up until substantial completion, (when OTE would be able to benefit from the Arena), including making progress payments, it became obvious to AG Light & Sound that OTE did not intend to deal fairly with AG Light & Sound or AG Light & Sound's subcontractors once OTE could use the building.

44.     In or about October 2021, OTE hired a consultant who insisted that the chilled water system that fed the air conditioning system must be steel-based.  Prior to October 2021, the chilled water system that had been approved by OTE, and represented by OTE to AG Light & Sound when AG Light & Sound bid on the project, was PVC-based, both because the Arena was not permanent and because PVC was substantially cheaper.  AG Light & Sound specifically informed OTE that if it wanted a steel-based system, OTE would have to pay for that change itself.  OTE later claimed, in bad faith, that this was a defect for which AG Light & Sound was responsible.

45.     OTE also claimed that issues with the pools were deficiencies on AG Light & Sound's part, and used this bad faith claim as an alleged basis to refuse to pay AG Light & Sound.  In reality, AG Light & Sound recommended that OTE hire

a pool professional, because the pools were not within AG Light & Sound's scope of work and not in the design OTE had presented to AG Light & Sound back in March 2021. Instead, OTE decided to order pools from Australia. OTE ordered the wrong pools, with the wrong wiring/power capabilities.

46.    OTE has made other claims of alleged defects that are not accurate.

47.    Upon reaching substantial completion, OTE began making unfounded claims that AG Light & Sound's workmanship was not acceptable and stopped making progress payments.

48.    Then, in an effort to reduce costs and save money on the Arena that had gone over budget, instead of paying AG Light & Sound the agreed-upon amounts, OTE refused to pay money owed to AG Light & Sound, thereby making it difficult for AG Light & Sound to pay its subcontractors.

49.    OTE then sought to negotiate pay reductions with many of AG Light & Sound's subcontractors. OTE did so by threatening not to pay AG Light & Sound, but telling Andrew Gumper, AG Light & Sound's principal, that if he assisted in negotiating pay reductions with AG Light & Sound's subcontractors, OTE would make good on its obligation to pay AG Light & Sound.

50.    Mr. Gumper reluctantly agreed in an effort to resolve any disputes with OTE, and to save AG Light & Sound's relationships with AG Light & Sound's subcontractors. Mr. Gumper traveled back to Atlanta, Georgia and worked with

Lloyd Davidson and Matt Blumenstock of OTE on the subcontractor issues. Ultimately Mr. Gumper assisted in resolving nearly every subcontractor claim. All of the subcontractors had to settle for less than they had agreed to do the work for. This harmed AG Light & Sound's business relationships with its subcontractors.

51.    Mr. Gumper assisted in attempting to reach a resolution with his company's subcontractors in an effort to minimize the damage done by OTE's bad faith conduct, and because OTE had promised to make good on its payment obligations to AG Light & Sound in exchange for Mr. Gumper's assistance with the subcontractor claims.

52.    With regard to any alleged deficiencies, OTE did not allow AG Light & Sound to fix any alleged deficiencies.  Rather, OTE went around AG Light & Sound and hired AG Light & Sound's subcontractors directly to complete work, so as to circumvent AG Light & Sound and deprive AG Light & Sound of its profits.

53.    Moreover, OTE's refusal to pay AG Light & Sound its final payment deprived AG Light & Sound profits related to its months of hard work – all while OTE has enjoyed the use and benefits of the Arena.

54.    To top it all off, after refusing to make the final payment to AG Light & Sound (out of which the subcontractors would have been paid), OTE sent a demand letter to AG Light & Sound, demanding that AG Light & Sound repay approximately $9.5 million.  *See* email dated February 17, 2022 and attached letter,

dated February 16, 2022, attached hereto as **Exhibit 7**.  That includes the amounts OTE paid directly to AG Light & Sound's subcontractors – amounts that are clearly not to be reimbursed to OTE by AG Light & Sound, because they would have been paid out of AG Light & Sound's final payment.

55.    These actions by OTE, as described above, demonstrate OTE's breaches of the Contract, failure to act in good faith under the Contract, and bad faith, intentional conduct intended to harm AG Light & Sound to OTE's benefit.

56.    Having precluded AG Light & Sound from remedying any allegedly deficient work, OTE purportedly terminated the Contract.  *See* email dated February 28, 2022 and attached letter dated February 24, 2022, attached hereto as **Exhibit 8**.

57.    AG Light & Sound sent correspondence to OTE asking for all documentation related to the claims asserted in the February 16, 2022 letter.  AG Light & Sound also notified OTE that at least one vendor listed in the February 16, 2022 letter, Lala Productions, Inc. ("Lala"), had filed a lawsuit against AG Light & Sound, claiming non-payment for what OTE claimed it had paid.  OTE initially reaffirmed it had paid Lala, but when pressed for documentation to confirm the payment, ultimately admitted it had not paid Lala and at least one other vendor, Building Workshop.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

58.     AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 57 of this Complaint as though set forth fully herein at length.

59.     AG Light & Sound and OTE entered into a valid Contract, as described above.

60.     Counterclaimant AG Light & Sound has performed its obligations under the terms of the Contracts.

61.     Counterdefendant OTE has breached the Contracts as set forth above.

62.     AG Light & Sound has sustained damages in the millions of dollars, an amount well in excess of the seventy-five thousand dollar ($75,000.00) jurisdictional threshold, as a direct result of Counterdefendant OTE's breach, with the exact amount to be determined at trial.

63.     Further, because the party to a contract who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform, Counterdefendant OTE is not entitled to attempt to enforce the agreement against AG Light & Sound or to allege bogus defaults.

64.     As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the

15

services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## SECOND CAUSE OF ACTION
**(Contractual Breach of Implied Covenant of Good Faith and Fair Dealing)**

65.     AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 64 of this Complaint as though set forth fully herein at length.

66.     In every contract there is imposed a duty of good faith and fair dealing between the parties.

67.     AG Light & Sound and OTE entered into a valid Contract, as described above.

68.     Counterdefendant OTE owed a duty of good faith in performing its duties to AG Light & Sound.

69.     As set forth above, Counterdefendant OTE breached that duty by failing and/or refusing to meet its obligations under the agreement and performing in a manner that was unfaithful to the purpose of the Contract.  Counterdefendant OTE's actions constitute contractual breaches of the covenant of good faith and fair dealing.

70.     AG Light & Sound's justified expectations were thus denied.

71.     AG Light & Sound has sustained damages in the millions of dollars, an amount well in excess of the seventy-five thousand dollar ($75,000.00) jurisdictional

threshold, as a direct result of Counterdefendant OTE's breach, with the exact amount to be determined at trial.

72.     As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

### THIRD CAUSE OF ACTION
**(Intentional Interference with Prospective Economic Advantage)**

73.     AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 72 of this Complaint as though set forth fully herein at length.

74.     A prospective contractual relationship exists or existed between AG Light & Sound and a third party (i.e., AG Light & Sound's subcontractors).

75.     Counterdefendant OTE knew of these prospective relationships.

76.     Counterdefendant OTE intended to harm AG Light & Sound by preventing these relationships and in fact did so by refusing to pay AG Light & Sound as it promised it would, and then, instead of paying AG Light & Sound the agreed-upon amounts, refusing pay money owed to AG Light & Sound, thereby making it difficult for AG Light & Sound to pay its subcontractors.  OTE then sought to negotiate pay reductions with many of AG Light & Sound's subcontractors.  OTE

did so by threatening not to pay AG Light & Sound, but telling Andrew Gumper, AG Light & Sound's principal, that if he assisted in negotiating pay reductions with AG Light & Sound's subcontractors, OTE would make good on its obligation to pay AG Light & Sound.  This conduct harmed AG Light & Sound's relationships.

77.     Counterdefendant OTE had no privilege or justification for its conduct.

78.     As a direct and proximate result of Counterdefendant OTE's acts, AG Light & Sound has been damaged in an amount to be proven at trial, including actual and presumed damages.

79.     As a result of Counterdefendant OTE's actions, AG Light & Sound has been required to retain the services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## FOURTH CAUSE OF ACTION
### (Intentional Interference with Contractual Relations)

80.     AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 79 of this Complaint as though set forth fully herein at length.

81.     A contractual relationship exists or existed between AG Light & Sound and a third party (i.e., AG Light & Sound's subcontractors).

82.     Counterdefendant OTE knew of these contractual relationships.

83.     Counterdefendant OTE committed intentional acts to disrupt the contractual relationship between AG Light & Sound and its subcontractors. Counterdefendant OTE refused to pay AG Light & Sound as it promised it would, and then, instead of paying AG Light & Sound the agreed-upon amounts, refused to pay money owed to AG Light & Sound, thereby making it difficult for AG Light & Sound to pay its subcontractors.  OTE then sought to negotiate pay reductions with many of AG Light & Sound's subcontractors.  OTE did so by threatening not to pay AG Light & Sound, but telling Andrew Gumper, AG Light & Sound's principal, that if he assisted in negotiating pay reductions with AG Light & Sound's subcontractors, OTE would make good on its obligation to pay AG Light & Sound.  Then, OTE went around AG Light & Sound and directly hired AG Light & Sound's subcontractors in an attempt to avoid paying AG Light & Sound what AG Light & Sound was owed under the Contract.

84.     Counterdefendant OTE actually disrupted the contracts between AG Light & Sound and its subcontractors.

85.     As a direct and proximate result of Counterdefendant OTE's acts, AG Light & Sound has been damaged in an amount to be proven at trial, including actual and presumed damages.

86.     As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the

services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## FIFTH CAUSE OF ACTION
### (Unjust Enrichment)

87.     AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 86 of this Complaint as though fully set forth herein at length.

88.     Counterdefendant OTE retained AG Light & Sound's money and/or property against fundamental principles of justice or equity and good conscience, all to the unjust benefit of Counterdefendant OTE.

89.     Counterdefendant OTE accepted, used, and enjoyed the benefits of AG Light & Sound's money and/or services.

90.     Defendants knew or should have known that AG Light & Sound expected that the Defendants' use of AG Light & Sound's money and/or services would require commensurate benefit to AG Light & Sound.

91.     Counterdefendant OTE has been unjustly enriched to AG Light & Sound's detriment.

92.     As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the

services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## SIXTH CAUSE OF ACTION
### (Quantum Meruit)

93.    AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 92 of this Complaint as though fully set forth herein at length.

94.    AG Light & Sound provided valuable services and materials to Counterdefendant OTE, for which Counterdefendant OTE was to pay AG Light & Sound.

95.    Counterdefendant OTE accepted, used, and enjoyed the benefits of AG Light & Sound's services and materials.

96.    Defendants knew or should have known that AG Light & Sound expected that the Defendants' use of AG Light & Sound's services and materials would require commensurate benefit to AG Light & Sound.

97.    Counterdefendant OTE has refused to pay the reasonable value of AG Light & Sound's materials and services to AG Light & Sound's detriment.

98.    As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the

services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## SEVENTH CAUSE OF ACTION
### (Negligent Misrepresentation)

99.   AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 98 of this Complaint as though set forth fully herein at length.

100.   Counterdefendant OTE had a duty to exercise reasonable care or competence in communicating information to AG Light & Sound.

101.   As set forth in detail above, Counterdefendant OTE, through its agents and/or employees, made repeated representations that Counterdefendant OTE should have known were false, and/or had insufficient information for making these statements to AG Light & Sound.

102.   Counterdefendant OTE's negligent misstatements were material.

103.   Counterdefendant OTE failed to exercise reasonable care in making these misstatements, with the intent of inducing AG Light & Sound to enter into the Contract with OTE.  After the agreements were entered into, Counterdefendant OTE continued to fail to exercise reasonable care in making misrepresentations, with the intent of inducing AG Light & Sound to remain a party to the Contract, and later, to

negotiate with AG Light & Sound's own subcontractors to reduce amounts the subcontractors would receive.

104.   AG Light & Sound had a right to rely on the representations of Counterdefendant OTE, and reasonably did rely upon Counterdefendant OTE's negligent misrepresentations.

105.   As a direct and proximate result of Counterdefendant OTE's negligent misrepresentations, AG Light & Sound has sustained damages in the millions of dollars, an amount well in excess of the seventy-five thousand dollar ($75,000.00) jurisdictional threshold, with the exact amount to be determined at trial.

106.   As a result of Counterdefendant OTE's actions, AG Light & Sound has been required to retain the services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## EIGHTH CAUSE OF ACTION
### (Attorneys' Fees and Expenses)

107.   AG Light & Sound repeats and realleges each and every allegation contained in paragraphs 1 through 106 of this Complaint as though set forth fully herein at length.

108.   As set forth above, Counterdefendant OTE has breached the Contract, acted in bad faith, instigated this litigation, been stubbornly litigious, and caused unnecessary trouble and expense.

109.   As a result of Counterdefendant OTE's bad faith conduct and stubbornly litigious actions, AG Light & Sound has been required to retain the services of an attorney and is entitled to recover its attorney fees and costs of suit under O.C.G.A. § 13-6-11.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant AG Light and Sound respectfully requests the following relief:

a.   That the Court enter judgment in favor of Counterclaimant and against Counterdefendant on the causes of action stated above and any other cause of action which may be added to this Counterclaim by amendment or otherwise;

b.   That the Court award the equitable relief requested herein in favor of Counterclaimant;

c.   That the Court award damages in favor of Counterclaimant as compensation for Counterdefendant's breaches of the Contract and other wrongful conduct, including pre- and post-judgment interest, costs, and attorney's fees;

d.   That the Court award such other relief as the Court may deem just and proper.

This 23rd day of December, 2022.

Respectfully submitted,

**BENDIN SUMRALL & LADNER, LLC**

/s/ Stephen T. Snow, Esq.
STEPHEN T. SNOW
Georgia Bar No. 142452
CARRIE A. MOSS
Georgia Bar No. 806050
One Midtown Plaza, Suite 800
1360 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 671-3100 Phone
(404) 671-3080 Fax
SSnow@bsllaw.net
Cmoss@bsllaw.net
*Counsel for Defendants Andrew Gumper, AG Light and Sound, Inc., and AG Production Services, Inc.*
*Counsel for Counterclaimant AG Light and Sound, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this date I have electronically filed and served the

foregoing **COUNTERCLAIM** with the Clerk of Court using CM/ECF system and

upon opposing counsel via electronic mail as follows:

Jason D. McLarry, Esq.
Jason.mclarry@troutman.com
Wheaton P. Webb, Esq.
Wheaton.webb@troutmann.com

This 23rd day of December, 2022.

Respectfully submitted,

**BENDIN SUMRALL & LADNER, LLC**

/s/ Stephen T. Snow, Esq.
STEPHEN T. SNOW
Georgia Bar No. 142452
CARRIE A. MOSS
Georgia Bar No. 806050
One Midtown Plaza, Suite 800
1360 Peachtree Street, N.E.
Atlanta, Georgia 30309
(404) 671-3100 Phone
(404) 671-3080 Fax
SSnow@bsllaw.net
Cmoss@bsllaw.net
*Counsel for Defendants Andrew Gumper, AG Light and Sound, Inc., and AG Production Services, Inc.*
*Counsel for Counterclaimant AG Light and Sound, Inc.*

# EXHIBIT 1

# EXHIBIT 1



# Overtime Launches 'OTE', a Pro League
# for the Next Generation of Basketball Stars

*OTE offers extraordinary athletes a unique new path to playing pro;*
*it's time to pay athletes the compensation they deserve*

**NEW YORK (March 4, 2021)** – Overtime, the leading brand for the next generation of sports fans, announced today that it is launching Overtime Elite (OTE), a transformative new sports league that offers the world's most talented young basketball players a better pathway to becoming professional athletes.

OTE (*pronounced Oh-Tee-E*) provides a comprehensive accelerator for elite players' professional careers. The league offers a year-round development program combining world-class coaching, cutting-edge sports science and performance technologies, top-notch facilities, and a rigorous, highly personalized academic program that energizes and enhances each athlete's journey from proficiency to pro.

OTE teams will feature a dynamic player roster, competing both within the league and in external competitions against international teams. The league will feature up to 30 players, all living, learning, training and playing in a single city*. OTE's inaugural season begins in September.

"In just four years, Overtime has become synonymous with sports for a new generation of athletes and fans, with programming that is viewed more than 14 billion times a year and an audience of more than 45 million social media followers," said Dan Porter, Overtime's CEO and co-founder. "We have created an amazing platform by telling the stories of the next generation of superstars. Now, it's time to leverage that platform to create a league that strengthens players' development and performance and results in fewer injuries and longer careers."

OTE will directly address one of the biggest issues in global sports: compensation of amateur athletes. Today's system prevents amateur basketball athletes from earning a single dollar from their talents, while expecting players – and their families – to bear the costs for access to the training, facilities and coaching that are necessary for reaching their full potential. OTE will flip that system on its head by offering the following:

- Every single OTE player will earn a six-figure salary, with a guaranteed minimum salary of at least $100,000 per year, plus bonuses and shares of equity in Overtime.
- In addition, players will participate in revenue from use of their name, image and likeness, including through sales of custom jerseys, trading cards, video games and NFTs.
- They will also retain the right to sign direct sponsorships with sneaker companies.

"Many athletes aren't properly prepared for what it really means to go pro," said ten-time NBA All-Star, entrepreneur and philanthropist Carmelo Anthony, who is joining OTE's board of directors. "We need to do a better job of empowering the next generation of players and setting them up for success. OTE is leading the way on that front by offering players a comprehensive route that fully develops the athlete – not just basketball skills, but also education, economic empowerment and building their own brand. Having this type of guidance for high school players is critical in setting them up for a successful career both on and off the court."

"OTE offers the next generation of basketball talent what they have long deserved: a path that respects their value and honors their potential, as players and as people," said Zack Weiner, Overtime's president and co-founder. "Paying basketball players isn't radical. What's radical is telling people who put in thousands of hours of work that they have to do it for free."

OTE also fills a substantial gap in the development landscape for top prospects between the ages of 16 and 18, preparing elite players for the next level in a way not possible in an ordinary high school environment. At every practice and in every game, OTE athletes will compete against their equals: the top prospects from around the world. They will have access to professional facilities, staffed by a world-class front office comprised of coaches, executives and performance personnel with over 30 years of championship-caliber experience in the NBA; experts in fitness, nutrition, and sports science who have helped the best become even better; and advisors who have excelled on the hardwood, the sidelines, and the front office.

The league will also break new ground in offering benefits that strengthen athletes' bodies and protect their futures.

- Every player will receive full health care coverage as well as disability insurance coverage, providing financial protection should they receive an injury that hinders their ability to play professionally.
- For each athlete, Overtime will guarantee payment of up to $100,000 for college tuition should they decide not to pursue a professional basketball career.

Players will participate in a robust, accredited academic program that's highly tailored to their individual needs, with a special emphasis on developing the life skills necessary to manage and sustain a successful pro sports career. OTE will offer a direct-instruction model led by individual instructors who teach both one-on-one and in small group sessions featuring a 4:1 student-teacher ratio. OTE will supplement a traditional course offering with a focus on skills like financial literacy, media training and social justice advocacy, all of which help athletes better prepare for the pressures that come with stardom and the opportunities that come with being a role model.

Overtime also announced its first two key leadership positions for the new venture. OTE's Commissioner and President is Aaron Ryan, a longtime NBA executive who served the league for more than 22 years in a variety of roles, including Senior Vice President with USA Basketball and as Head of Business Operations for the NBA 2K league. More recently, Ryan served as the Chief Operating Officer for Relevent Sports Group, the largest privately owned soccer company in North America and Asia.

"I'm incredibly excited to join the Overtime family and bring OTE to life," said Ryan. "We are already building a world-class team of coaches, teachers, trainers and mentors focused on helping these phenomenal athletes prepare for success at the next level."

OTE's EVP and Head of Basketball Operations is Brandon Williams, who brings more than 20 years of experience as an NBA player, champion and a league and front office executive. Williams served with the NBA's Player Programs and Basketball Operations, the Philadelphia 76ers and most recently with the Sacramento Kings as Assistant General Manager. Williams is responsible for building a dynamic basketball organization, which will include recruiting a best-in-class coaching, development, performance and research staff.

OTE leverages Overtime's existing strengths as a leading sports platform spanning the worlds of media, technology, community and apparel. Since its founding in 2016, Overtime has raised more than $60 million in funding.

*\* Following an extensive search process, OTE has narrowed the list to two cities. OTE will announce a final decision on the league's location in the coming weeks.*

**About Overtime:**
Overtime is the leading brand for the next generation of sports fans. In just four years, we have built a community of over 45 million followers and a platform that generates over 1.7 billion video views each month. We produce original series across YouTube, Snapchat and IGTV, as well as highly engaging short-form content on Instagram and TikTok.

Based in NYC, Overtime's investors include Andreessen Horowitz, Sapphire Sport, Spark Capital, Greycroft Ventures, Kevin Durant, Carmelo Anthony's Melo7 Tech II fund and the late NBA Commissioner David Stern.

# EXHIBIT 2

# EXHIBIT 2



# Overtime Elite Selects Atlanta as its Home

*League's new facility will be located in Atlantic Station, where players will study, train and compete*

**BROOKLYN (May 19, 2021) –** Transformative new sports league OTE (Overtime Elite) announced today that it has selected Atlanta as its home. OTE selected the city of Atlanta after a year-long search, during which league officials visited and studied eight cities across the United States. OTE, which offers the world's most talented young basketball players a better pathway to becoming professional athletes, begins playing in Atlanta this September.

"If we could construct a city that would be the perfect home for Overtime Elite, it would look just like Atlanta," said Overtime Elite Commissioner and President Aaron Ryan. "The city's storied basketball history, diverse population, vibrant business community and rich culture make Atlanta a special place. OTE is looking forward to being an active contributor to the community."

OTE is committed to building an inclusive, diverse and equitable workforce, with a focus on hiring among communities of color and on employing people who live within Atlanta's city limits. The league is actively recruiting and hiring a staff of more than 100 people in the city, including basketball staff, educators, residential staff, food service, and additional support staff. OTE has already begun building its senior leadership team in Atlanta; the league's Head of Basketball Operations, Brandon Williams, and its Head of Talent and Recruiting, Kali Franklin, both live in the metro area. Individuals interested in career opportunities with OTE should visit LinkedIn for additional information.

"This exciting announcement underscores that Atlanta is still a great place to do business. Overtime Elite will bring several well-paying jobs to our city, generate millions of dollars in economic impact and expand mentorship and programming opportunities for our young people," said Atlanta Mayor Keisha Lance Bottoms. "We are pleased that Overtime Elite has chosen Atlanta to be its permanent home, and we look forward to welcoming the next generation of basketball stars to our city."

Planning is underway on construction of a brand-new 103,000-square-foot facility in the city's Atlantic Station neighborhood, where OTE's players will train, study and compete. This project will create up to 400 construction jobs in metro Atlanta, at least 30% of which will be diverse hires.

To maximize efficiency and reduce waste, the structure will be built using recycled and reused components, with an energy-efficient HVAC system and green-compliant LED lighting system and outer covering. The facility will be completed in time for the league's September debut. Larry Serota, Clark Dean and Clark Seydel of Transwestern led market exploration, site selection, and transaction-structuring for OTE.

"Overtime Elite is a welcome addition to Atlanta's rich sports tradition, elevating the city as a global center for basketball development and a cultural hub for people of all backgrounds," said Atlanta Hawks player and Overtime investor Trae Young.

OTE leadership has longstanding personal and professional relationships within the Atlanta Hawks organization, with a deep respect for the team's long history in the city and the role they have played to create positive change in the community. Similarly, OTE has been inspired by the impact that the Atlanta Dream and its players have had over the past year in using their voices to increase voter participation in the 2020 election.

"Overtime Elite is a project that will bring long-time benefits to the city of Atlanta, not only economically, but it will teach our young people about empowerment and competing from a position of strength," said Michael Render, aka Killer Mike, Atlanta-based rapper, entrepreneur, songwriter, actor, and activist.

Overtime Elite provides a comprehensive accelerator for elite players' professional careers, preparing them for the next level in a way not possible in an ordinary high school environment. The league offers a year-round development program combining world-class coaching, cutting-edge sports science and performance technologies, top-notch facilities, and a rigorous, highly personalized academic program that energizes and enhances each athlete's journey from proficiency to pro.

The league directly addresses one of the biggest issues in global sports: compensation of amateur athletes. Every single OTE player will earn a six-figure salary, with a guaranteed minimum salary of more than $100,000 per year, plus bonuses and shares of equity in Overtime. In addition, players will participate in revenue from use of their name, image and likeness, including through sales of custom jerseys, trading cards, video games and NFTs.

Players will participate in a robust, accredited academic program that's highly tailored to their individual needs, with a special emphasis on developing the life skills necessary to manage and sustain a successful pro sports career. OTE will offer a direct-instruction model led by individual instructors who teach both one-on-one and in small group sessions featuring a 4:1 student-teacher ratio. OTE will supplement a traditional course offering with a focus on skills like financial literacy, media training and social justice advocacy, all of which help athletes better prepare for the pressures that come with stardom and the opportunities that come with being a role model.

**About Overtime Elite**
OTE is a transformative new sports league that offers the world's most talented young basketball players a better pathway to becoming professional athletes. OTE provides a comprehensive accelerator for elite players' professional careers. The league offers a year-round development program combining world-class coaching, cutting-edge sports science and performance technologies, top-notch facilities, and a rigorous, highly personalized academic program that energizes and enhances each athlete's journey from proficiency to pro.

2

# EXHIBIT 3

# EXHIBIT 3











# EXHIBIT 4

# EXHIBIT 4

# AIA® Document A141™ – 2014

## *Standard Form of Agreement Between Owner and Design-Builder*

**AGREEMENT** made as of the « 19th » day of «August  » in the year « 2021 »
*(In words, indicate day, month and year.)*

**BETWEEN** the Owner:
*(Name, legal status, address and other information)*

Overtime Elite, LLC
20 Jay Street, Suite 600
Brooklyn, New York 11201

and the Design-Builder:
*(Name, legal status, address and other information)*

AG Light and Sound Inc.
4660 Berg Street, Suite 130
North Las Vegas, Nevada 89081

for the following Project:
*(Name, location and detailed description)*

OTE Center of Excellence
264 17th Street NW
Atlanta, Georgia 30363

The Owner and Design-Builder agree as follows.

**ADDITIONS AND DELETIONS:** The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Consultation with an attorney is also encouraged with respect to professional licensing requirements in the jurisdiction where the Project is located.

**ELECTRONIC COPYING** of any portion of this AIA® Document to another electronic file is prohibited and constitutes a violation of copyright laws as set forth in the footer of this document.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

**TABLE OF ARTICLES**

1        GENERAL PROVISIONS

2        COMPENSATION AND PROGRESS PAYMENTS

3        GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT

4        WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT

5        WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT

6        CHANGES IN THE WORK

7        OWNER'S RESPONSIBILITIES

8        TIME

9        PAYMENT APPLICATIONS AND PROJECT COMPLETION

10       PROTECTION OF PERSONS AND PROPERTY

11       UNCOVERING AND CORRECTION OF WORK

12       COPYRIGHTS AND LICENSES

13       TERMINATION OR SUSPENSION

14       CLAIMS AND DISPUTE RESOLUTION

15       MISCELLANEOUS PROVISIONS

16       SCOPE OF THE AGREEMENT

**TABLE OF EXHIBITS**

A        DESIGN-BUILD AMENDMENT

B        INSURANCE AND BONDS

**ARTICLE 1    GENERAL PROVISIONS**
**§ 1.1 Owner's Criteria**
This Agreement is based on the Owner's Criteria set forth in this Section 1.1.

**§ 1.1.1** The Owner's program for the Project:

*See* Construction Documents, dated June 16, 2021, and Scope of Services, dated July 29, 2021, collectively attached to **Ex. A (Design-Build Amendment)**

**§ 1.1.2** The Owner's design requirements for the Project and related documentation:

*See* Sec. 1.1.1.

**§ 1.1.3** The Project's physical characteristics:

*See* Sec. 1.1.1.

**§ 1.1.4** The Owner's anticipated Sustainable Objective for the Project, if any:

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                      (1282092854)
115508735v6

N/A

**§ 1.1.5** Incentive programs the Owner intends to pursue for the Project, including those related to the Sustainable Objective, and any deadlines for receiving the incentives that are dependent on, or related to, the Design-Builder's services, are as follows:

*See* Sec. 3.1.9.2.3.

**§ 1.1.6** The Owner's budget for the Work to be provided by the Design-Builder is set forth below:

As set forth in Design-Builder's proposal, dated March 23, 2021 and revised June 23, 2021, as well as the Scope of Services, dated July 29, 2021, collectively documented in **Ex. A (Design-Build Amendment)**, the budget for the Work is the not-to-exceed amount of Sixteen Million Dollars ($16,000,000).  Any change(s) after June 24, 2021 will be over and above the Stipulated Sum/Guaranteed Maximum of $16,000,000 and will be documented in a Change Order(s).

**§ 1.1.7** The Owner's design and construction milestone dates:

.1      Design phase milestone dates:

To be documented in **Ex. A (Design-Build Amendment).**

.2      Submission of Design-Builder Proposal:

To be documented in **Ex. A (Design-Build Amendment).**

.3      Phased completion dates:

To be documented in **Ex. A (Design-Build Amendment).**

.4      Substantial Completion date:

September 12, 2021

.5      Other milestone dates:

Final Completion date: September 30, 2021.

The Substantial Completion date and/or Final Completion date are subject to change due to problems beyond the reasonable control of the Design-Builder, including but not limited to extreme weather, unforeseen site issues not caused by Design-Builder, and/or widespread health issues, including mandated stoppages related to Covid-19.

**§ 1.1.8** The Owner requires the Design-Builder to retain the following Architect, Consultants and Contractors at the Design-Builder's cost:
*(List name, legal status, address and other information.)*

.1 Architect

« »

.2 Consultants

« »

.3 Contractors

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                        (1282092854)
115508735v6

«  »

**§ 1.1.9** Additional Owner's Criteria upon which the Agreement is based:

N/A

**§ 1.1.10** The Design-Builder shall confirm that the information included in the Owner's Criteria complies with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities.

**§ 1.1.10.1** If the Owner's Criteria conflicts with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Design-Builder shall notify the Owner of the conflict.

**§ 1.1.11** If there is a change in the Owner's Criteria, the Owner and the Design-Builder shall execute a Modification in accordance with Article 6.

**§ 1.1.12** If the Owner and Design-Builder intend to transmit Instruments of Service or any other information or documentation in digital form, they shall endeavor to establish necessary protocols governing such transmissions. Unless otherwise agreed, the parties will use AIA Document E203™–2013 to establish the protocols for the development, use, transmission, and exchange of digital data and building information modeling.

**§ 1.2 Project Team**
**§ 1.2.1** The Owner identifies the following representative in accordance with Section 7.1.1:
*(List name, address and other information.)*

Overtime Sports, Inc.;
S.M. Berger Architecture P.C.;
Tack Advising, LLC;
RL Edward Partners;

PPF RTL AS Block B, LLC;
Morgan Stanley Real Estate Advisors, Inc.;
Prime Property Fund, LLC;
PPF RTL Atlantic Town Center, LLC;
Hines Interests Limited Partnership, District  Owners' Association, Inc.;
Atlantic Station Master Owners' Association, Inc;
and each of their respective parent companies & affiliates, shareholders, members, managers, partners (including partners of partners), subsidiaries and related entities, and any successors and/or assigns of such entities, as well as any present or future mortgagee which encumbers an interest in the land or improvements located at the Project, together with their respective directors, officers, employees or agents, and any successors and assigns of such entities.

**§ 1.2.2** The persons or entities, in addition to the Owner's representative, who are required to review the Design-Builder's Submittals are as follows:
*(List name, address and other information.)*

Sanford M. Berger

**§ 1.2.3** The Owner will retain the following consultants and separate contractors:
*(List discipline, scope of work, and, if known, identify by name and address.)*

«  »

**§ 1.2.4** The Design-Builder identifies the following representative in accordance with Section 3.1.2:
*(List name, address and other information.)*

«  »
«  »
«  »
«  »

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                          (1282092854)
115508735v6

**§ 1.2.5** Neither the Owner's nor the Design-Builder's representative shall be changed without ten days' written notice to the other party.

### § 1.3 Binding Dispute Resolution
For any Claim subject to, but not resolved by, mediation pursuant to Section 14.3, the method of binding dispute resolution shall be the following:
*(Check the appropriate box. If the Owner and Design-Builder do not select a method of binding dispute resolution below, or do not subsequently agree in writing to a binding dispute resolution other than litigation, Claims will be resolved by litigation in a court of competent jurisdiction.)*

[ « » ]   Arbitration pursuant to Section 14.4

[ «X» ]   Mediation followed by litigation in a court of competent jurisdiction in accordance with Article 14 of this Agreement.

[ « » ]   Other: *(Specify)*

« »

### § 1.4 Definitions
**§ 1.4.1 Design-Build Documents.** The Design-Build Documents consist of this Agreement between Owner and Design-Builder and its attached Exhibits (hereinafter, the "Agreement"); other documents listed in this Agreement; and Modifications issued after execution of this Agreement. A Modification is (1) a written amendment to the Contract signed by both parties, including the Design-Build Amendment, (2) a Change Order, or (3) a Change Directive.

**§ 1.4.2 The Contract.** The Design-Build Documents form the Contract. The Contract represents the entire and integrated agreement between the parties and supersedes prior negotiations, representations or agreements, either written or oral. The Contract may be amended or modified only by a Modification. The Design-Build Documents shall not be construed to create a contractual relationship of any kind between any persons or entities other than the Owner and the Design-Builder.

**§ 1.4.3 The Work.** The term "Work" means the design, construction and related services required to fulfill the Design-Builder's obligations under the Design-Build Documents, whether completed or partially completed, and includes all labor, materials, equipment and services provided or to be provided by the Design-Builder. The Work may constitute the whole or a part of the Project.

**§ 1.4.4 The Project.** The Project is the total design and construction of which the Work performed under the Design-Build Documents may be the whole or a part, and may include design and construction by the Owner and by separate contractors.

**§ 1.4.5 Instruments of Service.** Instruments of Service are representations, in any medium of expression now known or later developed, of the tangible and intangible creative work performed by the Design-Builder, Contractor(s), Architect, and Consultant(s) under their respective agreements. Instruments of Service may include, without limitation, studies, surveys, models, sketches, drawings, specifications, digital models and other similar materials.

**§ 1.4.6 Submittal.** A Submittal is any submission to the Owner for review and approval demonstrating how the Design-Builder proposes to conform to the Design-Build Documents for those portions of the Work for which the Design-Build Documents require Submittals. Submittals include, but are not limited to, shop drawings, product data, and samples. Submittals are not Design-Build Documents unless incorporated into a Modification.

**§ 1.4.7 Owner.** The Owner is the person or entity identified as such in the Agreement and is referred to throughout the Design-Build Documents as if singular in number. The term "Owner" means the Owner or the Owner's authorized representative.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                           (1282092854)
115508735v6

**§ 1.4.8 Design-Builder.** The Design-Builder is the person or entity identified as such in the Agreement and is referred to throughout the Design-Build Documents as if singular in number. The term "Design-Builder" means the Design-Builder or the Design-Builder's authorized representative. Design-Builder represents and warrants that the Design-Builder holds, as appropriate and required, licenses, permits or other special licenses to perform the Work included in this Agreement, as required by law, or employs or works under the general supervision of the holder of such licenses, permits or special licenses, and shall keep and maintain all such licenses, permits and special licenses in good standing and in full force and effect at all times while the Design-Builder is performing the Work under this Agreement.

**§ 1.4.9 Consultant.** A Consultant is a person or entity providing professional services for the Design-Builder for all or a portion of the Work, and is referred to throughout the Design-Build Documents as if singular in number. To the extent required by the relevant jurisdiction, the Consultant shall be lawfully licensed to provide the required professional services.

**§ 1.4.10 Architect.** The Architect is a person or entity providing design services for the Design-Builder for all or a portion of the Work, and is lawfully licensed to practice architecture in the applicable jurisdiction. The Architect is referred to throughout the Design-Build Documents as if singular in number.

**§ 1.4.11 Contractor.** A Contractor is a person or entity performing all or a portion of the construction, required in connection with the Work, for the Design-Builder. The Contractor shall be lawfully licensed, if required in the jurisdiction where the Project is located. The Contractor is referred to throughout the Design-Build Documents as if singular in number and means a Contractor or an authorized representative of the Contractor.

**§ 1.4.12 Confidential Information.** Confidential Information is information containing confidential or business proprietary information that is clearly marked as "confidential."

**§ 1.4.13 Contract Time.** Unless otherwise provided, Contract Time is the period of time, including authorized adjustments, as set forth in the Design-Build Amendment for Substantial Completion of the Work.

**§ 1.4.14 Day.** The term "day" as used in the Design-Build Documents shall mean calendar day unless otherwise specifically defined.

**§ 1.4.15 Contract Sum.** The Contract Sum is the amount to be paid to the Design-Builder for performance of the Work after execution of the Design-Build Amendment, as identified in Article A.1 of the Design-Build Amendment.

**§ 1.4.16 Standard of Care.** The Standard of Care shall mean the same degree of skill, judgment, and abilities in performing the Work under this Agreement prevailing among comparable professionals with significant experience in the design, construction, and administration of projects similar in scope and complexity to the Project, who are practicing in geographical area where the Project is located.

**ARTICLE 2   COMPENSATION AND PROGRESS PAYMENTS**
**§ 2.1 Compensation for Work Performed Prior To Execution of Design-Build Amendment**
**§ 2.1.1** Unless otherwise agreed, payments for Work performed prior to Execution of the Design-Build Amendment shall be made monthly. For the Design-Builder's performance of Work prior to the execution of the Design-Build Amendment, the Owner shall compensate the Design-Builder as follows:
*(Insert amount of, or basis for, compensation, including compensation for any Sustainability Services, or indicate the exhibit in which the information is provided. If there will be a limit on the total amount of compensation for Work performed prior to the execution of the Design-Build Amendment, state the amount of the limit.)*

| 4/16/21 | AG Light and Sound Inc | Invoice 5320, Job Reference 2119-2, 50 percent elevator deposit | $    81,675.00 |
|---------|------------------------|------------------------------------------------------------------|----------------|
| 4/27/21 | AG Light and Sound Inc | Deposit Invoice 5324-1, Overtime Elite Basketball Arena Build | $ 2,931,542.26 |
| 5/17/21 | AG Light and Sound Inc | Deposit Invoice 5324-2, Overtime Elite Basketball Arena Build | $ 2,968,078.22 |
| 6/15/21 | AG Light and Sound Inc | Deposit Invoice 5324-3, Overtime Elite Basketball Arena Build | $ 2,949,810.24 |

**§ 2.1.2** The hourly billing rates for services of the Design-Builder and the Design-Builder's Architect, Consultants and Contractors, if any, are set forth below.
*(If applicable, attach an exhibit of hourly billing rates or insert them below.)*

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                      (1282092854)

115508735v6

« »

| Individual or Position | Rate |
|---|---|
| | |

**§ 2.1.3 Compensation for Reimbursable Expenses Prior To Execution of Design-Build Amendment**
**§ 2.1.3.1** Reimbursable Expenses are in addition to compensation set forth in Section 2.1.1 and 2.1.2 and include expenses, directly related to the Project, incurred by the Design-Builder and the Design-Builder's Architect, Consultants, and Contractors, as follows:

   .1   Transportation and authorized out-of-town travel and subsistence;
   .2   Dedicated data and communication services, teleconferences, Project web sites, and extranets;
   .3   Fees paid for securing approval of authorities having jurisdiction over the Project;
   .4   Printing, reproductions, plots, standard form documents;
   .5   Postage, handling and delivery;
   .6   Expense of overtime work requiring higher than regular rates, if authorized in advance by the Owner;
   .7   Renderings, physical models, mock-ups, professional photography, and presentation materials requested by the Owner;
   .8   All taxes levied on professional services and on reimbursable expenses; and
   .9   Other Project-related expenditures, if authorized in advance by the Owner.

**§ 2.1.3.2** For Reimbursable Expenses, the compensation shall be the expenses the Design-Builder and the Design-Builder's Architect, Consultants and Contractors incurred at cost.

**§ 2.1.4 Payments to the Design-Builder Prior To Execution of Design-Build Amendment**
**§ 2.1.4.1** Payments shall be made consistent with Article 9 to the extent applicable.

**§ 2.1.4.2** Records of Reimbursable Expenses and services performed on the basis of hourly rates shall be available to the Owner at mutually convenient times for a period of two years following execution of the Design-Build Amendment or termination of this Agreement, whichever occurs first.

**§ 2.2 Contract Sum and Payment for Work Performed After Execution of Design-Build Amendment**
For the Design-Builder's performance of the Work after execution of the Design-Build Amendment, the Owner shall pay to the Design-Builder the Contract Sum in current funds as agreed in the Design-Build Amendment.

**ARTICLE 3   GENERAL REQUIREMENTS OF THE WORK OF THE DESIGN-BUILD CONTRACT**
**§ 3.1 General**
**§ 3.1.1** The Design-Builder shall comply with any applicable licensing requirements in the jurisdiction where the Project is located.

**§ 3.1.2** The Design-Builder shall designate in writing a representative who is authorized to act on the Design-Builder's behalf with respect to the Project.

**§ 3.1.3** The Design-Builder shall perform the Work in accordance with the Design-Build Documents. The Design-Builder shall not be relieved of the obligation to perform the Work in accordance with the Design-Build Documents by the activities, tests, inspections or approvals of the Owner.

**§ 3.1.3.1** The Design-Builder shall perform the Work in compliance with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities. If the Design-Builder performs Work contrary to applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, the Design-Builder shall assume responsibility for such Work and shall bear the costs attributable to correction.

**§ 3.1.3.2** Neither the Design-Builder nor any Contractor, Consultant, or Architect shall be obligated to perform any act which they believe will violate any applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities. If the Design-Builder determines that implementation of any instruction received from the Owner, including those in the Owner's Criteria, would cause a violation of any applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities, the Design-Builder shall notify the Owner in

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                           (1282092854)
115508735v6

writing. Upon verification by the Owner that a change to the Owner's Criteria is required to remedy the violation, the Owner and the Design-Builder shall execute a Modification in accordance with Article 6.

**§ 3.1.3.3** The Design-Builder shall perform the Work in accordance with the Standard of Care.

**§ 3.1.3.4** Design-Builder represents and warrants the following to the Owner (in addition to any other representations and warranties contained in the Contract Documents) as a material inducement to the Owner to execute this Agreement, which representations and warranties shall survive the execution and delivery of this Agreement, any termination of this Agreement and the final completion of the Work.

> .1 The Design-Builder is financially solvent, able to pay all debts as they mature, and possessed of sufficient working capital to complete the Work and perform all obligations hereunder;
> .2 The Design-Builder is all able to furnish the tools, materials, supplies, equipment, and labor required to complete the Work and perform its obligations hereunder and has sufficient experience and competence to do so;
> .3 The Design-Builder is all authorized to do business in the place where the property is located and is properly licensed by all necessary governmental, public, and quasi-public authorities having jurisdiction over the Design-Builder and over the Work and the Project;
> .4 The Design-Builder's execution of this Agreement and performance thereof is within the Design-Builder's duly authorized powers;
> .5 The Design-Builder has visited the site of the Project, is generally familiar with the readily ascertainable or visible local conditions under which the Work is to be performed, including and without limitation, (i) the location, condition, layout, and nature of the Project site and surrounding areas, (ii) generally prevailing climatic conditions, (iii) anticipated labor supply and costs, and (iv) availability and costs of materials, tools, equipment.  Design-Builder has correlated observations with the requirements of the Design-Build Documents, and will take all appropriate precautions to protect the work, employees, and all adjacent facilities from damage or harm due to the Work;
> .6 The Design-Builder possesses experience and expertise in the business administration, design, construction, construction management, and coordination of projects for construction of office building facilities of the size, complexity, and nature of this particular Project, and will perform the Work with the care, skill, and diligence of such a design-builder.
> .7 The Design-Builder is familiar with laws, rules, regulations, building codes, and other governmental requirements pertaining to the Project, as well as with local customs and weather conditions, and will act accordingly on the Project.

**§ 3.1.4** The Design-Builder shall be responsible to the Owner for acts and omissions of the Design-Builder's employees, Architect, Consultants, Contractors, and their agents and employees, and other persons or entities performing portions of the Work.

**§ 3.1.5 General Consultation.** The Design-Builder shall schedule and conduct periodic meetings with the Owner to review matters such as procedures, progress, coordination, and scheduling of the Work.

**§ 3.1.6** When applicable law requires that services be performed by licensed professionals, the Design-Builder shall provide those services through qualified, licensed professionals. The Owner understands and agrees that the services of the Design-Builder's Architect and the Design-Builder's other Consultants are performed in the sole interest of, and for the exclusive benefit of, the Design-Builder.

**§ 3.1.7** The Design-Builder, with the assistance of the Owner, shall prepare and file documents required to obtain necessary approvals of governmental authorities having jurisdiction over the Project.

**§ 3.1.8 Progress Reports**
**§ 3.1.8.1** The Design-Builder shall keep the Owner informed of the progress and quality of the Work. On a monthly basis, or otherwise as agreed to by the Owner and Design-Builder, the Design-Builder shall submit written progress reports to the Owner, showing estimated percentages of completion and other information identified below:

> .1 Work completed for the period;
> .2 Project schedule status;
> .3 Submittal schedule and status report, including a summary of outstanding Submittals;
> .4 Responses to requests for information to be provided by the Owner;

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. <span style="color:red">The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission.</span> This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

**.5**    Approved Change Orders and Change Directives;
**.6**    Pending Change Order and Change Directive status reports;
**.7**    Tests and inspection reports;
**.8**    Status report of Work rejected by the Owner;
**.9**    Status of Claims previously submitted in accordance with Article 14;
**.10**   Cumulative total of the Cost of the Work to date including the Design-Builder's compensation and Reimbursable Expenses, if any;
**.11**   Current Project cash-flow and forecast reports; and
**.12**   Additional information as agreed to by the Owner and Design-Builder.

**§ 3.1.8.2** In addition, where the Contract Sum is the Cost of the Work with or without a Guaranteed Maximum Price, the Design-Builder shall include the following additional information in its progress reports:
**.1**    Design-Builder's work force report;
**.2**    Equipment utilization report; and
**.3**    Cost summary, comparing actual costs to updated cost estimates.

## § 3.1.9 Design-Builder's Schedules

**§ 3.1.9.1** The Design-Builder, promptly after execution of this Agreement, shall prepare and submit for the Owner's information a schedule for the Work (the "**Project Schedule**"). The schedule, including the time required for design and construction, shall not exceed time limits current under the Design-Build Documents, shall be revised at appropriate intervals as required by the conditions of the Work and Project, shall be related to the entire Project to the extent required by the Design-Build Documents, shall provide for expeditious and practicable execution of the Work, and shall include allowances for periods of time required for the Owner's review and for approval of submissions by authorities having jurisdiction over the Project.

    A.   The Project Schedule shall be updated and included with each Application for Payment.

    B.   <u>Critical Path</u>. The Project Schedule shall include critical path construction items to identity that portion of the Work that must be achieved in order to meet the Milestone Date(s), time being of the essence.

    C.   <u>Milestone Dates</u>. The Project Schedule shall include at the least the following Milestone Dates(s), which Milestone Dates are set forth as follows in the Project Schedule, time being of the essence:

        a.   Scheduled Substantial Completion Date
        b.   Final Completion Date

Revisions by the Design-Builder to the Project Schedule shall not amend, change or otherwise affect any Milestone Date unless approved by appropriate Modification.

**§ 3.1.9.2** The Design-Builder shall perform the Work in general accordance with the most recent schedules submitted to the Owner.

**§ 3.1.9.2.1** [Deleted.]

**§ 3.1.9.2.2** The Owner may deduct liquidated damages described in Section 3.1.9.2.1 hereof from any unpaid amounts then or thereafter due the Design-Builder under the Design-Build Documents. Any liquidated damages not so deducted from any unpaid amounts due the Design-Builder shall be payable by the Design-Builder to the Owner at the demand of the Owner, together with interest from the date of the demand at a rate equal to the lower of the Treasury Bill Rate or the highest lawful rate of interest payable by the Design-Builder.

**§ 3.1.9.2.3 [Deleted.]**

**§ 3.1.10 Certifications.** Upon the Owner's written request, the Design-Builder shall obtain from the Architect, Consultants, and Contractors, and furnish to the Owner, certifications with respect to the documents and services provided by the Architect, Consultants, and Contractors (a) that, to the best of their knowledge, information and belief, the documents or services to which the certifications relate (i) are consistent with the Design-Build Documents, except to the extent specifically identified in the certificate, and (ii) comply with applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of public authorities governing the design of the Project; and (b) that the Owner

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                (1282092854)
115508735v6

and its consultants shall be entitled to rely upon the accuracy of the representations and statements contained in the certifications. The Design-Builder's Architect, Consultants, and Contractors shall not be required to execute certificates or consents that would require knowledge, services or responsibilities beyond the scope of their services.

### § 3.1.11 Design-Builder's Submittals

**§ 3.1.11.1** Prior to submission of any Submittals, the Design-Builder shall prepare a Submittal schedule, and shall submit the schedule for the Owner's approval. The Owner's approval shall not unreasonably be delayed or withheld. The Submittal schedule shall (1) be coordinated with the Design-Builder's schedule provided in Section 3.1.9.1, (2) allow the Owner reasonable time to review Submittals, and (3) be periodically updated to reflect the progress of the Work. If the Design-Builder fails to submit a Submittal schedule, the Design-Builder shall not be entitled to any increase in Contract Sum or extension of Contract Time based on the time required for review of Submittals.

**§ 3.1.11.2** By providing Submittals the Design-Builder represents to the Owner that it has (1) reviewed and approved them, (2) determined and verified materials, field measurements and field construction criteria related thereto, or will do so and (3) checked and coordinated the information contained within such Submittals with the requirements of the Work and of the Design-Build Documents.

**§ 3.1.11.3** The Design-Builder shall perform no portion of the Work for which the Design-Build Documents require Submittals until the Owner has approved the respective Submittal.

**§ 3.1.11.4** The Work shall be in accordance with approved Submittals except that the Design-Builder shall not be relieved of its responsibility to perform the Work consistent with the requirements of the Design-Build Documents. The Work may deviate from the Design-Build Documents only if the Design-Builder has notified the Owner in writing of a deviation from the Design-Build Documents at the time of the Submittal and a Modification is executed authorizing the identified deviation. The Design-Builder shall not be relieved of responsibility for errors or omissions in Submittals by the Owner's approval of the Submittals.

**§ 3.1.11.5** All professional design services or certifications to be provided by the Design-Builder, including all drawings, calculations, specifications, certifications, shop drawings and other Submittals, shall contain the signature and seal of the licensed design professional preparing them. Submittals related to the Work designed or certified by the licensed design professionals, if prepared by others, shall bear the licensed design professional's written approval. The Owner and its consultants shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

**§ 3.1.12 Warranty.** The Design-Builder warrants to the Owner that materials and equipment furnished under the Contract will be of good quality and new unless the Design-Build Documents require or permit otherwise. The Design-Builder further warrants that the Work will conform to the requirements of the Design-Build Documents and will be free from defects, except for those inherent in the quality of the Work or otherwise expressly permitted by the Design-Build Documents. Work, materials, or equipment not conforming to these requirements may be considered defective. The Design-Builder's warranty excludes remedy for damage or defect caused by abuse, alterations to the Work not executed by the Design-Builder, improper or insufficient maintenance, improper operation, or normal wear and tear and normal usage. If required by the Owner, the Design-Builder shall furnish satisfactory evidence as to the kind and quality of materials and equipment.

### § 3.1.13 Royalties, Patents and Copyrights

**§ 3.1.13.1** The Design-Builder shall pay all royalties and license fees.

**§ 3.1.13.2** The Design-Builder shall defend suits or claims for infringement of copyrights and patent rights and shall hold the Owner and its separate contractors and consultants harmless from loss on account thereof, but shall not be responsible for such defense or loss when a particular design, process or product of a particular manufacturer or manufacturers is required by the Owner, or where the copyright violations are required in the Owner's Criteria. However, if the Design-Builder has reason to believe that the design, process or product required in the Owner's Criteria is an infringement of a copyright or a patent, the Design-Builder shall be responsible for such loss unless such information is promptly furnished to the Owner. If the Owner receives notice from a patent or copyright owner of an alleged violation of a patent or copyright, attributable to the Design-Builder, the Owner shall give prompt written notice to the Design-Builder.

### § 3.1.14 Indemnification

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115500875v6

**§ 3.1.14.1** To the fullest extent permitted by law, the Design-Builder shall indemnify, defend and hold harmless the Owner and the entities listed in Sec. 1.2.1 of the Agreement, including the Owner's agents and employees, as well as the Additional Insureds, from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from (i) a breach of this Agreement by Design-Builder or anyone directly or indirectly employed by them or anyone for whose acts they may be liable, or (ii) performance of the Work, but only to the extent caused by the negligent acts or omissions of the Design-Builder, Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by them or anyone for whose acts they may be liable. Such obligation shall not be construed to negate, abridge, or reduce other rights or obligations of indemnity that would otherwise exist as to a party or person described in this Section 3.1.14.  The Design-Builder's indemnification obligations set forth in this Agreement shall survive expiration or earlier termination of this Agreement for a period of at least 3 years from the date of Substantial Completion of the Work, or the statute of repose for construction in the State of Georgia, whichever is greater.

**§ 3.1.14.2** The indemnification obligation under this Section 3.1.14 shall not be limited by a limitation on amount or type of damages, compensation, or benefits payable by or for Design-Builder, Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by them, under workers' compensation acts, disability benefit acts or other employee benefit acts.

### § 3.1.15 Contingent Assignment of Agreements
**§ 3.1.15.1** Each agreement for a portion of the Work is assigned by the Design-Builder to the Owner, provided that
    **.1** assignment is effective only after termination of the Contract by the Owner for cause, pursuant to Sections 13.1.4 or 13.2.2, and only for those agreements that the Owner accepts by written notification to the Design-Builder and the Architect, Consultants, and Contractors whose agreements are accepted for assignment; and
    **.2** assignment is subject to the prior rights of the surety, if any, obligated under bond relating to the Contract.

When the Owner accepts the assignment of an agreement, the Owner assumes the Design-Builder's rights and obligations under the agreement.

**§ 3.1.15.2** Upon such assignment, if the Work has been suspended for more than 30 days, the compensation under the assigned agreement shall be equitably adjusted for increases in cost resulting from the suspension.

**§ 3.1.15.3** Upon such assignment to the Owner under this Section 3.1.15, the Owner may further assign the agreement to a successor design-builder or other entity. If the Owner assigns the agreement to a successor design-builder or other entity, the Owner shall nevertheless remain legally responsible for all of the successor design-builder's or other entity's obligations under the agreement.

**§ 3.1.16 Design-Builder's Insurance and Bonds.** The Design-Builder shall purchase and maintain insurance and provide bonds as set forth in Exhibit B.

## ARTICLE 4   WORK PRIOR TO EXECUTION OF THE DESIGN-BUILD AMENDMENT
**§ 4.1 General.** Design-Builder consents, acknowledges and agrees that any and all Work performed prior to the Effective Date shall be subject to and governed by Design-Build Documents.

**§ 4.1.1** Any information submitted by the Design-Builder, and any interim decisions made by the Owner, shall be for the purpose of facilitating the design process and shall not modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

**§ 4.1.2** The Design-Builder shall advise the Owner on proposed site use and improvements, selection of materials, and building systems and equipment. The Design-Builder shall also provide the Owner with recommendations, consistent with the Owner's Criteria, on constructability; availability of materials and labor; time requirements for procurement, installation and construction; and factors related to construction cost including, but not limited to, costs of alternative designs or materials, preliminary budgets, life-cycle data, and possible cost reductions.

### § 4.2 Evaluation of the Owner's Criteria
**§ 4.2.1** The Design-Builder shall schedule and conduct meetings with the Owner and any other necessary individuals or entities to discuss and review the Owner's Criteria as set forth in Section 1.1.The Design-Builder shall thereafter

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

again meet with the Owner to discuss a preliminary evaluation of the Owner's Criteria. The preliminary evaluation shall address possible alternative approaches to design and construction of the Project and include the Design-Builder's recommendations, if any, with regard to accelerated or fast-track scheduling, procurement, or phased construction. The preliminary evaluation shall consider cost information, constructability, and procurement and construction scheduling issues.

§ 4.2.2 After the Design-Builder meets with the Owner and presents the preliminary evaluation, the Design-Builder shall provide a written report to the Owner, summarizing the Design-Builder's evaluation of the Owner's Criteria. The report shall also include

.1 allocations of program functions, detailing each function and their square foot areas;
.2 a preliminary estimate of the Cost of the Work, and, if necessary, recommendations to adjust the Owner's Criteria to conform to the Owner's budget;
.3 a preliminary schedule, which shall include proposed design milestones; dates for receiving additional information from, or for work to be completed by, the Owner; anticipated date for the Design-Builder's Proposal; and dates of periodic design review sessions with the Owner; and
.4 the following:
*(List additional information, if any, to be included in the Design-Builder's written report.)*



§ 4.2.3 The Owner shall review the Design-Builder's written report and, if acceptable, provide the Design-Builder with written consent to proceed to the development of the Preliminary Design as described in Section 4.3. The consent to proceed shall not be understood to modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

## § 4.3 Preliminary Design
§ 4.3.1 Upon the Owner's issuance of a written consent to proceed under Section 4.2.3, the Design-Builder shall prepare and submit a Preliminary Design to the Owner. The Preliminary Design shall include a report identifying any deviations from the Owner's Criteria, and shall include the following:

.1 Confirmation of the allocations of program functions;
.2 Site plan;
.3 Building plans, sections and elevations;
.4 Structural system;
.5 Selections of major building systems, including but not limited to mechanical, electrical and plumbing systems; and
.6 Outline specifications or sufficient drawing notes describing construction materials.

The Preliminary Design may include some combination of physical study models, perspective sketches, or digital modeling.

§ 4.3.2 The Owner shall review the Preliminary Design and, if acceptable, provide the Design-Builder with written consent to proceed to development of the Design-Builder's Proposal. The Preliminary Design shall not modify the Owner's Criteria unless the Owner and Design-Builder execute a Modification.

## § 4.4 Design-Builder's Proposal
§ 4.4.1 Upon the Owner's issuance of a written consent to proceed under Section 4.3.2, the Design-Builder shall prepare and submit the Design-Builder's Proposal to the Owner. The Design-Builder's Proposal shall include the following:

.1 A list of the Preliminary Design documents and other information, including the Design-Builder's clarifications, assumptions and deviations from the Owner's Criteria, upon which the Design-Builder's Proposal is based;
.2 The proposed Contract Sum, including the compensation method and, if based upon the Cost of the Work plus a fee, a written statement of estimated cost organized by trade categories, allowances, contingencies, Design-Builder's Fee, and other items that comprise the Contract Sum;
.3 The proposed date the Design-Builder shall achieve Substantial Completion;
.4 An enumeration of any qualifications and exclusions, if applicable;
.5 A list of the Design-Builder's key personnel, Contractors and suppliers; and
.6 The date on which the Design-Builder's Proposal expires.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**        (1282092854)
115508735v6

**§ 4.4.2** Submission of the Design-Builder's Proposal shall constitute a representation by the Design-Builder that it has visited the site and become familiar with local conditions under which the Work is to be completed.

**§ 4.4.3** If the Owner and Design-Builder agree on a proposal, the Owner and Design-Builder shall execute the Design-Build Amendment setting forth the terms of their agreement.

## ARTICLE 5   WORK FOLLOWING EXECUTION OF THE DESIGN-BUILD AMENDMENT
### § 5.1 Construction Documents
**§ 5.1.1** Upon the execution of the Design-Build Amendment, the Design-Builder shall prepare Construction Documents. The Construction Documents shall establish the quality levels of materials and systems required. The Construction Documents shall be consistent with the Design-Build Documents.

**§ 5.1.2** The Design-Builder shall provide the Construction Documents to the Owner for the Owner's information. If the Owner discovers any deviations between the Construction Documents and the Design-Build Documents, the Owner shall promptly notify the Design-Builder of such deviations in writing. The Construction Documents shall not modify the Design-Build Documents unless the Owner and Design-Builder execute a Modification. The failure of the Owner to discover any such deviations shall not relieve the Design-Builder of the obligation to perform the Work in accordance with the Design-Build Documents.

### § 5.2 Construction
**§ 5.2.1 Commencement.** Except as permitted in Section 5.2.2, construction shall not commence prior to execution of the Design-Build Amendment.

**§ 5.2.2** If the Owner and Design-Builder agree in writing, construction may proceed prior to the execution of the Design-Build Amendment. However, such authorization shall not waive the Owner's right to reject the Design-Builder's Proposal.

**§ 5.2.3** The Design-Builder shall supervise and direct the Work, using the Design-Builder's best skill and attention. The Design-Builder shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures, and for coordinating all portions of the Work under the Contract, unless the Design-Build Documents give other specific instructions concerning these matters.

**§ 5.2.4** The Design-Builder shall be responsible for inspection of portions of Work already performed to determine that such portions are in proper condition to receive subsequent Work.

### § 5.3 Labor and Materials
**§ 5.3.1** Unless otherwise provided in the Design-Build Documents, the Design-Builder shall provide and pay for labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and other facilities and services, necessary for proper execution and completion of the Work, whether temporary or permanent, and whether or not incorporated or to be incorporated in the Work.

**§ 5.3.2** When a material or system is specified in the Design-Build Documents, the Design-Builder may make substitutions only in accordance with Article 6.

**§ 5.3.3** The Design-Builder shall enforce strict discipline and good order among the Design-Builder's employees and other persons carrying out the Work. The Design-Builder shall not permit employment of unfit persons or persons not properly skilled in tasks assigned to them.

### § 5.4 Taxes
The Design-Builder shall pay sales, consumer, use and similar taxes, for the Work provided by the Design-Builder, that are legally enacted when the Design-Build Amendment is executed, whether or not yet effective or merely scheduled to go into effect.

### § 5.5 Permits, Fees, Notices and Compliance with Laws
**§ 5.5.1** Unless otherwise provided in the Design-Build Documents, the Design-Builder shall secure and pay for the building permit as well as any other permits, fees, licenses, and inspections by government agencies, necessary for proper execution of the Work and Substantial Completion of the Project.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                           (1282092854)

115508735v6

**§ 5.5.2** The Design-Builder shall comply with and give notices required by applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, applicable to performance of the Work.

**§ 5.5.3 Concealed or Unknown Conditions.** If the Design-Builder encounters conditions at the site that are (1) subsurface or otherwise concealed physical conditions that differ materially from those indicated in the Design-Build Documents or (2) unknown physical conditions of an unusual nature that differ materially from those ordinarily found to exist and generally recognized as inherent in construction activities of the character provided for in the Design-Build Documents, the Design-Builder shall promptly provide notice to the Owner before conditions are disturbed and in no event later than 21 days after first observance of the conditions. The Owner shall promptly investigate such conditions and, if the Owner determines that they differ materially and cause an increase or decrease in the Design-Builder's cost of, or time required for, performance of any part of the Work, shall recommend an equitable adjustment in the Contract Sum or Contract Time, or both. If the Owner determines that the conditions at the site are not materially different from those indicated in the Design-Build Documents and that no change in the terms of the Contract is justified, the Owner shall promptly notify the Design-Builder in writing, stating the reasons. If the Design-Builder disputes the Owner's determination or recommendation, the Design-Builder may proceed as provided in Article 14.

**§ 5.5.4** If, in the course of the Work, the Design-Builder encounters human remains, or recognizes the existence of burial markers, archaeological sites, or wetlands, not indicated in the Design-Build Documents, the Design-Builder shall immediately suspend any operations that would affect them and shall notify the Owner. Upon receipt of such notice, the Owner shall promptly take any action necessary to obtain governmental authorization required to resume the operations. The Design-Builder shall continue to suspend such operations until otherwise instructed by the Owner but shall continue with all other operations that do not affect those remains or features. Requests for adjustments in the Contract Sum and Contract Time arising from the existence of such remains or features may be made as provided in Article 14.

## § 5.6 Allowances
**§ 5.6.1** The Design-Builder shall include in the Contract Sum all allowances stated in the Design-Build Documents. Items covered by allowances shall be supplied for such amounts, and by such persons or entities as the Owner may direct, but the Design-Builder shall not be required to employ persons or entities to whom the Design-Builder has reasonable objection.

**§ 5.6.2** Unless otherwise provided in the Design-Build Documents,
   .1   allowances shall cover the cost to the Design-Builder of materials and equipment delivered at the site and all required taxes, less applicable trade discounts;
   .2   the Design-Builder's costs for unloading and handling at the site, labor, installation costs, overhead, profit, and other expenses contemplated for stated allowance amounts, shall be included in the Contract Sum but not in the allowances; and
   .3   whenever costs are more than or less than allowances, the Contract Sum shall be adjusted accordingly by Change Order. The amount of the Change Order shall reflect (1) the difference between actual costs and the allowances under Section 5.6.2.1 and (2) changes in Design-Builder's costs under Section 5.6.2.2.

**§ 5.6.3** The Owner shall make selections of materials and equipment with reasonable promptness for allowances requiring Owner selection.

## § 5.7 Key Personnel, Contractors and Suppliers
**§ 5.7.1** The Design-Builder shall not employ personnel, or contract with Contractors or suppliers to whom the Owner has made reasonable and timely objection. The Design-Builder shall not be required to contract with anyone to whom the Design-Builder has made reasonable and timely objection.

**§ 5.7.2** If the Design-Builder changes any of the personnel, Contractors or suppliers identified in the Design-Build Amendment, the Design-Builder shall notify the Owner and provide the name and qualifications of the new personnel, Contractor or supplier. The Owner may reply within 14 days to the Design-Builder in writing, stating (1) whether the Owner has reasonable objection to the proposed personnel, Contractor or supplier or (2) that the Owner requires additional time to review. Failure of the Owner to reply within the 14-day period shall constitute notice of no reasonable objection.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                                    (1282092854)
115508735v6

**§ 5.7.3** Except for those persons or entities already identified or required in the Design-Build Amendment, the Design-Builder, as soon as practicable after execution of the Design-Build Amendment, shall furnish in writing to the Owner the names of persons or entities (including those who are to furnish materials or equipment fabricated to a special design) proposed for each principal portion of the Work. The Owner may reply within 14 days to the Design-Builder in writing stating (1) whether the Owner has reasonable objection to any such proposed person or entity or (2) that the Owner requires additional time for review. Failure of the Owner to reply within the 14-day period shall constitute notice of no reasonable objection.

**§ 5.7.3.1** If the Owner has reasonable objection to a person or entity proposed by the Design-Builder, the Design-Builder shall propose another to whom the Owner has no reasonable objection. If the rejected person or entity was reasonably capable of performing the Work, the Contract Sum and Contract Time shall be increased or decreased by the difference, if any, occasioned by such change, and an appropriate Change Order shall be issued before commencement of the substitute person or entity's Work. However, no increase in the Contract Sum or Contract Time shall be allowed for such change unless the Design-Builder has acted promptly and responsively in submitting names as required.

## § 5.8 Documents and Submittals at the Site
The Design-Builder shall maintain at the site for the Owner one copy of the Design-Build Documents and a current set of the Construction Documents, in good order and marked currently to indicate field changes and selections made during construction, and one copy of approved Submittals. The Design-Builder shall deliver these items to the Owner in accordance with Section 9.10.2 as a record of the Work as constructed.

## § 5.9 Use of Site
The Design-Builder shall confine operations at the site to areas permitted by applicable laws, statutes, ordinances, codes, rules and regulations, lawful orders of public authorities, and the Design-Build Documents, and shall not unreasonably encumber the site with materials or equipment.

## § 5.10 Cutting and Patching
The Design-Builder shall not cut, patch or otherwise alter fully or partially completed construction by the Owner or a separate contractor except with written consent of the Owner and of such separate contractor; such consent shall not be unreasonably withheld. The Design-Builder shall not unreasonably withhold from the Owner or a separate contractor the Design-Builder's consent to cutting or otherwise altering the Work.

## § 5.11 Cleaning Up
**§ 5.11.1** The Design-Builder shall keep the premises and surrounding area free from accumulation of waste materials or rubbish caused by operations under the Contract. At completion of the Work, the Design-Builder shall remove waste materials, rubbish, the Design-Builder's tools, construction equipment, machinery and surplus materials from and about the Project.

**§ 5.11.2** If the Design-Builder fails to clean up as provided in the Design-Build Documents, the Owner may do so and Owner shall be entitled to reimbursement from the Design-Builder.

## § 5.12 Access to Work
The Design-Builder shall provide the Owner and its separate contractors and consultants access to the Work in preparation and progress wherever located. The Design-Builder shall notify the Owner regarding Project safety criteria and programs, which the Owner, and its contractors and consultants, shall comply with while at the site.

## § 5.13 Construction by Owner or by Separate Contractors
## § 5.13.1 Owner's Right to Perform Construction and to Award Separate Contracts
**§ 5.13.1.1** The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces; and to award separate contracts in connection with other portions of the Project, or other construction or operations on the site, under terms and conditions identical or substantially similar to this Contract, including those terms and conditions related to insurance and waiver of subrogation. The Owner shall notify the Design-Builder promptly after execution of any separate contract. If the Design-Builder claims that delay or additional cost is involved because of such action by the Owner, the Design-Builder shall make a Claim as provided in Article 14.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                     (1282092854)

15

115508735v6

**§ 5.13.1.2** When separate contracts are awarded for different portions of the Project or other construction or operations on the site, the term "Design-Builder" in the Design-Build Documents in each case shall mean the individual or entity that executes each separate agreement with the Owner.

**§ 5.13.1.3** The Owner shall provide for coordination of the activities of the Owner's own forces, and of each separate contractor, with the Work of the Design-Builder, who shall cooperate with them. The Design-Builder shall participate with other separate contractors and the Owner in reviewing their construction schedules. The Design-Builder shall make any revisions to the construction schedule deemed necessary after a joint review and mutual agreement. The construction schedules shall then constitute the schedules to be used by the Design-Builder, separate contractors and the Owner until subsequently revised.

**§ 5.13.1.4** Unless otherwise provided in the Design-Build Documents, when the Owner performs construction or operations related to the Project with the Owner's own forces or separate contractors, the Owner shall be deemed to be subject to the same obligations, and to have the same rights, that apply to the Design-Builder under the Contract.

## § 5.14 Mutual Responsibility
**§ 5.14.1** The Design-Builder shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Design-Builder's construction and operations with theirs as required by the Design-Build Documents.

**§ 5.14.2** If part of the Design-Builder's Work depends upon construction or operations by the Owner or a separate contractor, the Design-Builder shall, prior to proceeding with that portion of the Work, prepare a written report to the Owner, identifying apparent discrepancies or defects in the construction or operations by the Owner or separate contractor that would render it unsuitable for proper execution and results of the Design-Builder's Work. Failure of the Design-Builder to report shall constitute an acknowledgment that the Owner's or separate contractor's completed or partially completed construction is fit and proper to receive the Design-Builder's Work, except as to defects not then reasonably discoverable.

**§ 5.14.3** The Design-Builder shall reimburse the Owner for costs the Owner incurs that are payable to a separate contractor because of the Design-Builder's delays, improperly timed activities or defective construction. The Owner shall be responsible to the Design-Builder for costs the Design-Builder incurs because of a separate contractor's delays, improperly timed activities, damage to the Work or defective construction.

**§ 5.14.4** The Design-Builder shall promptly remedy damage the Design-Builder wrongfully causes to completed or partially completed construction or to property of the Owner or separate contractors as provided in Section 10.2.5.

**§ 5.14.5** The Owner and each separate contractor shall have the same responsibilities for cutting and patching the Work as the Design-Builder has with respect to the construction of the Owner or separate contractors in Section 5.10.

## § 5.15 Owner's Right to Clean Up
If a dispute arises among the Design-Builder, separate contractors and the Owner as to the responsibility under their respective contracts for maintaining the premises and surrounding area free from waste materials and rubbish, the Owner may clean up and will allocate the cost among those responsible.

## ARTICLE 6   CHANGES IN THE WORK
## § 6.1 General
**§ 6.1.1** Changes in the Work may be accomplished after execution of the Contract, and without invalidating the Contract, by Change Order or Change Directive, subject to the limitations stated in this Article 6 and elsewhere in the Design-Build Documents.

**§ 6.1.2** A Change Order shall be based upon agreement between the Owner and Design-Builder. The Owner may issue a Change Directive without agreement by the Design-Builder.

**§ 6.1.3** Changes in the Work shall be performed under applicable provisions of the Design-Build Documents, and the Design-Builder shall proceed promptly, unless otherwise provided in the Change Order or Change Directive.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

## § 6.2 Change Orders

A Change Order is a written instrument signed by the Owner and Design-Builder stating their agreement upon all of the following:

.1    The change in the Work;

.2    The amount of the adjustment, if any, in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation; and

.3    The extent of the adjustment, if any, in the Contract Time.

## § 6.3 Change Directives

**§ 6.3.1** A Change Directive is a written order signed by the Owner directing a change in the Work prior to agreement on adjustment, if any, in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, or Contract Time. The Owner may by Change Directive, without invalidating the Contract, order changes in the Work within the general scope of the Contract consisting of additions, deletions or other revisions, the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, and Contract Time being adjusted accordingly.

**§ 6.3.2** A Change Directive shall be used in the absence of total agreement on the terms of a Change Order.

**§ 6.3.3** If the Change Directive provides for an adjustment to the Contract Sum or, if prior to execution of the Design-Build Amendment, an adjustment in the Design-Builder's compensation, the adjustment shall be based on one of the following methods:

.1    Mutual acceptance of a lump sum properly itemized and supported by sufficient substantiating data to permit evaluation;

.2    Unit prices stated in the Design-Build Documents or subsequently agreed upon;

.3    Cost to be determined in a manner agreed upon by the parties and a mutually acceptable fixed or percentage fee; or

.4    As provided in Section 6.3.7.

**§ 6.3.4** If unit prices are stated in the Design-Build Documents or subsequently agreed upon, and if quantities originally contemplated are materially changed in a proposed Change Order or Change Directive so that application of such unit prices to quantities of Work proposed will cause substantial inequity to the Owner or Design-Builder, the applicable unit prices shall be equitably adjusted.

**§ 6.3.5** Upon receipt of a Change Directive, the Design-Builder shall promptly proceed with the change in the Work involved and advise the Owner of the Design-Builder's agreement or disagreement with the method, if any, provided in the Change Directive for determining the proposed adjustment in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, or Contract Time.

**§ 6.3.6** A Change Directive signed by the Design-Builder indicates the Design-Builder's agreement therewith, including adjustment in Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation, and Contract Time or the method for determining them. Such agreement shall be effective immediately and shall be recorded as a Change Order.

**§ 6.3.7** If the Design-Builder does not respond promptly or disagrees with the method for adjustment in the Contract Sum or, if prior to execution of the Design-Build Amendment, the method for adjustment in the Design-Builder's compensation, the Owner shall determine the method and the adjustment on the basis of reasonable expenditures and savings of those performing the Work attributable to the change, including, in case of an increase, an amount for overhead and profit as set forth in the Agreement, or if no such amount is set forth in the Agreement, a reasonable amount. In such case, and also under Section 6.3.3.3, the Design-Builder shall keep and present, in such form as the Owner may prescribe, an itemized accounting together with appropriate supporting data. Unless otherwise provided in the Design-Build Documents, costs for the purposes of this Section 6.3.7 shall be limited to the following:

.1    Additional costs of professional services;

.2    Costs of labor, including social security, unemployment insurance, fringe benefits required by agreement or custom, and workers' compensation insurance;

.3    Costs of materials, supplies and equipment, including cost of transportation, whether incorporated or consumed;

.4    Rental costs of machinery and equipment, exclusive of hand tools, whether rented from the Design-Builder or others;

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. **The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission.** This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                   (1282092854)
115508735v6

.5     Costs of premiums for all bonds and insurance, permit fees, and sales, use or similar taxes related to the Work; and

.6     Additional costs of supervision and field office personnel directly attributable to the change.

**§ 6.3.8** The amount of credit to be allowed by the Design-Builder to the Owner for a deletion or change that results in a net decrease in the Contract Sum or, if prior to execution of the Design-Build Amendment, in the Design-Builder's compensation, shall be actual net cost. When both additions and credits covering related Work or substitutions are involved in a change, the allowance for overhead and profit shall be figured on the basis of net increase, if any, with respect to that change.

**§ 6.3.9** Pending final determination of the total cost of a Change Directive to the Owner, the Design-Builder may request payment for Work completed under the Change Directive in Applications for Payment. The Owner will make an interim determination for purposes of certification for payment for those costs deemed to be reasonably justified. The Owner's interim determination of cost shall adjust the Contract Sum or, if prior to execution of the Design-Build Amendment, the Design-Builder's compensation, on the same basis as a Change Order, subject to the right of Design-Builder to disagree and assert a Claim in accordance with Article 14.

**§ 6.3.10** When the Owner and Design-Builder agree with a determination concerning the adjustments in the Contract Sum or, if prior to execution of the Design-Build Amendment, the adjustment in the Design-Builder's compensation and Contract Time, or otherwise reach agreement upon the adjustments, such agreement shall be effective immediately and the Owner and Design-Builder shall execute a Change Order. Change Orders may be issued for all or any part of a Change Directive.

## ARTICLE 7  OWNER'S RESPONSIBILITIES
### § 7.1 General
**§ 7.1.1** The Owner shall designate in writing a representative who shall have express authority to bind the Owner with respect to all Project matters requiring the Owner's approval or authorization.

**§ 7.1.2** The Owner shall render decisions in a timely manner and in accordance with the Design-Builder's schedule agreed to by the Owner. The Owner shall furnish to the Design-Builder, within 15 days after receipt of a written request, information necessary and relevant for the Design-Builder to evaluate, give notice of or enforce mechanic's lien rights. Such information shall include a correct statement of the record legal title to the property on which the Project is located, usually referred to as the site, and the Owner's interest therein.

### § 7.2 Information and Services Required of the Owner
**§ 7.2.1** The Owner shall furnish information or services required of the Owner by the Design-Build Documents with reasonable promptness.

**§ 7.2.2** The Owner shall provide, to the extent under the Owner's control and if not required by the Design-Build Documents to be provided by the Design-Builder, the results and reports of prior tests, inspections or investigations conducted for the Project involving structural or mechanical systems; chemical, air and water pollution; hazardous materials; or environmental and subsurface conditions and information regarding the presence of pollutants at the Project site. Upon receipt of a written request from the Design-Builder, the Owner shall also provide surveys describing physical characteristics, legal limitations and utility locations for the site of the Project, and a legal description of the site under the Owner's control.

**§ 7.2.3** The Owner shall promptly obtain easements, zoning variances, and legal authorizations or entitlements regarding site utilization where essential to the execution of the Project.

**§ 7.2.4** The Owner shall cooperate with the Design-Builder in securing building and other permits, licenses and inspections.

**§ 7.2.5** The services, information, surveys and reports required to be provided by the Owner under this Agreement, shall be furnished at the Owner's expense, and except as otherwise specifically provided in this Agreement or elsewhere in the Design-Build Documents or to the extent the Owner advises the Design-Builder to the contrary in writing, the Design-Builder shall be entitled to rely upon the accuracy and completeness thereof. In no event shall the Design-Builder be relieved of its responsibility to exercise proper precautions relating to the safe performance of the Work.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                          (1282092854)
115508735v6

**§ 7.2.6** If the Owner observes or otherwise becomes aware of a fault or defect in the Work or non-conformity with the Design-Build Documents, the Owner shall give prompt written notice thereof to the Design-Builder.

**§ 7.2.7** Prior to the execution of the Design-Build Amendment, the Design-Builder may request in writing that the Owner provide reasonable evidence that the Owner has made financial arrangements to fulfill the Owner's obligations under the Design-Build Documents and the Design-Builder's Proposal. Thereafter, the Design-Builder may only request such evidence if (1) the Owner fails to make payments to the Design-Builder as the Design-Build Documents require; (2) a change in the Work materially changes the Contract Sum; or (3) the Design-Builder identifies in writing a reasonable concern regarding the Owner's ability to make payment when due. The Owner shall furnish such evidence as a condition precedent to commencement or continuation of the Work or the portion of the Work affected by a material change. After the Owner furnishes the evidence, the Owner shall not materially vary such financial arrangements without prior notice to the Design-Builder.

**§ 7.2.8** Except as otherwise provided in the Design-Build Documents or when direct communications have been specially authorized, the Owner shall communicate through the Design-Builder with persons or entities employed or retained by the Design-Builder.

**§ 7.2.9** Unless required by the Design-Build Documents to be provided by the Design-Builder, the Owner shall, upon request from the Design-Builder, furnish the services of geotechnical engineers or other consultants for investigation of subsurface, air and water conditions when such services are reasonably necessary to properly carry out the design services furnished by the Design-Builder. In such event, the Design-Builder shall specify the services required. Such services may include, but are not limited to, test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion and resistivity tests, and necessary operations for anticipating subsoil conditions. The services of geotechnical engineer(s) or other consultants shall include preparation and submission of all appropriate reports and professional recommendations.

**§ 7.2.10** The Owner shall purchase and maintain insurance as set forth in Exhibit B.

### § 7.3 Submittals

**§ 7.3.1** The Owner shall review and approve or take other appropriate action on Submittals. Review of Submittals is not conducted for the purpose of determining the accuracy and completeness of other details, such as dimensions and quantities; or for substantiating instructions for installation or performance of equipment or systems; or for determining that the Submittals are in conformance with the Design-Build Documents, all of which remain the responsibility of the Design-Builder as required by the Design-Build Documents. The Owner's action will be taken in accordance with the submittal schedule approved by the Owner or, in the absence of an approved submittal schedule, with reasonable promptness while allowing sufficient time in the Owner's judgment to permit adequate review. The Owner's review of Submittals shall not relieve the Design-Builder of the obligations under Sections 3.1.11, 3.1.12, and 5.2.3. The Owner's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Owner, of any construction means, methods, techniques, sequences or procedures. The Owner's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

**§ 7.3.2** Upon review of the Submittals required by the Design-Build Documents, the Owner shall notify the Design-Builder of any non-conformance with the Design-Build Documents the Owner discovers.

**§ 7.4** Visits to the site by the Owner shall not be construed to create an obligation on the part of the Owner to make on-site inspections to check the quality or quantity of the Work. The Owner shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for the safety precautions and programs in connection with the Work, because these are solely the Design-Builder's rights and responsibilities under the Design-Build Documents.

**§ 7.5** The Owner shall not be responsible for the Design-Builder's failure to perform the Work in accordance with the requirements of the Design-Build Documents. The Owner shall not have control over or charge of, and will not be responsible for acts or omissions of the Design-Builder, Architect, Consultants, Contractors, or their agents or employees, or any other persons or entities performing portions of the Work for the Design-Builder.

**§ 7.6** The Owner has the authority to reject Work that does not conform to the Design-Build Documents. The Owner shall have authority to require inspection or testing of the Work in accordance with Section 15.5.2, whether or not such

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

Work is fabricated, installed or completed. However, neither this authority of the Owner nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Owner to the Design-Builder, the Architect, Consultants, Contractors, material and equipment suppliers, their agents or employees, or other persons or entities performing portions of the Work.

**§ 7.7** The Owner shall determine the date or dates of Substantial Completion in accordance with Section 9.8 and the date of final completion in accordance with Section 9.10.

**§ 7.8 Owner's Right to Stop Work**
If the Design-Builder fails to correct Work which is not in accordance with the requirements of the Design-Build Documents as required by Section 11.2 or persistently fails to carry out Work in accordance with the Design-Build Documents, the Owner may issue a written order to the Design-Builder to stop the Work, or any portion thereof, until the cause for such order has been eliminated; however, the right of the Owner to stop the Work shall not give rise to a duty on the part of the Owner to exercise this right for the benefit of the Design-Builder or any other person or entity, except to the extent required by Section 5.13.1.3.

**§ 7.9 Owner's Right to Carry Out the Work**
If the Design-Builder defaults or neglects to carry out the Work in accordance with the Design-Build Documents and fails within a ten-day period after receipt of written notice from the Owner to commence and continue correction of such default or neglect with diligence and promptness, the Owner may, without prejudice to other remedies the Owner may have, correct such deficiencies. In such case, an appropriate Change Order shall be issued deducting from payments then or thereafter due the Design-Builder the reasonable cost of correcting such deficiencies. If payments then or thereafter due the Design-Builder are not sufficient to cover such amounts, the Design-Builder shall pay the difference to the Owner.

**ARTICLE 8    TIME**
**§ 8.1 Progress and Completion**
**§ 8.1.1** Time limits stated in the Design-Build Documents are of the essence of the Contract. By executing the Design-Build Amendment the Design-Builder confirms that the Contract Time is a reasonable period for performing the Work.

**§ 8.1.2**  Owner has been aware of insurance coverage of Design-Builder from the inception of the Project.  Due to the urgent nature of the Project, Owner instructed Design-Builder to commence the Work at the earliest possible time. Owner and Design-Builder have been in close contact since the Work began, including on site at the property, and on or about July 9, 2021, Owner advised Design-Builder of increased insurance requirements.  Since that time, Design Builder has been working to obtain insurance at the increased level and Owner has been kept abreast of the status of insurance.  Given the increase in insurance required, any increase in cost to Design-Builder will be passed along to Owner and Owner will bear the increase in cost, which cost will be added to the $16,000,000 Stipulated Sum/Guaranteed Maximum.

**§ 8.1.3** The Design-Builder shall proceed expeditiously with adequate forces and shall achieve Substantial Completion within the Contract Time.

**§ 8.2 Delays and Extensions of Time**
**§ 8.2.1** If the Design-Builder is delayed at any time in the commencement or progress of the Work by an act or neglect of the Owner or of a consultant or separate contractor employed by the Owner; or by changes ordered in the Work by the Owner; or by labor disputes, fire, unusual delay in deliveries, unavoidable casualties or other causes beyond the Design-Builder's control; or by delay authorized by the Owner pending mediation and binding dispute resolution or by other causes that the Owner determines may justify delay, then the Contract Time shall be extended by Change Order for such reasonable time as the Owner may determine.

**§ 8.2.2** Claims relating to time shall be made in accordance with applicable provisions of Article 14.

**§ 8.2.3** This Section 8.2 does not preclude recovery of damages for delay by either party under other provisions of the Design-Build Documents.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                        (1282092854)
115508735v6

## ARTICLE 9   PAYMENT APPLICATIONS AND PROJECT COMPLETION

### § 9.1 Contract Sum
The Contract Sum is stated in the Design-Build Amendment.

### § 9.2 Schedule of Values
Where the Contract Sum is based on a stipulated sum or Guaranteed Maximum Price, the Design-Builder, prior to the first Application for Payment after execution of the Design-Build Amendment shall submit to the Owner a schedule of values allocating the entire Contract Sum to the various portions of the Work and prepared in such form and supported by such data to substantiate its accuracy as the Owner may require. This schedule, unless objected to by the Owner, shall be used as a basis for reviewing the Design-Builder's Applications for Payment.

### § 9.3 Applications for Payment
**§ 9.3.1** At least ten days before the date established for each progress payment, the Design-Builder shall submit to the Owner an itemized Application for Payment for completed portions of the Work. The application shall be notarized, if required, and supported by data substantiating the Design-Builder's right to payment as the Owner may require, such as copies of requisitions from the Architect, Consultants, Contractors, and material suppliers, and shall reflect retainage if provided for in the Design-Build Documents.

**§ 9.3.1.1** As provided in Section 6.3.9, Applications for Payment may include requests for payment on account of changes in the Work that have been properly authorized by Change Directives, or by interim determinations of the Owner, but not yet included in Change Orders.

**§ 9.3.1.2** Applications for Payment shall not include requests for payment for portions of the Work for which the Design-Builder does not intend to pay the Architect, Consultant, Contractor, material supplier, or other persons or entities providing services or work for the Design-Builder, unless such Work has been performed by others whom the Design-Builder intends to pay.

**§ 9.3.2** Unless otherwise provided in the Design-Build Documents, payments shall be made for services provided as well as materials and equipment delivered and suitably stored at the site for subsequent incorporation in the Work. If approved in advance by the Owner, payment may similarly be made for materials and equipment suitably stored off the site at a location agreed upon in writing. Payment for materials and equipment stored on or off the site shall be conditioned upon compliance by the Design-Builder with procedures satisfactory to the Owner to establish the Owner's title to such materials and equipment or otherwise protect the Owner's interest, and shall include the costs of applicable insurance, storage and transportation to the site for such materials and equipment stored off the site.

**§ 9.3.3** The Design-Builder warrants that title to all Work, other than Instruments of Service, covered by an Application for Payment will pass to the Owner no later than the time of payment. The Design-Builder further warrants that, upon submittal of an Application for Payment, all Work for which Certificates for Payment have been previously issued and payments received from the Owner shall, to the best of the Design-Builder's knowledge, information and belief, be free and clear of liens, claims, security interests or encumbrances in favor of the Design-Builder, Architect, Consultants, Contractors, material suppliers, or other persons or entities entitled to make a claim by reason of having provided labor, materials and equipment relating to the Work.

### § 9.4 Certificates for Payment
The Owner shall, within seven days after receipt of the Design-Builder's Application for Payment, issue to the Design-Builder a Certificate for Payment indicating the amount the Owner determines is properly due, and notify the Design-Builder in writing of the Owner's reasons for withholding certification in whole or in part as provided in Section 9.5.1.

### § 9.5 Decisions to Withhold Certification
**§ 9.5.1** The Owner may withhold a Certificate for Payment in whole or in part to the extent reasonably necessary to protect the Owner due to the Owner's determination that the Work has not progressed to the point indicated in the Design-Builder's Application for Payment, or the quality of the Work is not in accordance with the Design-Build Documents. If the Owner is unable to certify payment in the amount of the Application, the Owner will notify the Design-Builder as provided in Section 9.4. If the Design-Builder and Owner cannot agree on a revised amount, the Owner will promptly issue a Certificate for Payment for the amount that the Owner deems to be due and owing. The Owner may also withhold a Certificate for Payment or, because of subsequently discovered evidence, may nullify the

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

whole or a part of a Certificate for Payment previously issued to such extent as may be necessary to protect the Owner from loss for which the Design-Builder is responsible because of

    **.1**    defective Work, including design and construction, not remedied;

    **.2**    third party claims filed or reasonable evidence indicating probable filing of such claims unless security acceptable to the Owner is provided by the Design-Builder;

    **.3**    failure of the Design-Builder to make payments properly to the Architect, Consultants, Contractors or others, for services, labor, materials or equipment;

    **.4**    reasonable evidence that the Work cannot be completed for the unpaid balance of the Contract Sum;

    **.5**    damage to the Owner or a separate contractor;

    **.6**    reasonable evidence that the Work will not be completed within the Contract Time, and that the unpaid balance would not be adequate to cover actual or liquidated damages for the anticipated delay; or

    **.7**    repeated failure to carry out the Work in accordance with the Design-Build Documents.

**§ 9.5.2** When the above reasons for withholding certification are removed, certification will be made for amounts previously withheld.

**§ 9.5.3** If the Owner withholds certification for payment under Section 9.5.1.3, the Owner may, at its sole option, issue joint checks to the Design-Builder and to the Architect or any Consultants, Contractor, material or equipment suppliers, or other persons or entities providing services or work for the Design-Builder to whom the Design-Builder failed to make payment for Work properly performed or material or equipment suitably delivered.

### § 9.6 Progress Payments
**§ 9.6.1** After the Owner has issued a Certificate for Payment, the Owner shall make payment in the manner and within the time provided in the Design-Build Documents.

**§ 9.6.2** The Design-Builder shall pay each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder no later than the time period required by applicable law, but in no event more than seven days after receipt of payment from the Owner to the amount to which the Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder is entitled, reflecting percentages actually retained from payments to the Design-Builder on account of the portion of the Work performed by the Architect, Consultant, Contractor, or other person or entity. The Design-Builder shall, by appropriate agreement with each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder, require each Architect, Consultant, Contractor, and other person or entity providing services or work for the Design-Builder to make payments to subconsultants and subcontractors in a similar manner.

**§ 9.6.3** The Owner will, on request and if practicable, furnish to the Architect, a Consultant, Contractor, or other person or entity providing services or work for the Design-Builder, information regarding percentages of completion or amounts applied for by the Design-Builder and action taken thereon by the Owner on account of portions of the Work done by such Architect, Consultant, Contractor or other person or entity providing services or work for the Design-Builder.

**§ 9.6.4** The Owner has the right to request written evidence from the Design-Builder that the Design-Builder has properly paid the Architect, Consultants, Contractors, or other person or entity providing services or work for the Design-Builder, amounts paid by the Owner to the Design-Builder for the Work. If the Design-Builder fails to furnish such evidence within seven days, the Owner shall have the right to contact the Architect, Consultants, and Contractors to ascertain whether they have been properly paid. The Owner shall have no obligation to pay or to see to the payment of money to a Consultant or Contractor, except as may otherwise be required by law.

**§ 9.6.5** Design-Builder payments to material and equipment suppliers shall be treated in a manner similar to that provided in Sections 9.6.2, 9.6.3 and 9.6.4.

**§ 9.6.6** A Certificate for Payment, a progress payment, or partial or entire use or occupancy of the Project by the Owner shall not constitute acceptance of Work not in accordance with the Design-Build Documents.

**§9.6.7** Unless the Design-Builder provides the Owner with a payment bond in the full penal sum of the Contract Sum, payments received by the Design-Builder for Work properly performed by the Architect, Consultants, Contractors and other person or entity providing services or work for the Design-Builder, shall be held by the Design-Builder for the Architect and those Consultants, Contractors, or other person or entity providing services or work for the

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

Design-Builder, for which payment was made by the Owner. Nothing contained herein shall require money to be placed in a separate account and not commingled with money of the Design-Builder, shall create any fiduciary liability or tort liability on the part of the Design-Builder for breach of trust or shall entitle any person or entity to an award of punitive damages against the Design-Builder for breach of the requirements of this provision.

### § 9.7 Failure of Payment
If the Owner does not issue a Certificate for Payment, through no fault of the Design-Builder, within the time required by the Design-Build Documents, then the Design-Builder may, upon seven additional days' written notice to the Owner, stop the Work until payment of the amount owing has been received. The Contract Time shall be extended appropriately and the Contract Sum shall be increased by the amount of the Design-Builder's reasonable costs of shut-down, delay and start-up, plus interest as provided for in the Design-Build Documents.

### § 9.8 Substantial Completion
**§ 9.8.1** Substantial Completion is the stage in the progress of the Work when the Work or designated portion thereof is sufficiently complete in accordance with the Design-Build Documents so that the Owner can occupy or utilize the Work for its intended use. The date of Substantial Completion is the date certified by the Owner in accordance with this Section 9.8.

**§ 9.8.2** When the Design-Builder considers that the Work, or a portion thereof which the Owner agrees to accept separately, is substantially complete, the Design-Builder shall prepare and submit to the Owner a comprehensive list of items to be completed or corrected prior to final payment. Failure to include an item on such list does not alter the responsibility of the Design-Builder to complete all Work in accordance with the Design-Build Documents.
O
**§ 9.8.3** Upon receipt of the Design-Builder's list, the Owner shall make an inspection to determine whether the Work or designated portion thereof is substantially complete. If the Owner's inspection discloses any item, whether or not included on the Design-Builder's list, which is not sufficiently complete in accordance with the Design-Build Documents so that the Owner can occupy or utilize the Work or designated portion thereof for its intended use, the Design-Builder shall, before issuance of the Certificate of Substantial Completion, complete or correct such item upon notification by the Owner. In such case, the Design-Builder shall then submit a request for another inspection by the Owner to determine Substantial Completion.

**§ 9.8.4** Prior to issuance of the Certificate of Substantial Completion under Section 9.8.5 or Owner taking possession by moving Owner's property into the building, whichever occurs first, the Design-Builder shall maintain property insurance for the facility and property.  At the time of the issuance of the Certificate of Substantial Completion under Section 9.8.5 or Owner taking possession by moving Owner's property into the building,  Owner shall be responsible to obtain and maintain property insurance for the facility and property.

**§ 9.8.5** When the Work or designated portion thereof is substantially complete, the Design-Builder will prepare for the Owner's signature a Certificate of Substantial Completion that shall, upon the Owner's signature, establish the date of Substantial Completion; establish responsibilities of the Owner and Design-Builder for security, maintenance, heat, utilities, damage to the Work and insurance; and fix the time within which the Design-Builder shall finish all items on the list accompanying the Certificate. Warranties required by the Design-Build Documents shall commence on the date of Substantial Completion of the Work or designated portion thereof unless otherwise provided in the Certificate of Substantial Completion.

**§ 9.8.6** The Certificate of Substantial Completion shall be submitted by the Design-Builder to the Owner for written acceptance of responsibilities assigned to it in the Certificate. Upon the Owner's acceptance, and consent of surety, if any, the Owner shall make payment of retainage applying to the Work or designated portion thereof. Payment shall be adjusted for Work that is incomplete or not in accordance with the requirements of the Design-Build Documents.

### § 9.9 Partial Occupancy or Use
**§ 9.9.1** The Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Design-Builder, provided such occupancy or use is consented to, by endorsement or otherwise, by the insurer providing property insurance and authorized by public authorities having jurisdiction over the Project. Such partial occupancy or use may commence whether or not the portion is substantially complete, provided the Owner and Design-Builder have accepted in writing the responsibilities assigned to each of them for payments, retainage, if any, security, maintenance, heat, utilities, damage to the Work and insurance, and have agreed in writing concerning the period for correction of the Work and commencement of

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                          (1282092854)
115508735v6

warranties required by the Design-Build Documents. When the Design-Builder considers a portion substantially complete, the Design-Builder shall prepare and submit a list to the Owner as provided under Section 9.8.2. Consent of the Design-Builder to partial occupancy or use shall not be unreasonably withheld. The stage of the progress of the Work shall be determined by written agreement between the Owner and Design-Builder.

**§ 9.9.2** Immediately prior to such partial occupancy or use, the Owner and Design-Builder shall jointly inspect the area to be occupied or portion of the Work to be used in order to determine and record the condition of the Work.

**§ 9.9.3** Unless otherwise agreed upon, partial occupancy or use of a portion or portions of the Work shall not constitute acceptance of Work not complying with the requirements of the Design-Build Documents.

## § 9.10 Final Completion and Final Payment
**§ 9.10.1** Upon receipt of the Design-Builder's written notice that the Work is ready for final inspection and acceptance and upon receipt of a final Application for Payment, the Owner will promptly make such inspection. When the Owner finds the Work acceptable under the Design-Build Documents and the Contract fully performed, the Owner will, subject to Section 9.10.2, promptly issue a final Certificate for Payment.

**§ 9.10.2** Neither final payment nor any remaining retained percentage shall become due until the Design-Builder submits to the Owner (1) an affidavit that payrolls, bills for materials and equipment, and other indebtedness connected with the Work, for which the Owner or the Owner's property might be responsible or encumbered, (less amounts withheld by Owner) have been paid or otherwise satisfied, (2) a certificate evidencing that insurance required by the Design-Build Documents to remain in force after final payment is currently in effect, (3) a written statement that the Design-Builder knows of no substantial reason that the insurance will not be renewable to cover the period required by the Design-Build Documents, (4) consent of surety, if any, to final payment, (5) as-constructed record copy of the Construction Documents marked to indicate field changes and selections made during construction, (6) manufacturer's warranties, product data, and maintenance and operations manuals, and (7) if required by the Owner, other data establishing payment or satisfaction of obligations, such as receipts, or releases and waivers of liens, claims, security interests, or encumbrances, arising out of the Contract, to the extent and in such form as may be designated by the Owner. If an Architect, a Consultant, or a Contractor, or other person or entity providing services or work for the Design-Builder, refuses to furnish a release or waiver required by the Owner, the Design-Builder may furnish a bond satisfactory to the Owner to indemnify the Owner against such liens, claims, security interests, or encumbrances. If such liens, claims, security interests, or encumbrances remains unsatisfied after payments are made, the Design-Builder shall refund to the Owner all money that the Owner may be compelled to pay in discharging such liens, claims, security interests, or encumbrances, including all costs and reasonable attorneys' fees.

**§ 9.10.3** If, after Substantial Completion of the Work, final completion thereof is materially delayed through no fault of the Design-Builder or by issuance of Change Orders affecting final completion, the Owner shall, upon application by the Design-Builder, and without terminating the Contract, make payment of the balance due for that portion of the Work fully completed and accepted. If the remaining balance for Work not fully completed or corrected is less than retainage stipulated in the Design-Build Documents, and if bonds have been furnished, the written consent of surety to payment of the balance due for that portion of the Work fully completed and accepted shall be submitted by the Design-Builder to the Owner prior to issuance of payment. Such payment shall be made under terms and conditions governing final payment, except that it shall not constitute a waiver of claims.

**§ 9.10.4** The making of final payment shall constitute a waiver of Claims by the Owner except those arising from
.1    liens, Claims, security interests or encumbrances arising out of the Contract and unsettled;
.2    failure of the Work to comply with the requirements of the Design-Build Documents; or
.3    terms of special warranties required by the Design-Build Documents.

**§ 9.10.5** Acceptance of final payment by the Design-Builder shall constitute a waiver of claims by the Design-Builder except those previously made in writing and identified by the Design-Builder as unsettled at the time of final Application for Payment.

## ARTICLE 10   PROTECTION OF PERSONS AND PROPERTY
### § 10.1 Safety Precautions and Programs
The Design-Builder shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Contract.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                          (1282092854)

115508735v6

## § 10.2 Safety of Persons and Property
**§ 10.2.1** The Design-Builder shall be responsible for precautions for the safety of, and reasonable protection to prevent damage, injury or loss to

    **.1**    employees on the Work and other persons who may be affected thereby;

    **.2**    the Work and materials and equipment to be incorporated therein, whether in storage on or off the site, under care, custody or control of the Design-Builder or the Architect, Consultants, or Contractors, or other person or entity providing services or work for the Design-Builder; and

    **.3**    other property at the site or adjacent thereto, such as trees, shrubs, lawns, walks, pavements, roadways, or structures and utilities not designated for removal, relocation or replacement in the course of construction.

**§ 10.2.2** The Design-Builder shall comply with, and give notices required by, applicable laws, statutes, ordinances, codes, rules and regulations, and lawful orders of public authorities, bearing on safety of persons or property, or their protection from damage, injury or loss.

**§ 10.2.3** The Design-Builder shall implement, erect, and maintain, as required by existing conditions and performance of the Contract, reasonable safeguards for safety and protection, including posting danger signs and other warnings against hazards, promulgating safety regulations, and notify owners and users of adjacent sites and utilities of the safeguards and protections.

**§ 10.2.4** When use or storage of explosives or other hazardous materials or equipment, or unusual methods, are necessary for execution of the Work, the Design-Builder shall exercise utmost care, and carry on such activities under supervision of properly qualified personnel.

**§ 10.2.5** The Design-Builder shall promptly remedy damage and loss (other than damage or loss insured under property insurance required by the Design-Build Documents) to property referred to in Sections 10.2.1.2 and 10.2.1.3, caused in whole or in part by the Design-Builder, the Architect, a Consultant, a Contractor, or anyone directly or indirectly employed by any of them, or by anyone for whose acts they may be liable and for which the Design-Builder is responsible under Sections 10.2.1.2 and 10.2.1.3; except damage or loss attributable to acts or omissions of the Owner, or anyone directly or indirectly employed by the Owner, or by anyone for whose acts the Owner may be liable, and not attributable to the fault or negligence of the Design-Builder. The foregoing obligations of the Design-Builder are in addition to the Design-Builder's obligations under Section 3.1.14.

**§ 10.2.6** The Design-Builder shall designate a responsible member of the Design-Builder's organization, at the site, whose duty shall be the prevention of accidents. This person shall be the Design-Builder's superintendent unless otherwise designated by the Design-Builder in writing to the Owner.

**§ 10.2.7** The Design-Builder shall not permit any part of the construction or site to be loaded so as to cause damage or create an unsafe condition.

**§ 10.2.8 Injury or Damage to Person or Property.** If the Owner or Design-Builder suffers injury or damage to person or property because of an act or omission of the other, or of others for whose acts such party is legally responsible, written notice of the injury or damage, whether or not insured, shall be given to the other party within a reasonable time not exceeding 21 days after discovery. The notice shall provide sufficient detail to enable the other party to investigate the matter.

## § 10.3 Hazardous Materials
**§ 10.3.1** The Design-Builder is responsible for compliance with any requirements included in the Design-Build Documents regarding hazardous materials. If the Design-Builder encounters a hazardous material or substance not addressed in the Design-Build Documents and if reasonable precautions will be inadequate to prevent foreseeable bodily injury or death to persons resulting from a material or substance, including but not limited to asbestos or polychlorinated biphenyl (PCB), encountered on the site by the Design-Builder, the Design-Builder shall, upon recognizing the condition, immediately stop Work in the affected area and report the condition to the Owner in writing.

**§ 10.3.2** Upon receipt of the Design-Builder's written notice, the Owner shall obtain the services of a licensed laboratory to verify the presence or absence of the material or substance reported by the Design-Builder and, in the event such material or substance is found to be present, to cause it to be rendered harmless. Unless otherwise required

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. <span style="color:red">The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission.</span> This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

by the Design-Build Documents, the Owner shall furnish in writing to the Design-Builder the names and qualifications of persons or entities who are to perform tests verifying the presence or absence of such material or substance or who are to perform the task of removal or safe containment of such material or substance. The Design-Builder will promptly reply to the Owner in writing stating whether or not the Design-Builder has reasonable objection to the persons or entities proposed by the Owner. If the Design-Builder has an objection to a person or entity proposed by the Owner, the Owner shall propose another to whom the Design-Builder has no reasonable objection. When the material or substance has been rendered harmless, Work in the affected area shall resume upon written agreement of the Owner and Design-Builder. By Change Order, the Contract Time shall be extended appropriately and the Contract Sum shall be increased in the amount of the Design-Builder's reasonable additional costs of shut-down, delay and start-up.

**§ 10.3.3** To the fullest extent permitted by law, the Owner shall indemnify and hold harmless the Design-Builder, the Architect, Consultants, and Contractors, and employees of any of them, from and against claims, damages, losses and expenses, including but not limited to attorneys' fees, arising out of or resulting from performance of the Work in the affected area, if in fact the material or substance presents the risk of bodily injury or death as described in Section 10.3.1 and has not been rendered harmless, provided that such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death, or to injury to, or destruction of, tangible property (other than the Work itself), except to the extent that such damage, loss or expense is due to the fault or negligence of the party seeking indemnity.

**§ 10.3.4** The Owner shall not be responsible under this Section 10.3 for materials or substances the Design-Builder brings to the site unless such materials or substances are required by the Owner's Criteria. The Owner shall be responsible for materials or substances required by the Owner's Criteria, except to the extent of the Design-Builder's fault or negligence in the use and handling of such materials or substances.

**§ 10.3.5** The Design-Builder shall indemnify the Owner for the cost and expense the Owner incurs (1) for remediation of a material or substance the Design-Builder brings to the site and negligently handles, or (2) where the Design-Builder fails to perform its obligations under Section 10.3.1, except to the extent that the cost and expense are due to the Owner's fault or negligence.

**§ 10.3.6** If, without negligence on the part of the Design-Builder, the Design-Builder is held liable by a government agency for the cost of remediation of a hazardous material or substance solely by reason of performing Work as required by the Design-Build Documents, the Owner shall indemnify the Design-Builder for all cost and expense thereby incurred.

### § 10.4  Emergencies
In an emergency affecting safety of persons or property, the Design-Builder shall act, at the Design-Builder's discretion, to prevent threatened damage, injury or loss.

### ARTICLE 11  UNCOVERING AND CORRECTION OF WORK
### § 11.1  Uncovering of Work
The Owner may request to examine a portion of the Work that the Design-Builder has covered to determine if the Work has been performed in accordance with the Design-Build Documents. If such Work is in accordance with the Design-Build Documents, the Owner and Design-Builder shall execute a Change Order to adjust the Contract Time and Contract Sum, as appropriate. If such Work is not in accordance with the Design-Build Documents, the costs of uncovering and correcting the Work shall be at the Design-Builder's expense and the Design-Builder shall not be entitled to a change in the Contract Time unless the condition was caused by the Owner or a separate contractor in which event the Owner shall be responsible for payment of such costs and the Contract Time will be adjusted as appropriate.

### § 11.2 Correction of Work
**§ 11.2.1 Before or After Substantial Completion.** The Design-Builder shall promptly correct Work rejected by the Owner or failing to conform to the requirements of the Design-Build Documents, whether discovered before or after Substantial Completion and whether or not fabricated, installed or completed. Costs of correcting such rejected Work, including additional testing and inspections, the cost of uncovering and replacement, and compensation for any design consultant employed by the Owner whose expenses and compensation were made necessary thereby, shall be at the Design-Builder's expense.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                    (1282092854)

115508735v6

## § 11.2.2 After Substantial Completion

§ **11.2.2.1** In addition to the Design-Builder's obligations under Section 3.1.12, if, within one year after the date of Substantial Completion of the Work or designated portion thereof or after the date for commencement of warranties established under Section 9.9.1, or by terms of an applicable special warranty required by the Design-Build Documents, any of the Work is found not to be in accordance with the requirements of the Design-Build Documents, the Design-Builder shall correct it promptly after receipt of written notice from the Owner to do so unless the Owner has previously given the Design-Builder a written acceptance of such condition. The Owner shall give such notice promptly after discovery of the condition. During the one-year period for correction of the Work, if the Owner fails to notify the Design-Builder and give the Design-Builder an opportunity to make the correction, the Owner waives the rights to require correction by the Design-Builder and to make a claim for breach of warranty. If the Design-Builder fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner, the Owner may correct it in accordance with Section 7.9.

§ **11.2.2.2** The one-year period for correction of Work shall be extended with respect to portions of Work first performed after Substantial Completion by the period of time between Substantial Completion and the actual completion of that portion of the Work.

§ **11.2.2.3** The one-year period for correction of Work shall not be extended by corrective Work performed by the Design-Builder pursuant to this Section 11.2.

§ **11.2.3** The Design-Builder shall remove from the site portions of the Work that are not in accordance with the requirements of the Design-Build Documents and are neither corrected by the Design-Builder nor accepted by the Owner.

§ **11.2.4** The Design-Builder shall bear the cost of correcting destroyed or damaged construction of the Owner or separate contractors, whether completed or partially completed, caused by the Design-Builder's correction or removal of Work that is not in accordance with the requirements of the Design-Build Documents.

§ **11.2.5** Nothing contained in this Section 11.2 shall be construed to establish a period of limitation with respect to other obligations the Design-Builder has under the Design-Build Documents. Establishment of the one-year period for correction of Work as described in Section 11.2.2 relates only to the specific obligation of the Design-Builder to correct the Work, and has no relationship to the time within which the obligation to comply with the Design-Build Documents may be sought to be enforced, nor to the time within which proceedings may be commenced to establish the Design-Builder's liability with respect to the Design-Builder's obligations other than specifically to correct the Work.

## § 11.3 Acceptance of Nonconforming Work

If the Owner prefers to accept Work that is not in accordance with the requirements of the Design-Build Documents, the Owner may do so instead of requiring its removal and correction, in which case the Contract Sum will be reduced as appropriate and equitable. Such adjustment shall be effected whether or not final payment has been made.

## ARTICLE 12   COPYRIGHTS AND LICENSES

§ **12.1** Drawings, specifications, and other documents furnished by the Design-Builder, including those in electronic form, are Instruments of Service. The Design-Builder, and the Architect, Consultants, Contractors, and any other person or entity providing services or work for any of them, shall be deemed the authors and owners of their respective Instruments of Service, including the Drawings and Specifications, and shall retain all common law, statutory and other reserved rights, including copyrights. Submission or distribution of Instruments of Service to meet official regulatory requirements, or for similar purposes in connection with the Project, is not to be construed as publication in derogation of the reserved rights of the Design-Builder and the Architect, Consultants, and Contractors, and any other person or entity providing services or work for any of them.

§ **12.2** The Design-Builder and the Owner warrant that in transmitting Instruments of Service, or any other information, the transmitting party is the copyright owner of such information or has permission from the copyright owner to transmit such information for its use on the Project.

§ **12.3** Upon execution of the Agreement, the Design-Builder grants to the Owner a limited, irrevocable and non-exclusive license to use the Instruments of Service solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner substantially performs its obligations,

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                          (1282092854)
115508735v6

including prompt payment of all sums when due, under the Design-Build Documents. The license granted under this section permits the Owner to authorize its consultants and separate contractors to reproduce applicable portions of the Instruments of Service solely and exclusively for use in performing services or construction for the Project. If the Design-Builder rightfully terminates this Agreement for cause as provided in Section 13.1.4 or 13.2.1 the license granted in this Section 12.3 shall terminate.

§ **12.3.1** The Design-Builder shall obtain non-exclusive licenses from the Architect, Consultants, and Contractors, that will allow the Design-Builder to satisfy its obligations to the Owner under this Article 12. The Design-Builder's licenses from the Architect and its Consultants and Contractors shall also allow the Owner, in the event this Agreement is terminated for any reason other than the default of the Owner or in the event the Design-Builder's Architect, Consultants, or Contractors terminate their agreements with the Design-Builder for cause, to obtain a limited, irrevocable and non-exclusive license solely and exclusively for purposes of constructing, using, maintaining, altering and adding to the Project, provided that the Owner (1) agrees to pay to the Architect, Consultant or Contractor all amounts due, and (2) provide the Architect, Consultant or Contractor with the Owner's written agreement to indemnify and hold harmless the Architect, Consultant or Contractor from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Owner's alteration or use of the Instruments of Service.

§ **12.3.2** In the event the Owner alters the Instruments of Service without the author's written authorization or uses the Instruments of Service without retaining the authors of the Instruments of Service, the Owner releases the Design-Builder, Architect, Consultants, Contractors and any other person or entity providing services or work for any of them, from all claims and causes of action arising from or related to such uses. The Owner, to the extent permitted by law, further agrees to indemnify and hold harmless the Design-Builder, Architect, Consultants, Contractors and any other person or entity providing services or work for any of them, from all costs and expenses, including the cost of defense, related to claims and causes of action asserted by any third person or entity to the extent such costs and expenses arise from the Owner's alteration or use of the Instruments of Service under this Section 12.3.2. The terms of this Section 12.3.2 shall not apply if the Owner rightfully terminates this Agreement for cause under Sections 13.1.4 or 13.2.2.

**ARTICLE 13   TERMINATION OR SUSPENSION**
**§ 13.1   Termination or Suspension Prior to Execution of the Design-Build Amendment**
§ **13.1.1** If the Owner fails to make payments to the Design-Builder for Work prior to execution of the Design-Build Amendment in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Design-Builder's option, cause for suspension of performance of services under this Agreement. If the Design-Builder elects to suspend the Work, the Design-Builder shall give a seven days' written notice and opportunity to cure to the Owner before suspending the Work. In the event of a suspension of the Work, the Design-Builder shall have no liability to the Owner for delay or damage caused by the suspension of the Work. Before resuming the Work, the Design-Builder shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Design-Builder's Work. The Design-Builder's compensation for, and time to complete, the remaining Work shall be equitably adjusted.

§ **13.1.2** If the Owner suspends the Project, the Design-Builder shall be compensated for the Work performed prior to notice of such suspension. When the Project is resumed, the Design-Builder shall be compensated for expenses incurred in the interruption and resumption of the Design-Builder's Work. The Design-Builder's compensation for, and time to complete, the remaining Work shall be equitably adjusted.

§ **13.1.3** If the Owner suspends the Project for more than 90 cumulative days for reasons other than the fault of the Design-Builder, the Design-Builder may terminate this Agreement by giving not less than seven days' written notice.

§ **13.1.4** Either party may terminate this Agreement after the expiration of a seven days' written notice and opportunity to cure period should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

§ **13.1.5** The Owner may terminate this Agreement upon not less than seven days' written notice to the Design-Builder for the Owner's convenience and without cause.

§ **13.1.6** In the event of termination not the fault of the Design-Builder, the Design-Builder shall be compensated for Work performed prior to termination, together with Reimbursable Expenses then due and any other expenses directly

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                                (1282092854)
115508735v6

attributable to termination for which the Design-Builder is not otherwise compensated. In no event shall the Design-Builder's compensation under this Section 13.1.6 be greater than the compensation set forth in Section 2.1.

## § 13.2 Termination or Suspension Following Execution of the Design-Build Amendment
### § 13.2.1 Termination by the Design-Builder
**§ 13.2.1.1** The Design-Builder may terminate the Contract if the Work is stopped for a period of 30 consecutive days through no act or fault of the Design-Builder, the Architect, a Consultant, or a Contractor, or their agents or employees, or any other persons or entities performing portions of the Work under direct or indirect contract with the Design-Builder, for any of the following reasons:

.1 Issuance of an order of a court or other public authority having jurisdiction that requires all Work to be stopped;

.2 An act of government, such as a declaration of national emergency that requires all Work to be stopped;

.3 Because the Owner has not issued a Certificate for Payment and has not notified the Design-Builder of the reason for withholding certification as provided in Section 9.5.1, or because the Owner has not made payment on a Certificate for Payment within the time stated in the Design-Build Documents; or

.4 The Owner has failed to furnish to the Design-Builder promptly, upon the Design-Builder's request, reasonable evidence as required by Section 7.2.7.

**§ 13.2.1.2** The Design-Builder may terminate the Contract if, through no act or fault of the Design-Builder, the Architect, a Consultant, a Contractor, or their agents or employees or any other persons or entities performing portions of the Work under direct or indirect contract with the Design-Builder, repeated suspensions, delays or interruptions of the entire Work by the Owner as described in Section 13.2.3 constitute in the aggregate more than 100 percent of the total number of days scheduled for completion, or 120 days in any 365-day period, whichever is less.

**§ 13.2.1.3** If one of the reasons described in Section 13.2.1.1 or 13.2.1.2 exists, the Design-Builder may, upon seven days' written notice to the Owner, terminate the Contract and recover from the Owner payment for Work executed, including reasonable overhead and profit, costs incurred by reason of such termination, and damages.

**§ 13.2.1.4** If the Work is stopped for a period of 60 consecutive days through no act or fault of the Design-Builder or any other persons or entities performing portions of the Work under contract with the Design-Builder because the Owner has repeatedly failed to fulfill the Owner's obligations under the Design-Build Documents with respect to matters important to the progress of the Work, the Design-Builder may, upon seven additional days' written notice to the Owner, terminate the Contract and recover from the Owner as provided in Section 13.2.1.3.

### § 13.2.2 Termination by the Owner For Cause
**§ 13.2.2.1** The Owner may terminate the Contract if the Design-Builder

.1 fails to submit the Proposal by the date required by this Agreement, or if no date is indicated, within a reasonable time consistent with the date of Substantial Completion;

.2 repeatedly refuses or fails to supply an Architect, or enough properly skilled Consultants, Contractors, or workers or proper materials;

.3 fails to make payment to the Architect, Consultants, or Contractors for services, materials or labor in accordance with their respective agreements with the Design-Builder;

.4 repeatedly disregards applicable laws, statutes, ordinances, codes, rules and regulations, or lawful orders of a public authority; or

.5 is otherwise guilty of substantial breach of a provision of the Design-Build Documents.

**§ 13.2.2.2** When any of the above reasons exist, the Owner may without prejudice to any other rights or remedies of the Owner and after giving the Design-Builder and the Design-Builder's surety, if any, seven days' written notice, terminate employment of the Design-Builder and may, subject to any prior rights of the surety:

.1 Exclude the Design-Builder from the site and take possession of all materials, equipment, tools, and construction equipment and machinery thereon owned by the Design-Builder;

.2 Accept assignment of the Architect, Consultant and Contractor agreements pursuant to Section 3.1.15; and

.3 Finish the Work by whatever reasonable method the Owner may deem expedient. Upon written request of the Design-Builder, the Owner shall furnish to the Design-Builder a detailed accounting of the costs incurred by the Owner in finishing the Work.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                    (1282092854)
115508735v6

**§ 13.2.2.3** When the Owner terminates the Contract for one of the reasons stated in Section 13.2.2.1, the Design-Builder shall not be entitled to receive further payment until the Work is finished.

**§ 13.2.2.4** If the unpaid balance of the Contract Sum exceeds costs of finishing the Work and other damages incurred by the Owner and not expressly waived, such excess shall be paid to the Design-Builder. If such costs and damages exceed the unpaid balance, the Design-Builder shall pay the difference to the Owner. The obligation for such payments shall survive termination of the Contract.

### § 13.2.3 Suspension by the Owner for Convenience
**§ 13.2.3.1** The Owner may, without cause, order the Design-Builder in writing to suspend, delay or interrupt the Work in whole or in part for such period of time as the Owner may determine.

**§ 13.2.3.2** The Contract Sum and Contract Time shall be adjusted for increases in the cost and time caused by suspension, delay or interruption as described in Section 13.2.3.1. Adjustment of the Contract Sum shall include profit. No adjustment shall be made to the extent

    **.1**    that performance is, was or would have been so suspended, delayed or interrupted by another cause for which the Design-Builder is responsible; or

    **.2**    that an equitable adjustment is made or denied under another provision of the Contract.

### § 13.2.4 Termination by the Owner for Convenience
**§ 13.2.4.1** The Owner may, at any time, terminate the Contract for the Owner's convenience and without cause.

**§ 13.2.4.2** Upon receipt of written notice from the Owner of such termination for the Owner's convenience, the Design-Builder shall

    **.1**    cease operations as directed by the Owner in the notice;

    **.2**    take actions necessary, or that the Owner may direct, for the protection and preservation of the Work; and,

    **.3**    except for Work directed to be performed prior to the effective date of termination stated in the notice, terminate all existing Project agreements, including agreements with the Architect, Consultants, Contractors, and purchase orders, and enter into no further Project agreements and purchase orders.

**§ 13.2.4.3** In case of such termination for the Owner's convenience, the Design-Builder shall be entitled to receive payment for Work executed, and costs incurred by reason of such termination, along with reasonable overhead and profit on the Work not executed.

## ARTICLE 14   CLAIMS AND DISPUTE RESOLUTION
### § 14.1 Claims
**§ 14.1.1 Definition.** A Claim is a demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the Contract. The term "Claim" also includes other disputes and matters in question between the Owner and Design-Builder arising out of or relating to the Contract. The responsibility to substantiate Claims shall rest with the party making the Claim.

**§ 14.1.2 Time Limits on Claims.** The Owner and Design-Builder shall commence all claims and causes of action, whether in contract, tort, breach of warranty or otherwise, against the other, arising out of or related to the Contract in accordance with the requirements of the binding dispute resolution method selected in Section 1.3, within the time period specified by applicable law, but in any case not more than 10 years after the date of Substantial Completion of the Work. The Owner and Design-Builder waive all claims and causes of action not commenced in accordance with this Section 14.1.2.

**§ 14.1.2.1** No affiliate, officer, director, trustee, agent or employee of the Owner shall ever be personally or individually liable with respect to this Agreement or the Work.  Each Contract shall include the foregoing limitation, which shall be effective if the Owner ever succeeds to the Design-Builder's rights and obligations under a Contract.

### § 14.1.3 Notice of Claims
**§ 14.1.3.1 Prior To Final Payment.** Prior to Final Payment, Claims by either the Owner or Design-Builder must be initiated by written notice to the other party within 21 days after occurrence of the event giving rise to such Claim or within 21 days after the claimant first recognizes the condition giving rise to the Claim, whichever is later.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**    (1282092854)

115508735v6

**§ 14.1.3.2 Claims Arising After Final Payment.** After Final Payment, Claims by either the Owner or Design-Builder that have not otherwise been waived pursuant to Sections 9.10.4 or 9.10.5, must be initiated by prompt written notice to the other party. The notice requirement in Section 14.1.3.1 and the Initial Decision requirement as a condition precedent to mediation in Section 14.2.1 shall not apply.

**§ 14.1.4 Continuing Contract Performance.** Pending final resolution of a Claim, except as otherwise agreed in writing or as provided in Section 9.7 and Article 13, the Design-Builder shall proceed diligently with performance of the Contract and the Owner shall continue to make payments in accordance with the Design-Build Documents.

**§ 14.1.5 Claims for Additional Cost.** If the Design-Builder intends to make a Claim for an increase in the Contract Sum, written notice as provided herein shall be given before proceeding to execute the portion of the Work that relates to the Claim. Prior notice is not required for Claims relating to an emergency endangering life or property arising under Section 10.4. Moreover, the Design-Builder shall have a duty to attempt to mitigate reasonably the effects of any known condition or event which gives rise to or is likely to give rise to any increase in the Contract Sum. Notwithstanding any other provision of the Design-Build Documents, the Design-Builder shall not be entitled to any increase in the Contract Sum for any event or condition to the extent caused by the Design-Builder's negligence or failure to perform its contractual obligations pertaining to the Work.

**§ 14.1.6 Claims for Additional Time**
**§ 14.1.6.1** If the Design-Builder intends to make a Claim for an increase in the Contract Time, written notice as provided herein shall be given. The Design-Builder's Claim shall include an estimate of cost and of probable effect of delay on progress of the Work. In the case of a continuing delay, only one Claim is necessary. Moreover, the Design-Builder shall have a duty to attempt to mitigate reasonably the effects of any known condition or event which gives rise to or is likely to give rise to any increase in the Contract Time. Notwithstanding any other provision of the Design-Build Documents, the Design-Builder shall not be entitled to any increase in the Contract Time for any event or condition to the extent caused by the Design-Builder's negligence or failure to perform its contractual obligations pertaining to the Work.

**§ 14.1.6.2** If adverse weather conditions are the basis for a Claim for additional time, such Claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated, and had an adverse effect on the scheduled construction.

**§ 14.1.7 Claims for Consequential Damages**
Except with respect to claims arising out of gross negligence or willful misconduct, claims related to third party claims for personal injury, death or property damages, or claims covered by the Design-Builder's insurance, the Design-Builder and Owner waive Claims against each other for consequential damages arising out of or relating to this Contract. This mutual waiver includes

    **.1** damages incurred by the Owner for rental expenses, for losses of use, income, profit, financing, business and reputation, and for loss of management or employee productivity or of the services of such persons; and

    **.2** damages incurred by the Design-Builder for principal office expenses including the compensation of personnel stationed there, for losses of financing, business and reputation, and for loss of profit except anticipated profit arising directly from the Work.

This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 13. Nothing contained in this Section 14.1.7 shall be deemed to preclude an award of liquidated damages, when applicable, in accordance with the requirements of the Design-Build Documents.

**§ 14.2 Initial Decision**
**§ 14.2.1** An initial decision shall be required as a condition precedent to mediation of all Claims between the Owner and Design-Builder initiated prior to the date final payment is due, excluding those arising under Sections 10.3 and 10.4 of the Agreement and Sections B.3.2.9 and B.3.2.10 of Exhibit B to this Agreement, unless 30 days have passed after the Claim has been initiated with no decision having been rendered. Unless otherwise mutually agreed in writing, the Owner shall render the initial decision on Claims.

**§ 14.2.2 Procedure**
**§ 14.2.2.1 Claims Initiated by the Owner.** If the Owner initiates a Claim, the Design-Builder shall provide a written response to Owner within ten days after receipt of the notice required under Section 14.1.3.1. Thereafter, the Owner

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:** (1282092854)
115508735v6

shall render an initial decision within ten days of receiving the Design-Builder's response: (1) withdrawing the Claim in whole or in part, (2) approving the Claim in whole or in part, or (3) suggesting a compromise.

**§ 14.2.2.2 Claims Initiated by the Design-Builder.** If the Design-Builder initiates a Claim, the Owner will take one or more of the following actions within ten days after receipt of the notice required under Section 14.1.3.1: (1) request additional supporting data, (2) render an initial decision rejecting the Claim in whole or in part, (3) render an initial decision approving the Claim, (4) suggest a compromise or (5) indicate that it is unable to render an initial decision because the Owner lacks sufficient information to evaluate the merits of the Claim.

**§ 14.2.3** In evaluating Claims, the Owner may, but shall not be obligated to, consult with or seek information from persons with special knowledge or expertise who may assist the Owner in rendering a decision. The retention of such persons shall be at the Owner's expense.

**§ 14.2.4** If the Owner requests the Design-Builder to provide a response to a Claim or to furnish additional supporting data, the Design-Builder shall respond, within ten days after receipt of such request, and shall either (1) provide a response on the requested supporting data, (2) advise the Owner when the response or supporting data will be furnished or (3) advise the Owner that no supporting data will be furnished. Upon receipt of the response or supporting data, if any, the Owner will either reject or approve the Claim in whole or in part.

**§ 14.2.5** The Owner's initial decision shall (1) be in writing; (2) state the reasons therefor; and (3) identify any change in the Contract Sum or Contract Time or both. The initial decision shall be final and binding on the parties but subject to mediation and, if the parties fail to resolve their dispute through mediation, to binding dispute resolution.

**§ 14.2.6** Either party may file for mediation of an initial decision at any time, subject to the terms of Section 14.2.6.1.

**§ 14.2.6.1** Either party may, within 30 days from the date of an initial decision, demand in writing that the other party file for mediation within 60 days of the initial decision. If such a demand is made and the party receiving the demand fails to file for mediation within the time required, then both parties waive their rights to mediate or pursue binding dispute resolution proceedings with respect to the initial decision.

**§ 14.2.7** In the event of a Claim against the Design-Builder, the Owner may, but is not obligated to, notify the surety, if any, of the nature and amount of the Claim. If a Claim relates to a possibility of a Design-Builder's default, the Owner may, but is not obligated to, notify the surety and request the surety's assistance in resolving the controversy.

**§ 14.2.8** If a Claim relates to or is the subject of a mechanic's lien, the party asserting such Claim may proceed in accordance with applicable law to comply with the lien notice or filing deadlines.

## § 14.3  Mediation
**§ 14.3.1** Claims, disputes, or other matters in controversy arising out of or related to the Contract, except those waived as provided for in Sections 9.10.4, 9.10.5, and 14.1.7, shall be subject to mediation as a condition precedent to binding dispute resolution.

**§ 14.3.2** The parties shall endeavor to resolve their Claims by mediation which, unless the parties mutually agree otherwise, shall be administered by the American Arbitration Association in accordance with its Construction Industry Mediation Procedures in effect on the date of the Agreement. A request for mediation shall be made in writing, delivered to the other party to the Contract, and filed with the person or entity administering the mediation. The request may be made concurrently with the filing of binding dispute resolution proceedings but, in such event, mediation shall proceed in advance of binding dispute resolution proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order. If an arbitration proceeding is stayed pursuant to this Section 14.3.2, the parties may nonetheless proceed to the selection of the arbitrator(s) and agree upon a schedule for later proceedings.

**§ 14.3.3** The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction.

## § 14.4  Arbitration
## § [Intentionally Omitted]

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                  (1282092854)
115508735v6

### § 14.4.4 Consolidation or Joinder
**§ 14.4.4.1** Either party, at its sole discretion, may consolidate an arbitration conducted under this Agreement with any other arbitration to which it is a party provided that (1) the arbitration agreement governing the other arbitration permits consolidation, (2) the arbitrations to be consolidated substantially involve common questions of law or fact, and (3) the arbitrations employ materially similar procedural rules and methods for selecting arbitrator(s).

**§ 14.4.4.2** Either party, at its sole discretion, may include by joinder persons or entities substantially involved in a common question of law or fact whose presence is required if complete relief is to be accorded in arbitration, provided that the party sought to be joined consents in writing to such joinder. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent.

**§ 14.4.4.3** The Owner and Design-Builder grant to any person or entity made a party to an arbitration conducted under this Section 14.4, whether by joinder or consolidation, the same rights of joinder and consolidation as the Owner and Design-Builder under this Agreement.

### § 14.5 LITIGATION
**§ 14.5.1**     Owner and Design-Builder agree that any Claim not resolved by mediation shall be subject to the parties' respectful rights to commence litigation with respect to such Claim.  The parties agree that any cause of action, Claim, or suit arising from or related to this Agreement or any of the Design-Build Documents shall be brought in a court of competent jurisdiction in the venue where the Project is located, unless the parties agree otherwise in writing.  The parties expressly hereby consent to the jurisdiction of such courts to hear any such Claim.

**§ 14.5.2     IN THE EVENT OF LITIGATION WITH RESPECT TO ANY CLAIM ARISING UNDER THIS AGREEMENT OR THE DESIGN-BUILD DOCUMENTS,  EACH PARTY TO THIS AGREEMENT HEREBY KNOWINGLY, VOLUNTARILY AND WILLINGLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, SUIT, OR PROCEEDING BROUGHT TO RESOLVE ANY DISPUTE BETWEEN OR AMONG ANY OF THE PARTIES HERETO, WHETHER ARISING IN CONTRACT, TORT, OR OTHERWISE, ARISING OUT OF, CONNECTED WITH, RELATED OR INCIDENTAL TO THIS AGREEMENT, THE TRANSACTION(S) CONTEMPLATED HEREBY AND/OR THE RELATIONSHIP ESTABLISHED AMONG THE PARTIES HEREUNDER.**

### ARTICLE 15   MISCELLANEOUS PROVISIONS
### § 15.1 Governing Law
The Contract shall be governed by the law of the place where the Project is located except that, if the parties have selected arbitration as the method of binding dispute resolution, the Federal Arbitration Act shall govern Section 14.4.

### § 15.2 Successors and Assigns
**§ 15.2.1** The Owner and Design-Builder, respectively, bind themselves, their partners, successors, assigns and legal representatives to the covenants, agreements and obligations contained in the Design-Build Documents. Except as provided in Section 15.2.2, neither party to the Contract shall assign the Contract as a whole without written consent of the other. If either party attempts to make such an assignment without such consent, that party shall nevertheless remain legally responsible for all obligations under the Contract.

**§ 15.2.2** The Owner may, without consent of the Design-Builder, assign the Contract to a lender providing construction financing for the Project, if the lender assumes the Owner's rights and obligations under the Design-Build Documents. The Design-Builder shall execute all consents reasonably required to facilitate such assignment.

**§ 15.2.3** If the Owner requests the Design-Builder, Architect, Consultants, or Contractors to execute certificates, other than those required by Section 3.1.10, the Owner shall submit the proposed language of such certificates for review at least 14 days prior to the requested dates of execution. If the Owner requests the Design-Builder, Architect, Consultants, or Contractors to execute consents reasonably required to facilitate assignment to a lender, the Design-Builder, Architect, Consultants, or Contractors shall execute all such consents that are consistent with this Agreement, provided the proposed consent is submitted to them for review at least 14 days prior to execution. The Design-Builder, Architect, Consultants, and Contractors shall not be required to execute certificates or consents that would require knowledge, services or responsibilities beyond the scope of their services.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                       (1282092854)
115508735v6

### § 15.3 Written Notice
Written notice shall be deemed to have been duly served if delivered in person to the individual, to a member of the firm or entity, or to an officer of the corporation for which it was intended; or if delivered at, or sent by registered or certified mail or by courier service providing proof of delivery to, the last business address known to the party giving notice.

### § 15.4 Rights and Remedies
**§ 15.4.1** Duties and obligations imposed by the Design-Build Documents, and rights and remedies available thereunder, shall be in addition to and not a limitation of duties, obligations, rights and remedies otherwise imposed or available by law.

**§ 15.4.2** No action or failure to act by the Owner or Design-Builder shall constitute a waiver of a right or duty afforded them under the Contract, nor shall such action or failure to act constitute approval of or acquiescence in a breach thereunder, except as may be specifically agreed in writing.

### § 15.5 Tests and Inspections
**§ 15.5.1** Tests, inspections and approvals of portions of the Work shall be made as required by the Design-Build Documents and by applicable laws, statutes, ordinances, codes, rules and regulations or lawful orders of public authorities. Unless otherwise provided, the Design-Builder shall make arrangements for such tests, inspections and approvals with an independent testing laboratory or entity acceptable to the Owner, or with the appropriate public authority, and shall bear all related costs of tests, inspections and approvals. The Design-Builder shall give the Owner timely notice of when and where tests and inspections are to be made so that the Owner may be present for such procedures. The Owner shall bear costs of (1) tests, inspections or approvals that do not become requirements until after bids are received or negotiations concluded, and (2) tests, inspections or approvals where building codes or applicable laws or regulations prohibit the Owner from delegating their cost to the Design-Builder.

**§ 15.5.2** If the Owner determines that portions of the Work require additional testing, inspection or approval not included under Section 15.5.1, the Owner will instruct the Design-Builder to make arrangements for such additional testing, inspection or approval by an entity acceptable to the Owner, and the Design-Builder shall give timely notice to the Owner of when and where tests and inspections are to be made so that the Owner may be present for such procedures. Such costs, except as provided in Section 15.5.3, shall be at the Owner's expense.

**§ 15.5.3** If such procedures for testing, inspection or approval under Sections 15.5.1 and 15.5.2 reveal failure of the portions of the Work to comply with requirements established by the Design-Build Documents, all costs made necessary by such failure shall be at the Design-Builder's expense.

**§ 15.5.4** Required certificates of testing, inspection or approval shall, unless otherwise required by the Design-Build Documents, be secured by the Design-Builder and promptly delivered to the Owner.

**§ 15.5.5** If the Owner is to observe tests, inspections or approvals required by the Design-Build Documents, the Owner will do so promptly and, where practicable, at the normal place of testing.

**§ 15.5.6** Tests or inspections conducted pursuant to the Design-Build Documents shall be made promptly to avoid unreasonable delay in the Work.

### § 15.6 Confidential Information
If the Owner or Design-Builder transmits Confidential Information, the transmission of such Confidential Information constitutes a warranty to the party receiving such Confidential Information that the transmitting party is authorized to transmit the Confidential Information. If a party receives Confidential Information, the receiving party shall keep the Confidential Information strictly confidential and shall not disclose it to any other person or entity except as set forth in Section 15.6.1.

**§ 15.6.1** A party receiving Confidential Information may disclose the Confidential Information as required by law or court order, including a subpoena or other form of compulsory legal process issued by a court or governmental entity. A party receiving Confidential Information may also disclose the Confidential Information to its employees, consultants or contractors in order to perform services or work solely and exclusively for the Project, provided those employees, consultants and contractors are subject to the restrictions on the disclosure and use of Confidential Information as set forth in this Contract.

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                      (1282092854)

115508735v6

**§ 15.7 Capitalization**
Terms capitalized in the Contract include those that are (1) specifically defined, (2) the titles of numbered articles or (3) the titles of other documents published by the American Institute of Architects.

**§ 15.8 Interpretation**
**§ 15.8.1** In the interest of brevity the Design-Build Documents frequently omit modifying words such as "all" and "any" and articles such as "the" and "an," but the fact that a modifier or an article is absent from one statement and appears in another is not intended to affect the interpretation of either statement.

**§ 15.8.2** Unless otherwise stated in the Design-Build Documents, words which have well-known technical or construction industry meanings are used in the Design-Build Documents in accordance with such recognized meanings.

**ARTICLE 16   SCOPE OF THE AGREEMENT**
**§ 16.1** This Agreement is comprised of the following documents listed below:
    **.1**    AIA Document A141™–2014, Standard Form of Agreement Between Owner and Design-Builder
    **.2**    AIA Document A141™–2014, Exhibit A, Design-Build Amendment, if executed
    **.3**    AIA Document A141™–2014, Exhibit B, Insurance and Bonds.

This Agreement entered into as of the day and year first written above.

| OWNER *(Signature)* | DESIGN-BUILDER *(Signature)* |
|---|---|
| « »« » | « »« » |
| *(Printed name and title)* | *(Printed name and title)* |

**AIA Document A141™ – 2014.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:25 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                                    (1282092854)
115508735v6

# EXHIBIT 5

# EXHIBIT 5

# AIA® Document A141™ – 2014   Exhibit A

## *Design-Build Amendment*

This Amendment is incorporated into the accompanying AIA Document A141™–2014, Standard Form of Agreement Between Owner and Design-Builder dated the « 19th » day of « August » in the year « 2021 » (the "Agreement")
*(In words, indicate day, month and year.)*

**for the following PROJECT:**
*(Name and location or address)*

OTE Center of Excellence
264 17th Street NW
Atlanta, Georgia 30363

**THE OWNER:**
*(Name, legal status and address)*

Overtime Elite, LLC
20 Jay Street, Suite 600
Brooklyn, New York 11201

**THE DESIGN-BUILDER:**
*(Name, legal status and address)*

AG Light and Sound Inc.
4660 Berg Street, Suite 130
North Las Vegas, Nevada 89081

The Owner and Design-Builder hereby amend the Agreement as follows.

**TABLE OF ARTICLES**

A.1     CONTRACT SUM

A.2     CONTRACT TIME

A.3     INFORMATION UPON WHICH AMENDMENT IS BASED

A.4     DESIGN-BUILDER'S PERSONNEL, CONTRACTORS AND SUPPLIERS

A.5     COST OF THE WORK

**ARTICLE A.1   CONTRACT SUM**
**§ A.1.1** The Owner shall pay the Design-Builder the Contract Sum in current funds for the Design-Builder's performance of the Contract after the execution of this Amendment. The Contract Sum shall be one of the following and shall not include compensation the Owner paid the Design-Builder for Work performed prior to execution of this Amendment:
*(Check the appropriate box.)*

[ «X» ]  Stipulated Sum, in accordance with Section A.1.2 below

[ « » ]  Cost of the Work plus the Design-Builder's Fee, in accordance with Section A.1.3 below

ADDITIONS AND DELETIONS: The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

Consultation with an attorney is also encouraged with respect to professional licensing requirements in the jurisdiction where the Project is located.

ELECTRONIC COPYING of any portion of this AIA® Document to another electronic file is prohibited and constitutes a violation of copyright laws as set forth in the footer of this document.

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

[ « » ]   Cost of the Work plus the Design-Builder's Fee with a Guaranteed Maximum Price, in accordance with Section A.1.4 below

*(Based on the selection above, complete Section A.1.2, A.1.3 or A.1.4 below.)*

### § A.1.2 Stipulated Sum
**§ A.1.2.1** The Stipulated Sum shall be the not-to-exceed amount of Sixteen Million Dollars ($16,000,000), as set forth in Design Builder's proposal, dated March 23, 2021 and revised June 23, 2021, as well as the Scope of Services, dated July 29, 2021, collectively attached as **Exhibit A1** to this Amendment.

**§ A.1.2.2** The Stipulated Sum is based upon the following alternates, if any, which are described in the Design-Build Documents and are hereby accepted by the Owner:
N/A

**§ A.1.2.3** Unit prices, if any:
*(Identify item, state the unit price, and state any applicable quantity limitations.)*

| Item | Units and Limitations | Price per Unit ($0.00) |
|------|----------------------|------------------------|
|      |                      |                        |

### § A.1.3 Cost of the Work Plus Design-Builder's Fee
**§ A.1.3.1** N/A

### § A.1.4 Cost of the Work Plus Design-Builder's Fee With a Guaranteed Maximum Price
**§ A.1.4.1** N/A

### § A.1.5 Payments
### § A.1.5.1 Progress Payments
**§ A.1.5.1.1** Based upon Applications for Payment submitted to the Owner by the Design-Builder, the Owner shall make progress payments on account of the Contract Sum to the Design-Builder as provided below and elsewhere in the Design-Build Documents.

**§ A.1.5.1.2** The period covered by each Application for Payment shall be one calendar month ending on the last day of the month, or as follows:

N/A – Application for Payment not required; payment made per payment schedule agreed to by Owner and Design-Builder, attached as **Exhibit A3**.

**§ A.1.5.1.3** Provided that an Application for Payment is received not later than the «1st» day of the month, the Owner shall make payment of the certified amount to the Design-Builder not later than the «30th» day of the «same» month. If an Application for Payment is received by the Owner after the application date fixed above, payment shall be made by the Owner not later than «forty-five» ( «45» ) days after the Owner receives the Application for Payment.
*(Federal, state or local laws may require payment within a certain period of time.)*

**§ A.1.5.1.4** With each Application for Payment where the Contract Sum is based upon the Cost of the Work, or the Cost of the Work with a Guaranteed Maximum Price, the Design-Builder shall submit payrolls, petty cash accounts, receipted invoices or invoices with check vouchers attached, and any other evidence required by the Owner to demonstrate that cash disbursements already made by the Design-Builder on account of the Cost of the Work equal or exceed (1) progress payments already received by the Design-Builder, less (2) that portion of those payments attributable to the Design-Builder's Fee; plus (3) payrolls for the period covered by the present Application for Payment.

**§ A.1.5.1.5** With each Application for Payment where the Contract Sum is based upon a Stipulated Sum or Cost of the Work with a Guaranteed Maximum Price, the Design-Builder shall submit the most recent schedule of values in accordance with the Design-Build Documents. The schedule of values shall allocate the entire Contract Sum among the various portions of the Work. Compensation for design services, if any, shall be shown separately. Where the Contract Sum is based on the Cost of the Work with a Guaranteed Maximum Price, the Design-Builder's Fee shall be shown separately. The schedule of values shall be prepared in such form and supported by such data to substantiate its accuracy

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
(944009319)

as the Owner may require. This schedule of values, unless objected to by the Owner, shall be used as a basis for reviewing the Design-Builder's Applications for Payment.

**§ A.1.5.1.6** In taking action on the Design-Builder's Applications for Payment, the Owner shall be entitled to rely on the accuracy and completeness of the information furnished by the Design-Builder and shall not be deemed to have made a detailed examination, audit or arithmetic verification of the documentation submitted in accordance with Sections A.1.5.1.4 or A.1.5.1.5, or other supporting data; to have made exhaustive or continuous on-site inspections; or to have made examinations to ascertain how or for what purposes the Design-Builder has used amounts previously paid. Such examinations, audits and verifications, if required by the Owner, will be performed by the Owner's auditors acting in the sole interest of the Owner.

**§ A.1.5.1.7** Except with the Owner's prior approval, the Design-Builder shall not make advance payments to suppliers for materials or equipment which have not been delivered and stored at the site.

**§ A.1.5.2 Progress Payments—Stipulated Sum**
**§ A.1.5.2.1** Applications for Payment where the Contract Sum is based upon a Stipulated Sum shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment.

**§ A.1.5.2.2** Subject to other provisions of the Design-Build Documents, the amount of each progress payment shall be computed as follows:

.1 Take that portion of the Contract Sum properly allocable to completed Work as determined by multiplying the percentage completion of each portion of the Work by the share of the Contract Sum allocated to that portion of the Work in the schedule of values, less retainage of «ten» percent ( «10» %) on the Work. Pending final determination of cost to the Owner of Changes in the Work, amounts not in dispute shall be included as provided in Section 6.3.9 of the Agreement;

.2 Add that portion of the Contract Sum properly allocable to materials and equipment delivered and suitably stored at the site for subsequent incorporation in the completed construction (or, if approved in advance by the Owner, suitably stored off the site at a location agreed upon in writing), less retainage of «ten» percent ( «10» %);

.3 Subtract the aggregate of previous payments made by the Owner; and

.4 Subtract amounts, if any, the Owner has withheld or nullified, as provided in Section 9.5 of the Agreement.

**§ A.1.5.2.3** The progress payment amount determined in accordance with Section A.1.5.2.2 shall be further modified under the following circumstances:

.1 Add, upon Substantial Completion of the Work, a sum sufficient to increase the total payments to the full amount of the Contract Sum, less such amounts as the Owner shall determine for incomplete Work, retainage applicable to such work and unsettled claims; and
*(Section 9.8.6 of the Agreement discusses release of applicable retainage upon Substantial Completion of Work.)*

.2 Add, if final completion of the Work is thereafter materially delayed through no fault of the Design-Builder, any additional amounts payable in accordance with Section 9.10.3 of the Agreement.

**§ A.1.5.2.4** Reduction or limitation of retainage, if any, shall be as follows:
*(If it is intended, prior to Substantial Completion of the entire Work, to reduce or limit the retainage resulting from the percentages inserted in Sections A.1.5.2.2.1 and A.1.5.2.2.2 above, and this is not explained elsewhere in the Design-Build Documents, insert provisions here for such reduction or limitation.)*

N/A

**§ A.1.5.3 Progress Payments—Cost of the Work Plus a Fee**
**§ A.1.5.3.1** N/A

**§ A.1.5.4 Progress Payments—Cost of the Work Plus a Fee with a Guaranteed Maximum Price**
**§ A.1.5.4.1** N/A

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
(944009319)

### § A.1.5.5 Final Payment
**§ A.1.5.5.1** Final payment, constituting the entire unpaid balance of the Contract Sum, shall be made by the Owner to the Design-Builder not later than 30 days after the Design-Builder has fully performed the Contract and the requirements of Section 9.10 of the Agreement have been satisfied, except for the Design-Builder's responsibility to correct non-conforming Work discovered after final payment or to satisfy other requirements, if any, which extend beyond final payment.

**§ A.1.5.5.2** If the Contract Sum is based on the Cost of the Work, the Owner's auditors will review and report in writing on the Design-Builder's final accounting within 30 days after the Design-Builder delivers the final accounting to the Owner. Based upon the Cost of the Work the Owner's auditors report to be substantiated by the Design-Builder's final accounting, and provided the other conditions of Section 9.10 of the Agreement have been met, the Owner will, within seven days after receipt of the written report of the Owner's auditors, either issue a final Certificate for Payment, or notify the Design-Builder in writing of the reasons for withholding a certificate as provided in Section 9.5.1 of the Agreement.

## ARTICLE A.2    CONTRACT TIME
**§ A.2.1** Contract Time, as defined in the Agreement at Section 1.4.13, is the period of time, including authorized adjustments, for Substantial Completion of the Work.

**§ A.2.2** The Design-Builder shall achieve Substantial Completion of the Work not later than « » ( « » ) days from the date of this Amendment, or as follows:
*(Insert number of calendar days. Alternatively, a calendar date may be used when coordinated with the date of commencement. If appropriate, insert requirements for earlier Substantial Completion of certain portions of the Work.)*

See Project Schedule attached as **Exhibit A2** to this Amendment, which includes, but not limited to:

| | |
|---|---|
| Substantial Completion date: | September 12, 2021 |
| Final Completion date: | September 30, 2021 |

The Substantial Completion date and/or Final Completion date are subject to change due to problems beyond the reasonable control of the Design-Builder, including but not limited to extreme weather, unforeseen site issues not caused by Design-Builder, and/or widespread health issues, including mandated stoppages related to Covid-19.

## ARTICLE A.3    INFORMATION UPON WHICH AMENDMENT IS BASED
**§ A.3.1** The Contract Sum and Contract Time set forth in this Amendment are based on the following:

**§ A.3.1.1** The Supplementary and other Conditions of the Contract:

| Document | Title | Date | Pages |
|---|---|---|---|
| N/A | | | |

**§ A.3.1.2** The Specifications:
*(Either list the specifications here or refer to an exhibit attached to this Amendment.)*

« »

| Section | Title | Date | Pages |
|---|---|---|---|
| N/A | | | |

**§ A.3.1.3** The Drawings:
*(Either list the drawings here or refer to an exhibit attached to this Amendment.)*

*See* Construction Documents, dated June 16, 2021, as well as the Scope of Services, dated July 29, 2021, collectively attached as **Exhibit A3** to this Amendment.  Any change(s) after June 24, 2021 will be over and above the Stipulated Sum/Guaranteed Maximum of $16,000,000 and will be documented in a Change Order(s).

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
(944009319)

| Number | Title | Date |
|--------|-------|------|
|        |       |      |

**§ A.3.1.4** The Sustainability Plan, if any:
*(If the Owner identified a Sustainable Objective in the Owner's Criteria, identify the document or documents that comprise the Sustainability Plan by title, date and number of pages, and include other identifying information. The Sustainability Plan identifies and describes the Sustainable Objective; the targeted Sustainable Measures; implementation strategies selected to achieve the Sustainable Measures; the Owner's and Design-Builder's roles and responsibilities associated with achieving the Sustainable Measures; the specific details about design reviews, testing or metrics to verify achievement of each Sustainable Measure; and the Sustainability Documentation required for the Project, as those terms are defined in Exhibit C to the Agreement.)*

| Title | Date | Pages |
|-------|------|-------|
| N/A   |      |       |

*Other identifying information:*

« »

**§ A.3.1.5** Allowances and Contingencies:
*(Identify any agreed upon allowances and contingencies, including a statement of their basis.)*

 **.1** Allowances

 N/A

 **.2** Contingencies

 N/A

**§ A.3.1.6** Design-Builder's assumptions and clarifications:  Any change(s) after June 24, 2021 will be over and above the Stipulated Sum/Guaranteed Maximum of $16,000,000 and will be documented in a Change Order(s).

« »

**§ A.3.1.7** Deviations from the Owner's Criteria as adjusted by a Modification:

« »

**§ A.3.1.8** To the extent the Design-Builder shall be required to submit any additional Submittals to the Owner for review, indicate any such submissions below:

« »

**ARTICLE A.4    DESIGN-BUILDER'S PERSONNEL, CONTRACTORS AND SUPPLIERS**
**§ A.4.1** The Design-Builder's key personnel are identified below:
*(Identify name, title and contact information.)*

 **.1** Superintendent

 « »

 **.2** Project Manager

 « »

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
(944009319)

**5**

.3   Others



**§ A.4.2** The Design-Builder shall retain the following Consultants, Contractors and suppliers, identified below:
*(List name, discipline, address and other information.)*

## ARTICLE A.5   COST OF THE WORK
**§ A.5.1 Cost To Be Reimbursed as Part of the Contract**
**§ A.5.1.1 Labor Costs**
**§ A.5.1.1.1** Wages of construction workers directly employed by the Design-Builder to perform the construction of the Work at the site or, with the Owner's prior approval, at off-site workshops.

**§ A.5.1.1.2** With the Owner's prior approval, wages or salaries of the Design-Builder's supervisory and administrative personnel when stationed at the site.
*(If it is intended that the wages or salaries of certain personnel stationed at the Design-Builder's principal or other offices shall be included in the Cost of the Work, identify below the personnel to be included, whether for all or only part of their time, and the rates at which their time will be charged to the Work.)*

| Person Included | Status (full-time/part-time) | Rate ($0.00) | Rate (unit of time) |
| --- | --- | --- | --- |
|  |  |  |  |

**§ A.5.1.1.3** Wages and salaries of the Design-Builder's supervisory or administrative personnel engaged at factories, workshops or on the road, in expediting the production or transportation of materials or equipment required for the Work, but only for that portion of their time required for the Work.

**§ A.5.1.1.4** Costs paid or incurred by the Design-Builder for taxes, insurance, contributions, assessments and benefits required by law or collective bargaining agreements and, for personnel not covered by such agreements, customary benefits such as sick leave, medical and health benefits, holidays, vacations and pensions, provided such costs are based on wages and salaries included in the Cost of the Work under Section A.5.1.1.

**§ A.5.1.1.5** Bonuses, profit sharing, incentive compensation and any other discretionary payments paid to anyone hired by the Design-Builder or paid to the Architect or any Consultant, Contractor or supplier, with the Owner's prior approval.

**§ A.5.1.2 Contract Costs.** Payments made by the Design-Builder to the Architect, Consultants, Contractors and suppliers in accordance with the requirements of their subcontracts.

**§ A.5.1.3 Costs of Materials and Equipment Incorporated in the Completed Construction**
**§ A.5.1.3.1** Costs, including transportation and storage, of materials and equipment incorporated or to be incorporated in the completed construction.

**§ A.5.1.3.2** Costs of materials described in the preceding Section A.5.1.3.1 in excess of those actually installed to allow for reasonable waste and spoilage. Unused excess materials, if any, shall become the Owner's property at the completion of the Work or, at the Owner's option, shall be sold by the Design-Builder. Any amounts realized from such sales shall be credited to the Owner as a deduction from the Cost of the Work.

**§ A.5.1.4 Costs of Other Materials and Equipment, Temporary Facilities and Related Items**
**§ A.5.1.4.1** Costs of transportation, storage, installation, maintenance, dismantling and removal of materials, supplies, temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Design-Builder at the site and fully consumed in the performance of the Work. Costs of materials, supplies, temporary facilities, machinery, equipment and tools that are not fully consumed shall be based on the cost or value of the item at the time it is first used on the Project site less the value of the item when it is no longer used at the Project site. Costs for items not fully consumed by the Design-Builder shall mean fair market value.

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

**§ A.5.1.4.2** Rental charges for temporary facilities, machinery, equipment and hand tools not customarily owned by construction workers that are provided by the Design-Builder at the site and costs of transportation, installation, minor repairs, dismantling and removal. The total rental cost of any Design-Builder-owned item may not exceed the purchase price of any comparable item. Rates of Design-Builder-owned equipment and quantities of equipment shall be subject to the Owner's prior approval.

**§ A.5.1.4.3** Costs of removal of debris from the site of the Work and its proper and legal disposal.

**§ A.5.1.4.4** Costs of document reproductions, electronic communications, postage and parcel delivery charges, dedicated data and communications services, teleconferences, Project websites, extranets and reasonable petty cash expenses of the site office.

**§ A.5.1.4.5** Costs of materials and equipment suitably stored off the site at a mutually acceptable location, with the Owner's prior approval.

### § A.5.1.5 Miscellaneous Costs
**§ A.5.1.5.1** Premiums for that portion of insurance and bonds required by the Design-Build Documents that can be directly attributed to the Contract. With the Owner's prior approval self-insurance for either full or partial amounts of the coverages required by the Design-Build Documents.  Owner has been aware of insurance coverage of Design-Builder from the inception of the Project.  Due to the urgent nature of the Project, Owner instructed Design-Builder to commence the Work at the earliest possible time.  Owner and Design-Builder have been in close contact since the Work began, including on site at the property, and on or about July 9, 2021, Owner advised Design-Builder of increased insurance requirements.  Since that time, Design Builder has been working to obtain insurance at the increased level and Owner has been kept abreast of the status of insurance.  Given the increase in insurance required, any increase in cost to Design-Builder will be passed along to Owner and Owner will bear the increase in cost, which cost will be added to the $16,000,000 Stipulated Sum/Guaranteed Maximum.

**§ A.5.1.5.2** Sales, use or similar taxes imposed by a governmental authority that are related to the Work and for which the Design-Builder is liable.

**§ A.5.1.5.3** Fees and assessments for the building permit and for other permits, licenses and inspections for which the Design-Builder is required by the Design-Build Documents to pay.

**§ A.5.1.5.4** Fees of laboratories for tests required by the Design-Build Documents, except those related to defective or nonconforming Work for which reimbursement is excluded by Section 15.5.3 of the Agreement or by other provisions of the Design-Build Documents, and which do not fall within the scope of Section A.5.1.6.3.

**§ A.5.1.5.5** Royalties and license fees paid for the use of a particular design, process or product required by the Design-Build Documents; the cost of defending suits or claims for infringement of patent rights arising from such requirement of the Design-Build Documents; and payments made in accordance with legal judgments against the Design-Builder resulting from such suits or claims and payments of settlements made with the Owner's consent. However, such costs of legal defenses, judgments and settlements shall not be included in the calculation of the Design-Builder's Fee or subject to the Guaranteed Maximum Price. If such royalties, fees and costs are excluded by the second to last sentence of Section 3.1.13.2 of the Agreement or other provisions of the Design-Build Documents, then they shall not be included in the Cost of the Work.

**§ A.5.1.5.6** With the Owner's prior approval, costs for electronic equipment and software directly related to the Work.

**§ A.5.1.5.7** Deposits lost for causes other than the Design-Builder's negligence or failure to fulfill a specific responsibility in the Design-Build Documents.

**§ A.5.1.5.8** With the Owner's prior approval, which shall not be unreasonably withheld, legal, mediation and arbitration costs, including attorneys' fees, other than those arising from disputes between the Owner and Design-Builder, reasonably incurred by the Design-Builder after the execution of the Agreement and in the performance of the Work.

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

**§ A.5.1.5.9** With the Owner's prior approval, expenses incurred in accordance with the Design-Builder's standard written personnel policy for relocation, and temporary living allowances of, the Design-Builder's personnel required for the Work.

**§ A.5.1.5.10** That portion of the reasonable expenses of the Design-Builder's supervisory or administrative personnel incurred while traveling in discharge of duties connected with the Work.

### § A.5.1.6 Other Costs and Emergencies
**§ A.5.1.6.1** Other costs incurred in the performance of the Work if, and to the extent, approved in advance in writing by the Owner.

**§ A.5.1.6.2** Costs incurred in taking action to prevent threatened damage, injury or loss in case of an emergency affecting the safety of persons and property.

**§ A.5.1.6.3** Costs of repairing or correcting damaged or nonconforming Work executed by the Design-Builder, Contractors or suppliers, provided that such damaged or nonconforming Work was not caused by negligence or failure to fulfill a specific responsibility of the Design-Builder and only to the extent that the cost of repair or correction is not recovered by the Design-Builder from insurance, sureties, Contractors, suppliers, or others.

### § A.5.1.7 Related Party Transactions
**§ A.5.1.7.1** For purposes of Section A.5.1.7, the term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Design-Builder; any entity in which any stockholder in, or management employee of, the Design-Builder owns any interest in excess of ten percent in the aggregate; or any person or entity which has the right to control the business or affairs of the Design-Builder. The term "related party" includes any member of the immediate family of any person identified above.

**§ A.5.1.7.2** If any of the costs to be reimbursed arise from a transaction between the Design-Builder and a related party, the Design-Builder shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. If the Owner, after such notification, authorizes the proposed transaction, then the cost incurred shall be included as a cost to be reimbursed, and the Design-Builder shall procure the Work, equipment, goods or service from the related party, as a Contractor, according to the terms of Section A.5.4. If the Owner fails to authorize the transaction, the Design-Builder shall procure the Work, equipment, goods or service from some person or entity other than a related party according to the terms of Section A.5.4.

### § A.5.2 Costs Not to Be Reimbursed as Part of this Contract
The Cost of the Work shall not include the items listed below:
- .1 Salaries and other compensation of the Design-Builder's personnel stationed at the Design-Builder's principal office or offices other than the site office, except as specifically provided in Section A.5.1.1;
- .2 Expenses of the Design-Builder's principal office and offices other than the site office;
- .3 Overhead and general expenses, except as may be expressly included in Section A.5.1;
- .4 The Design-Builder's capital expenses, including interest on the Design-Builder's capital employed for the Work;
- .5 Except as provided in Section A.5.1.6.3 of this Agreement, costs due to the negligence or failure of the Design-Builder, Contractors and suppliers or anyone directly or indirectly employed by any of them or for whose acts any of them may be liable to fulfill a specific responsibility of the Contract;
- .6 Any cost not specifically and expressly described in Section A.5.1; and
- .7 Costs, other than costs included in Change Orders approved by the Owner, that would cause the Guaranteed Maximum Price to be exceeded.

### § A.5.3 Discounts, Rebates, and Refunds
**§ A.5.3.1** Cash discounts obtained on payments made by the Design-Builder shall accrue to the Owner if (1) before making the payment, the Design-Builder included them in an Application for Payment and received payment from the Owner, or (2) the Owner has deposited funds with the Design-Builder with which to make payments; otherwise, cash discounts shall accrue to the Design-Builder. Trade discounts, rebates, refunds and amounts received from sales of surplus materials and equipment shall accrue to the Owner, and the Design-Builder shall make provisions so that they can be obtained.

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

**§ A.5.3.2** Amounts that accrue to the Owner in accordance with Section A.5.3.1 shall be credited to the Owner as a deduction from the Cost of the Work.

## § A.5.4  Other Agreements

**§ A.5.4.1** When the Design-Builder has provided a Guaranteed Maximum Price, and a specific bidder (1) is recommended to the Owner by the Design-Builder; (2) is qualified to perform that portion of the Work; and (3) has submitted a bid that conforms to the requirements of the Design-Build Documents without reservations or exceptions, but the Owner requires that another bid be accepted, then the Design-Builder may require that a Change Order be issued to adjust the Guaranteed Maximum Price by the difference between the bid of the person or entity recommended to the Owner by the Design-Builder and the amount of the subcontract or other agreement actually signed with the person or entity designated by the Owner.

**§ A.5.4.2** Agreements between the Design-Builder and Contractors shall conform to the applicable payment provisions of the Design-Build Documents, and shall not be awarded on the basis of cost plus a fee without the prior consent of the Owner. If an agreement between the Design Builder and a Contractor is awarded on a cost plus a fee basis, the Design-Builder shall provide in the agreement for the Owner to receive the same audit rights with regard to the Cost of the Work performed by the Contractor as the Owner receives with regard to the Design-Builder in Section A.5.5, below.

**§ A.5.4.3** The agreements between the Design-Builder and Architect and other Consultants identified in the Agreement shall be in writing. These agreements shall be promptly provided to the Owner upon the Owner's written request.

## § A.5.5 Accounting Records

The Design-Builder shall keep full and detailed records and accounts related to the cost of the Work and exercise such controls as may be necessary for proper financial management under the Contract and to substantiate all costs incurred. The accounting and control systems shall be satisfactory to the Owner. The Owner and the Owner's auditors shall, during regular business hours and upon reasonable notice, be afforded access to, and shall be permitted to audit and copy, the Design-Builder's records and accounts, including complete documentation supporting accounting entries, books, correspondence, instructions, drawings, receipts, subcontracts, Contractor's proposals, purchase orders, vouchers, memoranda and other data relating to the Contract. The Design-Builder shall preserve these records for a period of three years after final payment, or for such longer period as may be required by law.

## § A.5.6 Relationship of the Parties

The Design-Builder accepts the relationship of trust and confidence established by this Agreement and covenants with the Owner to exercise the Design-Builder's skill and judgment in furthering the interests of the Owner; to furnish efficient construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the Work in an expeditious and economical manner consistent with the Owner's interests.

This Amendment to the Agreement entered into as of the day and year first written above.

| **OWNER** *(Signature)* | **DESIGN-BUILDER** *(Signature)* |
|---|---|
| « »« » | « »« » |
| *(Printed name and title)* | *(Printed name and title)* |

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

**EXHIBIT A1**

**PROPOSAL**

**AIA Document A141™ – 2014 Exhibit A**. Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

**EXHIBIT A2**

**PROJECT SCHEDULE**

**AIA Document A141™ – 2014 Exhibit A**. Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

## EXHIBIT A3

## CONSTRUCTION DOCUMENTS and SCOPE OF SERVICES

**AIA Document A141™ – 2014 Exhibit A.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:36 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.

(944009319)

115511337v5

# EXHIBIT 6

# EXHIBIT 6

# AIA® Document A141™ – 2014  Exhibit B

## *Insurance and Bonds*

**for the following PROJECT:**
*(Name and location or address)*

OTE Center of Excellence
264 17th Street NW
Atlanta, Georgia 30363

**THE OWNER:**
*(Name, legal status and address)*

Overtime Elite, LLC
20 Jay Street, Suite 600
Brooklyn, New York 11201

**THE DESIGN-BUILDER:**
*(Name, legal status and address)*

AG Light and Sound Inc.
4660 Berg Street, Suite 130
North Las Vegas, Nevada 89081

**THE AGREEMENT**
This Insurance Exhibit is part of the accompanying agreement for the Project, between the Owner and the Design-Builder (hereinafter, the Agreement), dated the «19th » day of «August» in the year «2021».
*(In words, indicate day, month and year.)*

**TABLE OF ARTICLES**

B.1      GENERAL

B.2      DESIGN BUILDER'S INSURANCE AND BONDS

B.3      OWNER'S INSURANCE

B.4      SPECIAL TERMS AND CONDITIONS

**ARTICLE B.1     GENERAL**
The Owner and Design-Builder shall purchase and maintain insurance and provide bonds as set forth in this Exhibit B. Where a provision in this Exhibit conflicts with a provision in the Agreement into which this Exhibit is incorporated, the provision in this Exhibit will prevail.

**ARTICLE B.2     DESIGN BUILDER'S INSURANCE AND BONDS**
**§ B.2.1** Throughout the term of this Agreement (including any extensions thereof) and prior to the commencement of the Work and for the duration of the Project through Final Completion, the Design-Builder shall purchase and maintain the following types and limits of insurance from a company or companies lawfully authorized to do business in the jurisdiction where the Project is located. The Design-Builder shall maintain the required insurance until the expiration of the period for correction of Work as set forth in Section 11.2.2.1 of the Agreement, unless a different duration is stated below:

**ADDITIONS AND DELETIONS:** The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An *Additions and Deletions Report* that notes added information as well as revisions to the standard form text is available from the author and should be reviewed.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

**ELECTRONIC COPYING** of any portion of this AIA® Document to another electronic file is prohibited and constitutes a violation of copyright laws as set forth in the footer of this document.

**AIA Document A141™ – 2014 Exhibit B.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:43 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                (1282559563)
115511163v2

*(If the Design-Builder is required to maintain insurance for a duration other than the expiration of the period for correction of Work, state the duration.)*

« »

**§ B.2.1.1** Commercial General Liability with policy limits of not less than ($1,000,000) for each occurrence and ($2,000,000) in the aggregate (with per project/per location aggregate endorsements applicable to the Work pursuant to this Agreement) providing coverage for claims for arising out the performance of Work, including

.1   damages because of bodily injury, sickness or disease, including occupational sickness or disease, and death of any person;

.2   personal injury;

.3   damages because of injury to or destruction of tangible property;

.4   premises liability (for the Project site and related construction operations);

.5   bodily injury or property damage arising out of products-completed operations; and

.6   contractual liability applicable to the Design-Builder's obligations under the Agreement, including but not limited to Section 3.1.14 of the Agreement.

Said Commercial General Liability policy shall include coverage for use, operation and maintenance of mobile equipment, independent contractors, and coverage for XCU hazards.  With respect to the products-completed operations insurance, said coverage shall be maintained for a minimum period of three (3) years after Substantial Completion of the Work or until expiration of the applicable statute of repose, whichever is longer.

**§ B.2.1.2** Automobile Liability insurance covering liability arising out of the ownership, maintenance or use of any auto (including owned, hired, and non-owned autos, trucks and other vehicles) by the Design-Builder and its contractors in the performance of Work on this Project, with limits not less than $1,000,000 each accident combined single limit for bodily injury and property damage; and Auto Physical Damage insurance providing coverage for Comprehensive and Collision losses to such autos. Said policy shall cover bodily injury, death of any person, and property damage arising out of the ownership, maintenance and use of any autos specified in this Section B.2.1.2, along with any other statutorily required automobile coverage.

**§ B.2.1.3** The Design-Builder may achieve the required limits and coverage for Commercial General Liability and Automobile Liability through a combination of primary and Umbrella/Excess liability insurance, provided such primary and excess insurance policies result in the same or greater coverage as those required under Sections B.2.1.1 and B.2.1.2.

**§ B.2.1.4** Workers' Compensation insurance covering all employees of Design-Builder and its contractors performing Work on the Project, with statutory coverage and limits, and Employers' Liability coverage with limits not less than $1,000,000 each accident, $1,000,000 disease-each employee and $1,000,000 disease-policy limit

**§ B.2.1.5** Umbrella/Excess Liability insurance with limits not less than $10,000,000 each occurrence and in the aggregate shall apply in excess of and on a following form basis to the underlying Commercial General Liability, Automobile Liability and Employer's Liability policy limits.

« »

**§ B.2.1.6** Professional Liability covering negligent acts, errors and omissions in the performance of professional services, including Design-Build Work related to this Project, performed by Design-Builder or its Architect, Consultants, and Contractors, with policy limits of not less than $5,000,000 per claim and in the aggregate.  To the extent such coverage is written on a claims-made policy form (rather than an occurrence form), the discovery period for insurance claims (tail coverage) will be at least 3 years from the date of Substantial Completion of the Work, or the statute of repose, whichever is greater.

**§ B.2.1.7** Pollution Liability with policy limits of not less than ($5,000,000  per claim and in the aggregate. Said policy shall include coverage for third-party environmental liability claims for bodily injury, property damage, defense, and cleanup as a result of pollution conditions (sudden/accidental and gradual) arising from construction operations in the performance of Work by or on behalf of the Design-Builder or any of its Contractors.  Said policy shall include

**AIA Document A141™ – 2014 Exhibit B.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:43 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                                        (1282559563)
115511163v2

2

coverage for liability arising out of any Hazardous Materials or explosives introduced to the Site by Design-Builder or its Contractors and to the extent any existing condition at the Project site is caused by the presence of pre-existing Hazardous Materials is exacerbated by the negligent actions of the Design-Builder or its Contractors.

**§ B.2.1.7.1** The Design-Builder may obtain a combined Professional Liability and Pollution Liability policy to satisfy the requirements set forth in Sections B.2.1.6 and B.2.1.7, with combined policy limits that are not less than $ 10,000,000 per claim and in the aggregate.

**§ B.2.1.8** <u>Contractors Equipment Property</u> insurance covering theft, loss or damage to any materials, supplies, temporary facilities, machinery, equipment and tools, whether owned, leased, rented, borrowed or otherwise in the care, custody and control of the Design-Builder or its Contractors for use in the performance of Work on the Project. Said policy shall be written on an "all risk" special causes of loss policy form for the full replacement cost of such property.

**§ B.2.1.9** <u>Builder's Risk Property</u> insurance covering loss or damage to the Work during the course of construction (including any portions of the Work manufactured and stored off the Project site, portions of the Work while in transit to the Project site, and the Work at the Project site). The policy shall be written on a "all-risk" special causes of loss or equivalent builder's risk policy form in the amount of the initial Contract Sum, plus the value of subsequent Modifications and cost of materials supplied or installed by others, comprising the total value for the entire Project at the site on a replacement cost basis. The policy shall insure against the perils of fire (with extended coverage) and physical loss or damage including, without duplication of coverage, theft, vandalism, malicious mischief, collapse, earthquake, flood, windstorm, falsework, testing and startup, temporary buildings and debris removal, including demolition occasioned by enforcement of any applicable legal requirements, and shall cover reasonable compensation for the Design-Builder's services and expenses required as a result of such insured loss. The ipolicy shall include the interests of the Owner, Design-Builder, Architect, Consultants, Contractors, and Subcontractors in the Project, with the Owner included as a Loss Payee with respect to its insurable interests.. The property insurance shall be maintaineda until a Certificate of Substantial Completion in accordance with Section 9.8 of the Agreement has been issued. Unless the parties agree otherwise, upon issuance of a Certificate of Final Completion, the Owner shall replace the Builder's Risk insurance policy with another property insurance policy written for the total value of the Project to insure the Owner's interests moving forward.

**Other Insurance Requirements**

<u>Carrier Requirement:</u>
All policies shall be written by insurance companies authorized to do business in the State of Georgia with A.M. Best ratings acceptable to the Owner.

<u>Primary and Non-contributory Requirement:</u>
All such insurance required above shall be primary to and non-contributory with any insurance maintained by the Owner,

<u>Notice Requirement:</u>
The Design-Builder shall provide at least thirty (30) days prior written notification to the Owner of the cancellation, expiration or material change in coverage to of any insurance required by this Article B.2. The Design-Builder shall provide such written notice within five (5) business days of the date the Design-Builder is first aware of the cancellation, expiration or material change is threatened or otherwise may occur, whichever comes first.

**Additional Insured Obligations:** The Owner and the entities listed in Sec. 1.2.1 of the Agreement shall be additional insureds on the Design-Builder's Commercial General Liability, Automobile Liability, Pollution Liability and Umbrella/Excess Liability policies. The additional insured coverage shall apply to both ongoing operations and completed operations. The policy limits applicable to the additional insureds shall be the same amount applicable to the named insured or, if the policy provides otherwise, policy limits not less than the amounts required under this Agreement.

<u>Loss Payee Requirement:</u>
Owner shall be included as a Loss Payee under the Builders Risk and Contractors Equipment property insurance policies, but only with respect to the Owner's insurable interests.

**AIA Document A141™ – 2014 Exhibit B.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:43 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
User Notes:                                                                                                                              (1282559563)

3

115511163v2

Waiver of Subrogation Requirement:
A waiver of subrogation in favor of Owner and the entities listed in Sec. 1.2.1 of the Agreement shall apply under all insurance policies to be maintained by Design-Builder and its Contractors.

Deductibles or Self-Insured Retentions:
Design-Builder shall bear all costs of all deductibles or self-insured retentions that apply under its insurance policies, and Design-Builder shall remain solely and fully liable for the full amount of any claim not covered by insurance.

No Limitation of Liability:
It is hereby agreed and understood that the insurance requirements shall not be construed as in any manner waiving, restricting or limiting the liability of the Design-Builder with respect to obligations imposed under this Agreement.

Design-Builder Parties:
To the extent that Design-Builder engages any Architects, Contractors or other parties to perform any Work on the Project, Design-Builder will require such parties to maintain appropriate insurance on similar terms to what is required of Design-Builder pursuant to this Agreement.

Certificates of Insurance:

**Certificates of Insurance.** The Design-Builder shall provide certificates of insurance acceptable to the Owner evidencing compliance with the insurance requirements in this Agreement, including Article B.2: (1) prior to commencement of the Work; (2) upon renewal or replacement of each required policy of insurance; and (3) upon Owner's written request. An additional certificate evidencing continuation of liability coverage, including coverage for completed operations, shall be submitted with the final Application for Payment as required by Section 9.10.2 of the Agreement and thereafter upon renewal or replacement of such coverage until the expiration of the time required by Section B.2.1. Information concerning reduction of coverage on account of revised limits, claims paid under the General Aggregate or both, shall be furnished by the Design-Builder with reasonable promptness.

### § B.2.2 Performance Bond and Payment Bond
The Design-Builder shall provide surety bonds as follows:
*(Specify type and penal sum of bonds.)*

| Type | Penal Sum ($0.00) |
| --- | --- |
|  |  |

### § B.2.2.1 Upon the request of any person or entity appearing to be a potential beneficiary of bonds covering payment
of obligations arising under the Agreement, the Design-Builder shall promptly furnish a copy of the bonds or shall permit a copy to be made.

### ARTICLE B.3   OWNER'S INSURANCE
### § B.3.1 Owner's Liability Insurance
The Owner shall be responsible for purchasing and maintaining the Owner's usual liability insurance.  Such coverage shall be secondary to and non-contributory with the General Liability and Umbrella/Excess Liability insurance required to be maintained by the Design-Builder for the performance of Work on the Project site.

### ARTICLE B.4   SPECIAL TERMS AND CONDITIONS
Special terms and conditions that modify this Insurance and Bonds Exhibit, if any, are as follows:

« »

**AIA Document A141™ – 2014 Exhibit B.** Copyright © 2004 and 2014 by The American Institute of Architects. All rights reserved. The "American Institute of Architects," "AIA," the AIA Logo, and "AIA Contract Documents" are registered trademarks and may not be used without permission. This draft was produced by AIA software at 13:54:43 ET on 04/14/2021 under Order No.2932225966 which expires on 12/14/2021, is not for resale, is licensed for one-time use only, and may only be used in accordance with the AIA Contract Documents® Terms of Service. To report copyright violations, e-mail copyright@aia.org.
**User Notes:**                                                                                                                    (1282559563)
115511163v2

# EXHIBIT 7

# EXHIBIT 7

**John Aldrich**

| | |
|---|---|
| **From:** | Aaron Ryan <aaron@overtimeelite.com> |
| **Sent:** | Thursday, February 17, 2022 10:56 AM |
| **To:** | Andrew Gumper |
| **Cc:** | Farzeen Ghorashy; jason.mclarry@troutman.com; Matthew M. Quirin; Lloyd E. Davidson; Andrew Eiger; John Aldrich |
| **Subject:** | OTE Center of Excellence: Notice of Nonconformance; Owner's Right to Cure |
| **Attachments:** | AG Light and Sound Notice (2.17.22).pdf |

Please see the attached letter.

Thank you,

Aaron

--

Aaron Ryan
*Commissioner & President*
**Overtime Elite**
aaron@overtimeelite.com
732.882.2766

February 16th, 2022



**VIA E-MAIL and FEDERAL EXPRESS**
Andrew Gumper
andrew@ag.tc
President and Project Lead
AG Light and Sound, Inc.
4660 Berg Street, Suite 130
North Las Vegas, Nevada  89081

Subject:     OTE Center of Excellence: Notice of Nonconformance; Owner's Right to Cure

Notice of Intent to Terminate for Cause - Agreement Between Owner and Design
Builder dated August 19, 2021 (the "Agreement")

Dear Mr. Gumper:

As you know, AG Light and Sound, Inc. ("Design Builder") is responsible for Design and
Construction of the Overtime Elite Basketball Arena located at 230 17th Street NW in Atlanta,
Georgia (30363).  Design Builder has failed to complete the work, failed to correct defective
work, and not been on-site since November 2021.  In addition, Design Builder has not provided
a Design-Builders' Schedule as required in section 3.1.9 of the Agreement.

Design Builder has not paid Architects, Consultants or Contractors amounts due that have
been paid to Design Builder by Owner as required by section 9.6.2 of the Agreement.  The lack
of distribution of payments from the Design Builder has forced the owner to remove liens and
settle with the Architects, Consultants and Contractors at great expense to Owner, see Exhibit A,
attached.  Owner demands Design Builder reimburse Owner for all cost incurred by Owner as a
result of Design Builder's failure to make timely payment of undisputed amounts as required by
the Agreement.

Design Builder's material breaches of the Agreement have left Owner no choice but to
complete the Project and take corrective actions to defective work performed by the Design
Build Contractor, that was not in accordance with the Contract Documents and not installed in a
professional manner per Article 3 of the Agreement.  This has and will continue to come at great
cost of the Owner, see Exhibit A, attached.  Owner demands Design Builder to reimburse Owner
for all costs incurred by Owner.

Finally, as a result of the foregoing material breaches of the Agreement, this letter constitutes Owner's notice under Sections 13.2.2.1 and 13.2.2.2 of the Design Build Agreement and starts the seven-day notice period under Section 13.2.2.2 of the Design Build Agreement. Owner's costs to correct and complete the Work will greatly exceed the remaining Contract Balance. Owner expects Design Builder to reimburse it for all such excess costs as required by the Agreement.

Owner reserves all rights and positions, both under the Agreement and at law.

Sincerely,

Aaron Ryan

Commissioner and President - Overtime Elite

CC Farzeen Ghorashy, Jason McLarry, Matthew Quirin, Andrew Eiger, John Aldrich and Lloyd Davidson

Attachments:

Exhibit A

EXHIBIT A

| Subonctractor/Vendor Settlement | |
| --- | --- |
| **Subcontractor** | **Value** |
| ADJ Products LLC | $2,812 |
| Airgas | $845 |
| Atlanta Rigging & Staging Services | $23,385 |
| B&B Services | $1,200,000 |
| BearCom Rentals | $1,605 |
| Bedrock Logistics | $18,495 |
| Black Raven Films | $3,500 |
| Building Workshop | $150,070 |
| Custom Cable Corp. | $834 |
| Curtis Steel | $14,000 |
| Dave Thormahlen | $1,145 |
| Design Management Group | $7,000 |
| Exclusive Networks USA Inc. | $5,000 |
| Ferguson Enterprises, LLC | $13,686 |
| Foursquare Roofs & Walls | $25,816 |
| George Richardson, Inc. | $4,710 |
| Granite Decoration and Investment AP | $3,700 |
| Holden & Associates | $11,540 |
| IC - Briggs, Nathan | $8,400 |
| IC - Collins, Curtis | $2,640 |
| IC - Fennell, Daniel | $7,104 |
| IC - Sclafani, Andrew (Cyanic) | $3,300 |
| IC - Harris Shannon | $6,144 |
| IC - Lortz, Corey | $2,269 |
| Jose Luis Baide | $775 |
| Anmi Saddaid Flores | $2,010 |
| Irvin David Matute Moradel | $525 |
| Jose Armando Ochoa | $1,900 |
| Jose Richard Medina Villagran | $1,675 |
| Carlos Juarez Villanueva | $2,190 |
| Daniel Lopez Villanueva | $1,400 |
| Jamar Waldron | $1,750 |
| Infra-Metals | $983 |
| Johnson Controls Fire Protection | $625,000 |
| JW & Company Inc. | $19,301 |
| Knight Construction & Associates | $602,712 |
| L&W Supply Corporation | $423,704 |
| Lala Productions, LLC | $199,802 |
| LED Systems LLC | $3,375 |
| Live Event Display of Atlanta | $1,300 |
| Ludovico Group LLC | $220,000 |
| LV Iron and Steel | $19,000 |
| McMaster-Carr | $98 |
| Mid-South Lumber | $5,781 |

| | |
|---|---:|
| Miller Rosentel Associates, Inc | $17,522 |
| National Construction Rentals, Inc. | $1,181 |
| Nationwide Logistics | $980 |
| New DirexWest Corp | $189,000 |
| Nova Engineering and Environmental, LLC | $8,836 |
| Otis Elevator Company | $91,400 |
| Panel Built, Inc. | $87,575 |
| Permitting Consultants | $5,000 |
| Porter, Caleb | $139 |
| Red-D-Arc, Inc | $1,216 |
| Republic Services #620 | $18,614 |
| Rose Brand | $9,078 |
| SUNBELT Rentals | $292,742 |
| Terminus Specialties | $10,000 |
| Theta Consulting LLC | $7,000 |
| TOURtechSupport Inc. | $300,000 |
| Trudoor, LLC | $7,000 |
| Uline | $4,962 |
| Unlimited Structures, LLC | $700,000 |
| Vanguard Commercial Flooring | $55,000 |
| Vegas Electric Supply | $44,842 |
| Vicinity Energy Atlantic Station, LLC | $58,000 |
| **Subtotal** | **$5,561,368** |

| DAY 2 Work - AG Owed Scope | |
|---|---|
| **Item** | **Value** |
| Pool Install | $150,000.00 |
| Insulation Domestic Water | $ 12,000.00 |
| Electrical Repairs as of Now | $ 48,500.00 |
| Electrical Inspection and Fix | $ 20,000.00 |
| Electrical Repairs | $100,000.00 |
| Temporary Controls | $ 15,000.00 |
| Install Doors/Hardware/ADA Showers (Complete Carp) | $ 39,600.00 |
| Painting/Patching/Carpet | $175,000.00 |
| Move BC-4 | $ 17,000.00 |
| Hammer Arrester Plumbing Issue | $ 65,000.00 |
| Install Ships Ladder (3) | $ 15,000.00 |
| ReKey Building, Fix Glass Doors on exterior, Fix All Doors | $ 75,000.00 |
| Access Control Building | $100,000.00 |
| Roof Leak Issue, | $ 2,000.00 |
| Plumbing Fixes, Floor Drains for Tubs, | $ 25,000.00 |
| Lighting Grid for Broadcast Booth | $ 16,000.00 |
| Lighting Grid for Studio | $ 49,000.00 |
| Track Lighting for Control Room | $ 21,000.00 |
| LV/Electrical Topology and Certification | |
| Structural/Rigging Engineering | $ 20,000.00 |

| | |
|---|---|
| Smoke Contol System (Owed in Contract Documents) | $500,000.00 |
| **Subtotal** | **$1,465,100** |

| Direct payment by OTE for TCO | |
|---|---|
| **Subcontractor/Item** | **Value** |
| Door Procurement | $ 75,000 |
| Door Install/Carpentry | $ 23,046 |
| Reinstall Condensate Drain, Check Valve | $ 50,000 |
| HVAC (Admiral) | $ 800,000 |
| Piping/Chilled Water (JCI) | $ 770,225 |
| Additional Electrical Labor | $ 329,000 |
| Overtime HVAC Duct Modiciations - JCI | $ 13,500 |
| RPZ for Chilled Water - JCI | $ 14,000 |
| **Subtotal** | **$2,074,771** |

| | |
|---|---|
| **TOTAL** | **$9,101,239** |

# EXHIBIT 8

# EXHIBIT 8

## John Aldrich

| | |
|---|---|
| **From:** | Aaron Ryan <aaron@overtimeelite.com> |
| **Sent:** | Monday, February 28, 2022 5:58 AM |
| **To:** | Andrew Gumper |
| **Cc:** | Farzeen Ghorashy; Lloyd E. Davidson; jason.mclarry@troutman.com; Matthew M. Quirin; John Aldrich; Andrew Eiger; Aaron Ryan |
| **Subject:** | Overtime Notice of Termination to AG Light |
| **Attachments:** | Overtime Notice of Termination to AG Light .pdf |

Please see the attached letter.

Thank you,

Aaron

--

Aaron Ryan
*Commissioner & President*
**Overtime Elite**
aaron@overtimeelite.com
732.882.2766



February 24, 2022

**VIA E-MAIL and FEDERAL EXPRESS**
Andrew Gumper
andrew@ag.tc
President and Project Lead
AG Light and Sound, Inc.
4660 Berg Street, Suite 130
North Las Vegas, Nevada 89081

Subject:     OTE Center of Excellence: Notice of Nonconformance; Owner's Right to Cure
Notice of Termination for Cause – Agreement Between Owner and Design-Builder
dated August 19, 2021 (the "Agreement")

Mr. Gumper:

     We have received no response from AG Light and Sound Inc. ("Design-Builder") in response to our correspondence dated February 16, 2022. Design Builder has not completed the work required by the Agreement, has failed to correct defective work, has not provided a Design-Builder's Schedule as required by the Agreement, and has not cured its failure to provide payments to Architects, Consultants, or Contractors as required by the Agreement.

     Having provided the required seven-day notice under Section 13.1.4 and 13.2.2.2 of the Agreement, Owner hereby terminates the employment of the Design-Builder for cause. Owner hereby expressly reserves, and will pursue, all rights and remedies available to it under the Agreement and applicable law. As indicated in our February 16 letter, those remedies include, but are not limited to, recovery of all costs incurred to complete and correct Design-Builder's incomplete and non-conforming work, cost to settle claims and liens of unpaid contractors and suppliers, as well as legal and other fees Owner is incurring as a result of Design-Builder's material breaches of the Agreement. Owner is continuing to incur these costs, which greatly exceed the remaining contract balance.

Sincerely,

Aaron Ryan
Commissioner and President, Overtime Elite

cc via email:
Farzeen Ghorashy
Lloyd Davidson
Jason McLarry, Esq.
Matthew Quirin, Esq.
Andrew Eiger, Esq.
John Aldrich, Esq.